IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil No.: 08 C 50081 |
| vs. | ) ) | Judge Philip Rinehard |
| DONNA QUAM, | ) ) | Magistrate Judge P. Michael Mahoney |
| Defendant. | ) ) ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

On March 31, 2008, Defendant Quam ("Defendant") was suspended from Ameriprise Financial Services, Inc. ("Ameriprise Financial") for violating company policy after a compliance investigation by Ameriprise Financial. Her affiliation with the Company was subsequently terminated approximately three weeks later. Ameriprise Financial has learned that during her suspension Quam contacted many Ameriprise Financial clients she had serviced to encourage them to leave Ameriprise Financial and join her at another broker dealer. These contacts have continued after Quam's suspension. Quam's conduct was and is in clear violation of her Franchise Agreement and threatens Ameriprise Financial with irreparable harm.

What is even more disturbing is the manner in which Quam chose to violate her contractual obligations to Ameriprise Financial, as well as Illinois law. Quam contacted clients questioning the ethics of Ameriprise Financial and its advisors. Quam also called an elderly retired couple, falsely telling them that Ameriprise Financial had frozen their accounts. The elderly couple was "besides themselves" with grief for four or five nights. Of course, the accounts had never been frozen -- Quam's statements to this couple were lies designed to

persuade them to move their accounts away from Ameriprise Financial.

Quam has left Ameriprise Financial with no choice but to file this action. Ameriprise Financial respectfully asks this Court to issue a temporary restraining order to preserve the *status quo* until a panel of FINRA can hear Ameriprise Financial.[1]

## I. BACKGROUND

### A.    <u>Defendant's Affiliation With Ameriprise Financial</u>

Defendant formerly served as an Ameriprise Financial representative under a Franchise Agreement which became effective on or about March 22, 2000. Affidavit of Kim Wilson, ¶ 2 ("Wilson Aff."), Exhibit A. The Franchise Agreement entitled Quam to operate an Independent Financial Advisory Business for the Company. The Agreement sets forth her business relationship with the Company, as well as her continuing obligations following the termination of that relationship. (Wilson Aff. ¶ 2). Among other things, the Franchise Agreements required Defendant, upon termination from Ameriprise Financial, to return confidential and proprietary business records, including the records of the clients she served on behalf of Ameriprise Financial, and to refrain, for a one-year period after termination, from soliciting and directing investment and insurance business of the Ameriprise Financial clients with whom she had worked or whom she had learned of while employed by Ameriprise Financial. (Wilson Aff. ¶ 2, Ex. A at ¶¶ 10, 18-19). Specifically, Quam recognized in the Franchise Agreement that, as an Ameriprise Financial financial advisor, she received numerous benefits. In recognition of these

---

[1]  FINRA Rule 13804 requires that an expedited hearing be held before FINRA within 15 days after this Court issues a temporary restraining order. In other words, if this Court issues a temporary restraining order, all further proceedings will transfer to FINRA and an expedited hearing will commence within 15 days. If this Court denies the temporary restraining order, the proceedings will still transfer to FINRA, but there will be no expedited hearing on Ameriprise Financial's request for injunctive relief.

benefits, to protect the confidentiality of Ameriprise Financial's client information and to protect

its goodwill, Quam contractually agreed that while affiliated with Ameriprise Financial, and for

one year after the expiration or termination of her Franchise Agreement, she would not, among

other things:

> a.      (1) Encourage, . . . , induce, or attempt to induce any Client or
> prospective business or customer to terminate an agreement with
> [Ameriprise Financial], [Ameriprise Financial]'s affiliates, Issuers, or any
> financial advisor business under the system; (2) Encourage, induce, or
> attempt to induce any Client or prospective business or customer to
> terminate, surrender, redeem, or cancel any action related to Products &
> Services acquired or ordered from or through [Ameriprise Financial],
> [Ameriprise Financial]'s affiliates, Issuers, or any financial advisor
> business under the System, except as provided in the Manuals or with
> [Ameriprise Financial]'s written approval and consent; (3) Solicit any
> Clients that Independent Advisor contacted, services or learned about
> while operating under this Agreement to open an account other than an
> [Ameriprise Financial] account or to sell any investment, financial or
> insurance products or services other than through [Ameriprise Financial]
> with [Ameriprise Financial]'s written approval and consent; or . . . (5)
> Disparage [Ameriprise Financial], its affiliates, employees, advisors, and
> Products & Services.

(Ex. B at § 19).

The Franchise Agreements also contained an Addendum 3-R (Rollout) Restrictive

Covenant Addendum ("Addendum 3-R") pursuant to which Ameriprise Financial agreed to

forbear from the enforcement of the post-termination restrictions under the Franchise

Agreements if Defendant satisfied certain minimal conditions.  (Wilson Aff. ¶ 2, Ex. A, pg. 41).

Under Addendum 3-R, those conditions include that the advisor must give two weeks notice; she

not engage in pre-termination solicitation of clients; she not be under investigation or subject to

discipline as a result of a violation of Ameriprise Financial's Compliance Rules; she not

disparage Ameriprise Financial, its advisors or its products/services; and she has otherwise

complied with the termination obligations specified in the Franchise Agreement.  (Wilson Aff. ¶

2, Ex. A, pg. 41).  Defendant failed to satisfy several of these conditions, including that she was

under a compliance investigation, she engaged in pre-termination solicitation and disparaged Ameriprise Financial and its advisors.  See infra.  Accordingly, Defendant is subject to the post-termination limitations listed in Section 19 of her Franchise Agreement.

**B.**      **Defendant Was Suspended After An Investigation And Then Terminated.**

Defendant was an Ameriprise Financial advisor until her suspension for 90 days on March 31, 2008.  (Wilson Aff. ¶ 3).  That suspension for breach of company policy occurred after a compliance investigation by Ameriprise Financial.  Id.  The suspension letter also outlined exactly what Quam was not allowed to do as of the date of her suspension.  The letter stated, among other things, that "As a result of this suspension you cannot contact any Ameriprise Financial clients for business purposes.  You must immediately turn over all client records and files upon request.  During the suspension period you will not receive any compensation.  You will receive the compensation that you were eligible to after termination." Id.

Shortly after her suspension, Ameriprise Financial learned that Defendant had contacted Ameriprise Financial clients for business purposes to convince them to move their assets away from Ameriprise Financial, which was a violation of her Franchise Agreement.  (Wilson Aff. ¶ 4),  Affidavit of Kirk Osborne ¶ 2 ("Osborne Aff.")(Ex. C), Affidavit of Dina Malstaff ¶ 2 ("D. Malstaff Aff.") (Ex. D), and Affidavit of Ron Malstaff ¶ 2 ("R. Malstaff. Aff.") (Ex. E). Based on those violations, Ameriprise Financial terminated Defendant before the 90-day suspension period had ended.  (Wilson Aff. ¶ 4, Ex. A).  Accordingly, on or about April 18, 2008, the Company delivered a Termination Notice letter to Defendant.  (*See* Complaint, Ex. C)  This letter requested that Defendant comply with all of her post-termination obligations, in order to

99999-0678/LEGAL14261154.2
99999-0678/LEGAL14262143.1

avoid legal action. (Wilson Aff. ¶ 4, Ex. A). Even after her termination, Defendant continued to violated her post-termination obligations.[2]

## C.    **Defendant's Wrongful Conduct**

Quam's conduct before and after her termination was similar. For example, Quam called two clients, (an 87 and 89 year old husband and wife) on two different occasions after she was suspended from Ameriprise Financial. This call was during the time that Quam was prohibited from contacting clients for any business purpose as a result of her suspension. Quam told these clients that people at Ameriprise Financial were trying to take away her business and ruin her integrity. Quam also said that she wanted this couple to stay with her as clients when she moved to another broker dealer. In the first call, Quam said she would be moving to Wachovia. In the second call, she said she would be moving to Fidelity. Quam asked this couple to keep this business contact a secret. She told this couple that they should not tell anyone at Ameriprise Financial that she had called because she is not supposed to be contacting clients. See D. Malstaff Affidavit, ¶ 2 ("D. Malstaff Aff.") (Ex. D).

What is even more disturbing is that Quam was willing to use fear and deception to move at least these clients away from Ameriprise Financial. About two or three weeks after Quam was suspended, and either just before or just after her termination, Quam called this same elderly couple and told them that **Ameriprise Financial had frozen their assets**. The couple was beside themselves with grief and could not sleep, and were forced to take sleeping pills for four or five nights just so they could sleep. The representations made by Quam were, of course, false. Their accounts had not been frozen by Ameriprise Financial. Id. ¶ 2.

---

[2]  On or after April 24, 2008, nearly a week after her termination, and after having contacted clients soliciting them to leave Ameriprise Financial, Quam sent to the clients she serviced a letter stating in part that she is affiliated with Brewer Investment Group LLC in Chicago, Illinois.

In addition, after her suspension Quam called the home of Ron and Donna Malstaff, another client she had serviced. On one occasion, Quam stated that she was going to move to Wachovia, and then in a later communication stated she was moving to Fidelity. Quam asked the couple to move their assets with her away from Ameriprise Financial. She also asked these clients not to tell anyone that she had called their house because she was not supposed to do that. These clients also received Quam's letter dated April 24, 2008 ("R. Malstaff. Aff..).

On May 2, 2008, Ron Malstaff went to lunch with a group of people. After he finished, and was starting to leave the restaurant, he heard someone call out his name. It was Quam. He saw Quam sitting at a table with two elderly people who he assumed were other Quam clients. Quam asked if she could talk to Mr. Malstaff for a "second." Quam asked him if he had received her letter regarding her move to Brewer. He told her he had. Quam asked him what he thought. He told her that he had met with Joan Kelley at Ameriprise Financial and that he was planning on staying with Joan. Quam asked him why Joan, reminded him that he had her phone number, and indicated she wanted to talk further so she could tell Mr. Malstaff what went on and could give him "the scoop."

In addition, based upon additional inquiries by Ameriprise Financial, Quam contacted clients both during her suspension and after her termination in an effort to convince clients to move their assets from Ameriprise Financial to her new broker dealer. For example, Quam told Client A that she had placed her accounts on hold until she moved to "Fidelity" and then would move Client A's account over to "Fidelity." In addition, Ameriprise Financial has further learned that: (1) Quam has met with Clients B and C; (2) Clients B, C and D-N received at least one call from Quam after her termination from Ameriprise Financial; (3) Clients C-G, I, J and O intend to move their accounts to Quam; and (4) other clients are uncertain about their plans

99999-0678/LEGAL14261154.2
99999-0678/LEGAL14262143.1

whether to continue their relationship with Ameriprise Financial. In at least some of these meetings, Quam has disparaged Ameriprise Financial. (Osborne Aff.).

Although Defendant has already acted to harm Ameriprise Financial, she is capable of inflicting further, even greater harm to Ameriprise Financial and its clients based upon her conduct to date.

## II. ARGUMENT

### A.     Temporary Restraining Order Standard

A party seeking a temporary restraining order before this Court must show: (1) a likelihood of success on the merits; (2) that no adequate legal remedy exists; and (3) it will suffer irreparable harm if no injunctive relief is granted. *Long v. Bd. of Ed., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (stating identical standard for preliminary injunctions)). If these requirements have been met, courts must balance any irreparable harm that the nonmoving party will suffer if preliminary relief is granted against the irreparable harm the moving party will suffer if relief is denied. *Id.* Courts are to apply a "sliding scale" approach, under which "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.* The public interest in granting or denying preliminary relief should also be considered. *Id.*[3]

### B.     Ameriprise Financial Has a Significant Likelihood of Success on the Merits

---

[3]   In the Franchise Agreement, Defendant expressly agreed that Ameriprise is entitled to an injunction from the Court to keep them from violating their obligations. (See Complaint, Ex. A at ¶ 19 and Addendum 3-R at ¶ I (providing for a 45-day injunction)). Even if portions of this dispute may be eligible for FINRA arbitration, the Court has jurisdiction to grant injunctive relief pending that possible arbitration. *See IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 527 (7th Cir. 1996)(preliminary injunction hearings may go forward in Court even though dispute is subject to arbitration).

1.    Breach of Contract

    a.    Minnesota Law Applies to Breach of Contract Claim

The parties have agreed that the restrictive covenants are to be "interpreted and construed exclusively under the laws of the State of Minnesota." *See* Complaint, Ex. A.  Under Illinois law, courts "will enforce a contractual choice of law provision unless the law to be applied is repugnant to a strong and fundamental policy of Illinois or there is no relationship between the parties and the state whose law is to be applied." *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 405-06 (N.D. Ill. 2001) (citing *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 753 (Ill. Ct. App. 2nd Dist. 1987)); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1355 (N.D. Ill. 1990); *Boss v. American Express Financial Advisors, Inc.*, 844 N.E.2d 1142, 1144 (Ct.App.N.Y. 2006)(forum selection clauses are enforced because they provide certainty and predictability in the resolution of disputes).  This Court will apply the law of a foreign jurisdiction governing the validity of restrictive covenants where that law requires that such contracts be reasonable, including restrictions as to size and scope, and protect a legitimate business interest of the employer. *Labor Ready*, 149 F. Supp. 2d at 406; *Thera-Kinetics, Inc. v. Managed Home Recovery, Inc.*, No. 95 C 3821, 1997 WL 610305, at *3 (N.D. Ill. Sept. 29, 1997).  The law of the two states need not be identical. *Labor Ready*, 149 F. Supp. 2d at 407; *Thera-Kinetics*, 1997 WL 610305 at *3.  In fact, even if the differences in the laws is outcome determinative, the foreign state's laws will be applied. *Labor Ready*, 149 F. Supp. 2d at 407.  "Illinois courts have held that 'a court should not refuse to apply the law of a foreign state, however unlike its own, unless it is contrary to pure morals and abstract justice, or unless the enforcement would be of evil example and harmful to its people.'" *Id.* (quoting *Potomac Leasing*, 509 N.E.2d at 754).

Minnesota, like Illinois, requires that restrictive covenants be reasonably necessary to protect a legitimate business interest and be reasonable in scope and duration. *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 (Minn. 1980); *Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892, 899-900 (Minn. 1965). Accordingly, Minnesota law is not repugnant to a strong and fundamental policy of Illinois law. *Labor Ready*, 149 F. Supp. 2d at 407 (applying similar Washington law); *Thera-Kinetics*, 1997 WL 610305, at *3 (applying similar New Jersey law). Indeed, this Court has implicitly held as much by applying Minnesota law to a restrictive covenant in a virtually identical case between Ameriprise Financial and another former employee. *IDS Financial Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994).

Moreover, it cannot be said that Minnesota law bears no relationship to this dispute. Ameriprise Financial has its principal place of business in Minnesota and is allowed, consistent with Illinois law, to "use its choice-of-law provisions to ensure that its [] contracts are uniformly interpreted according to the laws of a single state." *Thera-Kinetics*, 1997 WL 610305, at *3; *ISC-Bunker*, 765 F. Supp. at 1335-36. Under such circumstances, this Court will apply the law of the chosen jurisdiction in interpreting the validity of the non-compete contract. *Id.*

b.    Defendants' Contracts Are Enforceable

A covenant not to compete is enforceable under Minnesota law if consideration was given for the covenant and if the restriction on the employee is reasonable to protect a legitimate interest. *Webb Publishing Co. v. Fosshage*, 426 N.W.2d 445, 449-450 (Minn. Ct. App. 1988); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698, 703-04 (Minn. Ct. App. 1989). In this case, the non-competition provisions in Defendant's Franchise Agreement is enforceable because it is supported by valid consideration and is of a reasonable scope to protect Ameriprise Financial's legitimate business interests.

- 9 -

i.    The agreements are supported by consideration

Defendant signed her restrictive covenant on or about December 17, 1999, at the commencement of her franchisee relationship with Ameriprise Financial which became effective March 22, 2000.  Minnesota law provides that a signing of such a covenant at the commencement of, and as a condition of, employment provides adequate consideration. *Overholt*, 437 N.W.2d at 702 (citing *National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982)).

ii.    The agreements are of a reasonable scope to protect Ameriprise
        Financial's legitimate business interests

Minnesota courts enforce non-competition agreements to the extent necessary to protect legitimate business interests. *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 (Minn. 1980) (citing *Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892, 899-900 (Minn. 1965)); *Webb Publishing*, 426 N.W.2d at 450.  In considering reasonableness, courts consider the temporal and geographic limits of the agreement.  *Id.*

Here, Defendant's Franchise Agreement was narrowly drafted to protect Ameriprise Financial's legitimate business interests.  Under Minnesota law, Ameriprise Financial has a legitimate interest in protecting itself against "the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Bennett*, 134 N.W.2d at 898; *Overholt*, 437 N.W.2d at 703; *Webb Publishing*, 426 N.W.2d at 450.  The restrictions in the Franchise Agreements are tailored to provide Ameriprise Financial a reasonable period of time to protect its confidential information and trade secrets, as well as reestablish relationships with its customers and protect their goodwill.  They do not prohibit Defendant from working as a financial planner, so long as she does not use confidential information she obtained at Ameriprise Financial or solicit or divert clients whom she worked

- 10 -

with or learned of while at Ameriprise Financial. Thus, the covenant does not unnecessarily restrict competition or prevent Defendant from earning a livelihood; the contract only prohibits unfair competition.

In light of this legitimate interest, the geographic scope of Defendant's covenant is reasonable. Courts in Minnesota "generally uphold geographic limitations when they are limited to areas necessary to protect the employer's interest." *Overholt*, 437 N.W.2d at 703 (citing *Davies*, 298 N.W.2d at 131). In *Overholt*, the court found that a covenant limited to the areas in which the employee actually worked for the employer was not overbroad where the purpose of the covenant was to protect the employer against the deflection of clients. *Id.* Here, with a covenant designed for the same purpose, the covenant is also restricted to those clients to which Defendant had exposure and is therefore reasonable.

Finally, the restrictions are reasonable in duration. The Minnesota Supreme Court has identified three alternative standards as to whether a time restriction is reasonable: (1) a restriction that provides the time necessary to obliterate the identification between the employer and the employee in the minds of the employer's customers; (2) a restriction that permits the employer to obtain and train a replacement; and (3) the time necessary to protect the company's trade secrets and confidential information. *See Davies*, 298 N.W.2d at 131; *Minnesota Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 335 (D. Minn. 1980); *Cherne Indus., Inc. v. Grounds & Assoc.*, 278 N.W.2d 81, 93 (Minn. 1979). Minnesota courts have upheld, for example, a nationwide geographic restriction for one year, *Webb Publishing*, 426 N.W.2d at 450, and a two-year restriction covering only the former employee's sales territory, *Overholt*, 437 N.W.2d at 703.

Here, the one year limitation provides a reasonable period of time for Ameriprise

Financial to protect its interests. Ameriprise Financial seeks to remove its clients' identification of Defendant with Ameriprise Financial, train replacements and allow the replacements time to develop relationships with the clients, and take advantage of the trade secret information developed for it by Defendant pursuant to her Franchiser Agreement. A one-year time period in which to do this is entirely reasonable and appropriate. Indeed, this Court has previously enforced, interpreting Minnesota law, the same language at issue here part of the agreement in place with a predecessor to Ameriprise Financial and AEFA. *IDS Financial Servs. Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994). The cases are quite similar. Because an injunction was warranted there, an injunction is warranted here.

c.    The Evidence Demonstrates Defendant's Breach

Prior to and after her termination from Ameriprise Financial, Defendant communicated with many of her Ameriprise Financial clients, attempting to solicit their business away from Ameriprise Financial. (Wilson Aff. ¶ 4 and Osborne Aff. ¶ 2). In some circumstances she did so by disparaging Ameriprise Financial and its financial advisors, and in some by deceiving clients. At a minimum, this is in direct violation of the non-solicitation clause of the restrictive covenants in Defendant's contract with Ameriprise Financial. (Wilson Aff. ¶ 2, Ex. A); *see supra*.

In light of Defendant's continued refusal to comply with the terms of her Franchise Agreement, there is every reason to believe that she will continue in her efforts to use Ameriprise Financial's proprietary and confidential client information to solicit its clients.

2.    Quam Has Violated The Illinois Uniform Deceptive Trade Practices Act

Ameriprise Financial also has a separate protected right under the Illinois Uniform Deceptive Practices Act ("IUDTPA"), 815 ILCS 510/2. Under the IUDTPA, "a person likely to

- 12 -

be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable." 815 ILCS 510/3.

Here, Quam has violated the IUDTPA by disparaging American Financial's products, business, and services by false and misleading representations of fact. See 815 ILCS 510/2(a)(8). Specifically, approximately two or three weeks after Quam was suspended, and either just before or just after her termination, Quam maliciously represented to an elderly couple that Ameriprise Financial had frozen their assets. See Dina Malstaff Affidavit, ¶3. As one could expect, the couple was beside themselves with grief and could not sleep, and were forced to take sleeping pills for four or five nights just so they could sleep. The representations made by Quam were, of course, a false and an utterly misleading misrepresentation of fact. The couple's accounts had not been frozen by Ameriprise Financial. Id. ¶3. Quam willfully engaged in deceptive trade practices.

**C.    A Temporary Injunction is Necessary to Prevent Irreparable Harm**

Irreparable harm may be inferred from the breach of a valid covenant not to compete and the threat of losing customers. *See Overholt Crop Ins. Serv. Co. v. Bredeson,* 437 N.W.2d 698, 701 (Minn. Ct. App. 1989); *Gold v. Ziff Communications Co.*, 196 Ill.App.3d 425, 434, 553 N.E.2d 404, 410 (1st Dist. 1989) ("loss of customers and sales" sufficient to show, absent protection, threat of irreparable injury); *Falcon, Ltd. v. Corr's Natural Beverages, Inc.*, 165 Ill.App.3d 815, 821 (1st Dist. 1987) (loss of sales and customers and threat of continued losses constitutes irreparable injury). These inferences carry great weight in this case for the following reasons:  (1) Quam was the primary contact with clients that she serviced while an Ameriprise Financial advisor.  In addition to providing financial advice to clients, Quam worked to build and strengthen relationships with her clients to encourage them to come to her (and her alone) for

their financial service needs. In fact, Ameriprise Financial has policies in place to protect an advisor's relationship with clients they service by prohibiting other advisors from poaching those clients. Quam was in a unique position to have a personal hold over Ameriprise Financial's good will as a result of the relationships she was able to create with the clients she serviced. As a result, her solicitation of clients threatens Ameriprise Financial with irreparable harm. Id.; (2) the manner in which Quam has chosen to disparage Ameriprise Financial and frighten clients threatens Ameriprise Financial with irreparable harm as well.

Unless the requested injunctive relief is granted, Ameriprise Financial will suffer irreparable injury through the loss of goodwill and diversion of customer relationships. Defendant has displayed a willingness and intention to violate repeatedly and in a deceptive manner the terms of her restrictive covenant, making Ameriprise Financial even more vulnerable to continued infliction of irreparable harm by Defendant's further solicitation and deflection of Ameriprise Financial's clients.[4]

**D.    The Balance of the Harms Favors Granting The Temporary Injunction**

The balance of the harms weighs in favor of granting injunctive relief. The injunction would subject Defendant to comparatively little harm as it would not prevent her from earning a livelihood, only from violating the terms of the restrictive covenant. Defendant is free to

---

[4]    In addition to breaching her contractual obligations, Defendant interfered with prospective business advantage of Ameriprise Financial by soliciting clients to interfere with Ameriprise Financial's legitimate expectancy from ripening into a valid business relationship, and doing so in a deceptive manner. *See Cromeens v. AB Volvo*, 349 F.3d 376 (7th Cir. 2003). For the same reasons, Ameriprise Financial has demonstrated a likelihood of success on the merits on its unfair competition claim. "[E]ven though competition will justify interference with a business relationship, if the manner of interference is improper, the interference will be actionable. *See Film and Tape Works, Inc. v. JuneTwenty Films, Inc.*, 856 N.E.2d 612, 620 (Ill. App.3d 2006). By breaching her franchise agreement obligations in a manner which is deceptive, Quam has "committed some impropriety" by competing. As a result, she has committed the tort of unfair competition. *Id.* (noting that acts of fraud, deceit, intimidation and deliberate disparagement are never privileged acts of competition).

99999-0678/LEGAL14261154.2
99999-0678/LEGAL14262143.1

continue working as a financial advisor anywhere she wants. She is not prevented from working with new customers that she develops independently, so long as she does not use trade secrets she learned at Ameriprise Financial. Moreover, because an expedited hearing must be commenced on Ameriprise Financial's preliminary injunction motion before FINRA no later than 15 days after entry of a temporary restraining order, the matter will be resolved quickly.

**E.    The Public Interest Favors Entry of the Injunction.**

Granting of injunctive relief under these circumstances benefits the public interest. *Id.* Ameriprise Financial's clients will be "protected by the status quo" and will not be unfairly or unknowingly diverted from their relationship with Ameriprise Financial. *Id.* Moreover, the public interest will be served in preventing an advisor from making disparaging, false and deceptive statements to clients as a tactic to solicit their business away. Accordingly, the balance of factors weighs in favor of granting injunctive relief.

## IV. CONCLUSION

For these reasons, Ameriprise Financial respectfully requests that this Court grant its request for a temporary restraining order.

Respectfully submitted,

AMERIPRISE FINANCIAL SERVICES, INC.

Dated:  May 12, 2008

By       /s/ Craig T. Boggs
         Craig T. Boggs
131 South Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559

        Edward B. Magarian #208796
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600

Attorneys for Plaintiff Ameriprise Financial
Services, Inc.

# EXHIBIT

# A

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC. | File No. _____ |
| Plaintiff, | **CORRECTED AFFIDAVIT OF KIM WILSON** |
| v. | |
| DONNA QUAM, | |
| Defendant. | |

STATE OF MINNESOTA   )
                             ) SS.
COUNTY OF HENNEPIN  )

    I, KIM WILSON, being first duly sworn on oath, depose and state as follows:

    1.     I am a Risk Consultant for Advisor Transitions in Risk Mitigation for Ameriprise Financial Services, Inc. ("Ameriprise Financial"). My office is at Ameriprise Financial headquarters in Minneapolis, Minnesota.

    2.     Donna Quam became a franchisee financial advisor of Ameriprise Financial on or about March 22, 2000. A copy of the relevant portions of her Franchise Agreement and Addendum 3R are attached hereto as Exhibit A. Ameriprise Financial records indicate that Ms. Quam was the primary contact with clients that she serviced while an Ameriprise Financial advisor. In addition to providing financial advice to clients, Ms. Quam, like other advisors affiliated with Ameriprise Financial, would have worked to build and strengthen relationships with her clients to encourage them to come to her for

their financial servicing needs. In fact, Ameriprise Financial has policies in place to protect an advisor's relationship with clients they service by prohibiting other advisors from poaching those clients.

3.    Ms. Quam was suspended on March 31, 2008 for violating company policy following a compliance investigation by Ameriprise Financial. Among other things, the March 31, 2008 suspension letter outlined exactly what Quam was not allowed to do during her 90 day suspension. Specifically, the letter stated, among other things that: "As a result of this suspension you cannot contact any Ameriprise Financial clients for business purposes. You must immediately turn over all client records and files upon request. During the suspension period you will not receive any compensation. You will receive the compensation that you were eligible to receive after termination."

4.    Shortly after her suspension, Ameriprise Financial learned that Quam had contacted Ameriprise Financial clients for business purposes to convince them to move their assets away from Ameriprise Financial. Accordingly, on or about April 18, 2008, Ameriprise Financial delivered a Termination Notice letter to Quam.

5.    On April 25, 2008, after receiving no response from Ms. Quam, Ameriprise Financial again reminded her of her contractual obligations to refrain from contacting clients and that she is not eligible to compete for her clients for a 12-month period. That same letter also reminded Ms. Quam to return all originals and copies of all confidential

client information to Ameriprise Financial and to cease all use of confidential client

information at once.   A copy of this letter is attached hereto as Exhibit B.

FURTHER AFFIANT SAITH NOT.

_Kim Wilson_

Kim Wilson

Subscribed and sworn to before me
this 12th day of May, 2008.

Notary Public



THOMAS E. GOUGH
Notary Public-Minnesota
My Commission Expires Jan 31, 2012

-3-

4818-1415-42421

# AMERICAN EXPRESS FINANCIAL ADVISORS INC.
## INDEPENDENT ADVISOR BUSINESS
## FRANCHISE AGREEMENT

THIS PAGE INTENTIONALLY LEFT BLANK

## TABLE OF CONTENTS

<u>Section</u>                                                                                          <u>Page</u>

RECITALS.................................................................................................................1
1.     GRANT.......................................................................................................1
2.     TERM AND RENEWAL ..........................................................................3
3.     DUTIES OF AEFA .....................................................................................4
4.     FEES AND COMPENSATION ................................................................5
5.     ONGOING DUTIES OF INDEPENDENT ADVISOR .........................6
6.     OPENING OF FRANCHISED BUSINESS ..............................................9
7.     ORIENTATION AND TRAINING...........................................................10
8.     PROPRIETARY MARKS ..........................................................................10
9.     MANUALS ..................................................................................................12
10.    CONFIDENTIAL INFORMATION ..........................................................13
11.    ACCOUNTING AND RECORDS.............................................................14
12.    ADVERTISING AND PROMOTION .......................................................14
13.    ERRORS AND OMISSIONS COVERAGE/INSURANCE .....................17
14.    TRANSFER OF INTEREST ......................................................................18
15.    COMPLIANCE AND INSPECTIONS ......................................................21
16.    SPECIAL REGULATORY SUPERVISION .............................................22
17.    DEFAULT AND TERMINATION ............................................................23
18.    OBLIGATIONS UPON TERMINATION OR EXPIRATION.................26
19.    COVENANTS .............................................................................................28
20.    TAXES, PERMITS, AND INDEBTEDNESS ...........................................30
21.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION .............31
22.    APPROVALS AND WAIVERS .................................................................32
23.    NOTICES.....................................................................................................32
24.    ENTIRE AGREEMENT.............................................................................33
25.    SEVERABILITY AND CONSTRUCTION ..............................................33
26.    APPLICABLE LAW ..................................................................................33
27.    ACKNOWLEDGMENTS ..........................................................................34

THIS PAGE INTENTIONALLY LEFT BLANK

REDACTED

## AGREEMENT

THIS IS AN AGREEMENT, made and entered into on _____ 20___ by and between American Express Financial Advisors Inc. ("AEFA") at its principal place of business at IDS Tower 10, Minneapolis, Minnesota 55440, and you; _____ Dona M. Quan ("Independent Advisor").

### RECITALS:

A.     Through its time, skill, effort, and money, AEFA has developed a distinctive system that offers, through financial advisors, a variety of financial services to individuals and/or business owners (the "System"). The financial services include financial planning, investment advice and consulting services, securities products, insurance products, brokerage services, , including individual securities, tax services, lending services, and other related products & services provided or procured through AEFA and/or its affiliates or third parties (collectively, "Products & Services").

B.     The distinguishing characteristics of the System include a well recognized brand; distinctive products & services; high level of securities and regulatory compliance; the highest standards of customer service and quality advice, including financial planning; administrative procedures; providing superior customer service, including consolidated statements; orientation programs; advertising and promotional programs; and direct marketing services, telemarketing and on-line services directed to clients; all of which may be changed, improved, and further developed by AEFA from time to time.

C.     The System is identified by trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the mark "American Express," (the "Proprietary Marks");

D.     Independent Advisor desires to contract with AEFA to operate a business offering Products & Services under the System and using the Proprietary Marks (the "Independent Financial Advisor Business"), and to receive the services provided by AEFA in consideration for the covenants contained herein; and

E.     Independent Advisor understands and acknowledges the importance of all the Independent Financial Advisors operating their Independent Financial Advisor Businesses in a manner which meets AEFA's high standards of quality of advice and customer service, to protect the value and integrity of the System and all the Independent Financial Advisor Businesses.

THEREFORE, Independent Advisor and AEFA agree as follows:

1.     GRANT

A.     Independent Financial Advisor Business.
•      AEFA and Independent Advisor agree upon the terms and conditions in this Agreement, for Independent Advisors to establish and operate the Independent Financial Advisor Business.

- Independent Advisor agrees to operate the Independent Financial Advisor Business only at the location specified in Schedule A (the "Location") in the market group (as described in the Uniform Franchise Offering Circular) (the "Market Group"). Independent Advisor agrees to not relocate the Independent Financial Advisor Business outside the Market Group without prior written approval by AEFA, which approval will not be unreasonably withheld.

- AEFA will only compensate an appropriately licensed individual. Accordingly, Independent Advisor agrees to operate the Independent Financial Advisor Business, as described in this Agreement, as an individual business and shall not conduct such business as a corporation, partnership, limited liability company, sub-chapter S company or any other similar organizational structure. This shall not prevent Independent Advisor from operating other related businesses as described in Section 5, under the heading Use of Premises, and in the Manuals.

- Independent Advisor agrees to have the right during the term of this Agreement to solicit Clients for Products & Services as more fully described in Section 5 and in the Manuals. For purposes of this Agreement, "Client" shall mean a person or entity that acquires any Products & Services from or through Independent Advisor, AEFA, AEFA's affiliates, or an advisor operating under the System.

- Independent Advisor acknowledges that the System may be supplemented, improved, and otherwise modified from time to time by AEFA; and Independent Advisor agrees to comply with all reasonable requirements of AEFA in that regard.

B. <u>Non-Exclusive Agreement</u>.

- **INDEPENDENT ADVISOR EXPRESSLY ACKNOWLEDGES AND AGREES THAT THIS INDEPENDENT FINANCIAL ADVISOR BUSINESS IS NON-EXCLUSIVE, AND THAT THIS AGREEMENT DOES NOT GRANT OR IMPLY ANY PROTECTED AREA, TERRITORY, OR CLIENTS FOR THE INDEPENDENT FINANCIAL ADVISOR BUSINESS. BY WAY OF EXAMPLE, OTHER INDEPENDENT ADVISORS, AEFA, AND ITS AFFILIATES MAY OR WILL CONTINUE TO MARKET, AT INDEPENDENT ADVISOR'S LOCATION, THROUGH EMPLOYEES, AGENTS, DEALERS, DIRECT MARKETING, TELEMARKETING, AND ON-LINE SERVICES.**

- AEFA and its affiliates reserve the following rights:

    a. To offer financial products and services, including Products & Services, directly or indirectly to any client or business (including the Clients), or license others to offer Products & Services under any proprietary marks (including the Proprietary Marks) at any location, through other Independent Advisors, employees, direct marketing, telemarketing, on-line services, third-party marketers and any other distribution method;

    b. To own and/or operate, and license others to operate, businesses that offer Products & Services using the System and Proprietary Marks, at any location; and

c.  To own and/or operate, and license others to operate, businesses that offer other investment opportunities and financial services and products, using proprietary marks other than the Proprietary Marks or other systems, whether such businesses are similar to or different from the Independent Financial Advisor Business, at any location.

- Independent Advisor acknowledges and agrees that AEFA and certain of AEFA's affiliates and designees (including other Independent Advisors of AEFA, AEFA employees, third-party dealers, persons associated with such persons, and mail orders services) now sell, and shall continue to have the right to sell, Products & Services, to clients located in the same or close proximity to Independent Advisor's Location; and that AEFA and such affiliates and designees shall be direct competitors of Independent Advisor.

- AEFA expressly reserves any and all rights not explicitly granted to Independent Advisor by the terms and conditions of this Agreement.

2.  **TERM AND RENEWAL**

- <u>Three-Year Term</u>.  This Agreement shall be in effect upon its execution by AEFA and, except as otherwise provided herein, the term of this Agreement shall be three (3) years from the date of execution by AEFA.

- <u>Renewal</u>.  This Agreement will automatically renew for additional terms of three (3) years, subject to satisfaction of the following conditions:

    a.  The premises of the Independent Financial Advisor Business under Independent Advisor's control and supervision (the "Premises") shall meet reasonable professional standards and the requirements set forth in the Manuals regarding signage and the use of Proprietary Marks;

    b.  Independent Advisor agrees to not be in default of any provision of this Agreement, any other agreement between Independent Advisor and AEFA or its affiliates, or any standards applicable to Independent Advisor as set forth in the Manuals; and Independent Advisor agrees to have substantially complied with all the terms and conditions of such agreements and standards;

    c.  Except as otherwise allowed by AEFA, Independent Advisor agrees to have satisfied all monetary obligations owed by Independent Advisor to AEFA and its affiliates, and shall have timely met those obligations throughout the term of this Agreement.

- <u>Terminating the System</u>.  In the event of changes in regulatory, market or industry conditions, AEFA may make a policy decision to terminate or dissolve the System upon ninety (90) days' written notice to Independent Advisors. In the event AEFA terminates or dissolves the System, AEFA shall make available to Independent Advisor a new form of agreement, which will be substantially similar to the terms of this Agreement.

3.    DUTIES OF AEFA

- Compensation.  Within thirteen (13) business days of the end of each Accounting Period (defined below), AEFA agrees to prepare a statement (i) containing a summary of Independent Advisor's financial activity for Products & Services during such Accounting Period (the "Commission Statement"), (ii) detailing the Compensation as defined in Section 4 below, and (iii) containing certain confidential Client information.  With each Commission Statement, AEFA agrees to remit Independent Advisor's share of the Compensation.  AEFA may provide the Commission Statement by providing Independent Advisor with limited access to AEFA's computer system for the purpose of downloading the Commission Statement.  "Accounting Period" means each of the two week accounting periods in a calendar year, as determined by AEFA.

- Offering and Servicing Products and Services.  AEFA, except as otherwise provided herein, shall provide those Products & Services distributed or offered by AEFA and/or its affiliates consistent with the standards set forth in the Manuals.  AEFA agrees to perform such bookkeeping, processing, and related functions as described in the Manuals. AEFA agrees to process all applications from Clients for Products & Services.  AEFA retains the right to reject any application for Products & Services that does not meet the qualifications, specifications, or standards set forth in the Manuals. AEFA agrees to provide Clients with consolidated statements as provided in the Manuals.  AEFA agrees to provide Independent Advisor with certain forms, brochures, prospectuses, and sales literature required to process the Independent Financial Advisor Business as part of the Association Fee.  AEFA will provide to Independent Advisor certain other forms, brochures, and sales literature related to Products & Services for a fee.

- Advertising and Promotions.  AEFA agrees to provide national advertising, as provided in Section 12 below, as part of the Association fee. AEFA may make available for a fee American Express Cardmember leads to Independent Advisors who meet criteria described in the Manuals.  AEFA may develop promotional programs and sales campaigns for Products & Services, the nature, duration, and geographic scope of which shall be determined by AEFA.

- Compliance.   AEFA agrees to provide regulatory compliance training and corporate compliance oversight as part of the Association Fee.  AEFA agrees to conduct, as it deems advisable and consistent with its regulatory and supervisory obligations, inspections of Independent Advisor's operation of the Independent Financial Advisor Business for the purpose of establishing Independent Advisor's compliance with this Agreement and with all federal, state, local and NASD (and other self-regulatory organizations) laws, rules, and regulations requirements, including licensing requirements, and all of AEFA's policies and practices in the Client Relations Manuals (hereinafter referred to as "Compliance Rules").

- Orientation and Training.  As provided in Section 7 below, AEFA agrees to (i) provide an initial orientation program as part of the Initial Franchise Fee to Independent Advisor, and (ii) offer continuing education programs as it deems necessary for a fee.

- **Premises**. AEFA agrees to make available signage specifications to Independent Advisor as part of the Association Fee. AEFA may provide for a fee on-site pre-opening and opening assistance to ensure the orderly opening of an office as Independent Advisor requests.

- **Manuals**. AEFA agrees to provide Independent Advisor, on loan, one copy of AEFA's Confidential Manuals (the "Manuals"), as more fully described in Section 9 hereof. The Manuals shall also include AEFA's Quality of Advice Standards, Client Satisfaction Standards and Client Relations Manuals.

- **Other Optional Services**. AEFA agrees to offer optional services to Independent Advisor for a fee, as described in the Manuals.

- Independent Advisor acknowledges and agrees that any duty or obligation imposed on AEFA by this Agreement may be performed by a Branch Manager (as defined below), any independent contractor, designee, employee, or agent of AEFA, as AEFA may direct.

4.   **FEES AND COMPENSATION**
- **Initial Franchise Fee**. In consideration of the franchise granted herein, Independent Advisor has paid to AEFA an initial franchise fee of One Thousand Five Hundred Dollars ($1,500), receipt of which is hereby acknowledged, and which is non-refundable. Independent Advisor is paying this fee in consideration of administrative and other expenses incurred by AEFA in entering into this Agreement.

- **Association Fee**. During each Accounting Period (but not in the third Accounting Period of any month that has three Accounting Periods), Independent Advisor authorizes AEFA to deduct the association fee of One Hundred Ninety-Five Dollars ($195) for national advertising, accounting, payroll, compliance and fidelity bond coverage and errors and omissions program participation as set forth in the Manuals (the "Association Fee") from the portion of the Compensation due to Independent Advisor. During any Accounting Period in which Independent Advisor is not entitled to a portion of the Compensation or Independent Advisor's share of the Compensation is less than the Association Fee, Independent Advisor agrees to promptly pay to AEFA the Association Fee as provided in the Manuals.

- **Compensation**. As long as this Agreement is in effect and Independent Advisor is not in default hereunder or under Special Regulatory Supervision (as defined below), AEFA agrees to (i) retain a percentage of the Compensation for each Accounting Period as set forth in the compensation schedule which is in the Manuals; (the "Compensation Schedule") (ii) pay to Independent Advisor's branch manager (the "Branch Manager") in accordance with the branch agreement (the "Branch Agreement") the specified amount of the Compensation for each Accounting Period, (iii) pay to Independent Advisor after deducting the Association Fee, any other fees, interest, or other monies due to AEFA for Services authorized by Independent Advisor and/or other deductions provided for in this Agreement, the balance of the Compensation for each Accounting Period in accordance with Section 3.

As used in this Agreement, "Compensation" which is further defined in the Manuals, is the compensation from a product sale as specified in the Compensation Schedule, based on what Products & Services the Advisor sells.

---

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

- <u>Method of Payment</u>. AEFA agrees to have the right to make the payments to Independent Advisor due under Section 4 by telegraphic transfer, auto-draft arrangement, electronic funds transfer, or by other means AEFA may specify from time to time, to a bank account designated by Independent Advisor, in accordance with procedures in the Manuals; provided, however, that if Independent Advisor requests payment under Section 4 in the form of a check, AEFA may charge a reasonable fee to Independent Advisor for providing payment via check.

- <u>Uncollected Payments</u>. If there are any uncollected payments (i) for Products & Services that Independent Advisor failed to remit to AEFA, (ii) an error occurs and Independent Advisor receives an overpayment, (iii) a payment has been made to Independent Advisor for any canceled or returned Products & Services, (iv) there is a loss, refund or payment due to a settlement or claim related to Products & Services purchased by a Client that Independent Advisor serviced, and/or (v) Independent Advisor owes AEFA pursuant to Section 21 below, AEFA may deduct such amount from the percentage of Compensation due to Independent Advisor in any Accounting Period following the event.

- <u>Incentive Programs</u>. AEFA may offer incentive programs, such as awards and conferences as described in the Manuals.

- <u>Disclaimer of Benefits.</u> Independent Advisor acknowledges that the Manuals, including the Compensation Schedule contained therein, constitute the complete list of the compensation and benefits owed Independent Advisor resulting from this Agreement or Independent Advisor's relationship with AEFA. Independent Advisor acknowledges that Independent Advisor has no claim to any other compensation or benefit plan, program or policy of or sponsored by AEFA unless such plan, policy or benefit plan specifically references Independent Advisors in their role as Independent Advisors as an eligible group under such plan, program or policy and Independent Advisor meets all conditions for eligibility set forth in such program.

5.    <u>ONGOING DUTIES OF INDEPENDENT ADVISOR</u>

- Independent Advisor shares AEFA's and the other Independent Advisors' commitment to high standards of financial planning, quality advice and customer service to increase the demand for Products & Services offered by all Independent Advisors operating under the System, and to protect the reputation and goodwill of AEFA and the Proprietary Marks through regulatory compliance and related policies. Consistent with this commitment, Independent Advisor agrees:

  a. <u>Compliance</u>. To maintain all required licenses and regulatory compliance standards consistent with the standards set forth in Section 15 and the Manuals, including Client Relations Manuals and Compliance Rules as defined in this Agreement.

  b. <u>Financial Planning</u>. To produce a minimum of five (5) financial plans or Three Thousand Dollars ($3,000) in fees during the year 2000. AEFA reserves the right to increase this minimum on an annual basis and will provide written notice of any such increase 60 days prior to the beginning of each year. During the first three year term, the maximum requirement AEFA may impose is seven (7) plans or Four

Thousand Two Hundred Dollars ($4,200) in fees per year. AEFA may make exceptions to these requirements on an individual Independent Advisor basis, provided that the branch office where the Independent Advisor is located has an average on a per advisor basis of the current minimum number of plans or the current minimum dollar amount. The definition of "financial plan" and the definition of "fee" shall be as described in the appropriate AEFA financial planning ADV brochure, and specifically excludes services or fees described in the wrap fee program ADV brochures.

c.   <u>Quality of Advice</u>. To maintain a Quality of Advice standard of at least level three (3), as more fully described in the Manuals.

d.   <u>Client Satisfaction</u>. To maintain Client Satisfaction Standards of at least seventy percent (70%), as more fully described in the Manuals.

e.   <u>Premises and Signage</u>. To maintain, at Independent Advisor's expense, an office with the fixtures, furnishings, and equipment necessary to maintain professional standards for the operation of the Independent Financial Advisor Business. Independent Advisor agrees to purchase and install signs as provided in the Manuals.

f.   <u>Products and Services</u>. To offer, provide, and market the Products & Services to Clients.

• <u>Use of Premises</u>.   Independent Advisor agrees to use the Premises to operate the Independent Financial Advisor Business and any other activities for which Independent Advisor has obtained written consent from AEFA or provided notice to AEFA as specified in the Manuals, or for other uses which do not require consent or notice as explained in the Manuals; and shall refrain from using or permitting the use of the Premises for any other purpose at any time without first obtaining written consent from AEFA or providing notice to AEFA as specified in the Manuals, or unless the use is permitted without obtaining consent or providing notice as specified in the Manuals.

• <u>Client Service</u>. As provided in the Manuals, Independent Advisor agrees to: (a) promptly submit complete and accurate applications for Products & Services and other financial information required by AEFA to comply with legal, regulatory, underwriting or AEFA's internal processing requirements; (b) promptly forward all payments received from Clients for Products & Services to AEFA; and (c) preserve good customer relations; render competent, prompt, courteous, and knowledgeable service; and meet such minimum standards as AEFA may establish from time to time in the Manuals.

• <u>Territory</u>. Independent Advisor will operate the Independent Financial Advisor Business at the Location and in the Market Group. Independent Advisor will not relocate the office of the Independent Financial Advisor Business outside the Market Group without prior written approval from AEFA. AEFA recognizes that Independent Advisor may desire to actively seek prospects outside the Market Group, and in order to do this, Independent Advisor agrees to obtain the approval of AEFA, which approval shall not be unreasonably withheld, and provided Independent Advisor and the person who performs regulatory supervision for the Independent Advisor have the appropriate licenses. Independent Advisor may also service

unsolicited clients outside the Market Group, provided Independent Advisor and the person who performs regulatory supervision for the Independent Advisor have the appropriate licenses. Independent Advisor may continue to accept referrals from outside the Market Group. AEFA may change Market Group boundaries. Independent Financial Advisor Business will not be adversely impacted by these changes and Independent Advisor will have the benefits of the new Market Group boundaries.

- Computer Hardware and Software. Independent Advisor agrees to purchase or lease a computer system that meets the specifications of AEFA, including such peripheral devices and equipment as AEFA may specify in the Manuals, or otherwise in writing, as reasonably necessary for the efficient management and operation of the Independent Financial Advisor Business and the transmission of data to and from AEFA. AEFA may specify in the Manuals or otherwise in writing the information that Independent Advisor agrees to collect and maintain on the computer system installed at the Independent Financial Advisor Business to satisfy regulatory and processing requirements, and Independent Advisor agrees to provide to AEFA such information as AEFA may reasonably request from the data so collected and maintained. While AEFA does not intend to have access to personal or other non-Independent Financial Advisor Business activities, Independent Advisor agrees to permit AEFA, upon AEFA's request, to access the computer system installed at the Independent Financial Advisor Business for the purpose of obtaining AEFA-related information from Independent Advisor's computer system to satisfy regulatory and business processing requirements. Independent Advisor agrees to acquire from AEFA or, if any, an approved vendor, a license to use software designated by AEFA for the computer system. In order to send messages electronically, AEFA may require Independent Advisor to establish and maintain an e-mail address with an Internet provider. At the request of AEFA, Independent Advisor agrees to obtain such upgrades, or other modifications to the computer system and software to conform to the specifications of AEFA.

- Approved Products & Services. Independent Advisor agrees to obtain all AEFA Products & Services solely from AEFA, or from suppliers approved by AEFA. If Independent Advisor desires to offer products or services, other than those already approved in the Manuals, Independent Advisor agrees to submit to AEFA a written request to approve the proposed products or services and its supplier, together with such evidence of conformity with AEFA's specifications as AEFA may reasonably require. AEFA agrees to have the right to require that its representatives be permitted to evaluate the proposed products or services. AEFA agrees to, within thirty (30) days after its receipt of such request, notify Independent Advisor in writing of its approval or disapproval of the proposed products or services and/or supplier. AEFA reserves the right to (i) deny approval of any proposed products or services and/or supplier, (ii) limit the number of approved products and services and approved suppliers, and/or (iii) condition approval of unapproved products and services on AEFA being the supplier of such products and services. Independent Advisor agrees to not offer for sale or sell any products or services until written approval by AEFA of the proposed product or service or supplier is received. AEFA may from time to time revoke its approval of particular Products & Services or suppliers if AEFA determines, in its sole discretion, that the Products & Services or suppliers no longer meet the standards of AEFA. Upon receipt of written notice of such revocation, Independent Advisor agrees to cease to offer and sell any disapproved Products & Services and/or cease to purchase from any disapproved supplier, although Independent Advisor may continue to service such Products and Services.

- <u>Use of Proprietary Marks</u>.  Independent Advisor agrees to ensure that all advertising and promotional materials, signs, decorations, stationery, business forms, and other items bear the Proprietary Marks in the form, color, location, and manner prescribed by AEFA. Independent Advisor will use best efforts to uphold the reputation and goodwill of AEFA and its affiliates.

- <u>Employees of Independent Advisor</u>.  Independent Advisor agrees to be solely responsible for all employment decisions and all state, federal, and local laws and functions of the Independent Financial Advisor Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees. Independent Advisor's employees must be competent, conscientious, and properly trained and licensed.  Any licensed employee of Independent Advisor must be approved by and licensed with AEFA.

- <u>No Changes Without Consent</u>.  Independent Advisor agrees to not implement any material change to the System without the express prior written consent of AEFA.  Independent Advisor agrees to notify AEFA in writing of any material change to the System which Independent Advisor proposes to make, and shall provide to AEFA such information as AEFA requests regarding the proposed change.  AEFA may, but is not obligated to, compensate Independent Advisor for consulting services regarding a material change to the System proposed by Independent Advisor.  Independent Advisor acknowledges and agrees that AEFA shall have the right to incorporate the proposed material change into the System and shall thereupon obtain all right, title, and interest therein without the obligation to compensate Independent Advisor.

6.    <u>OPENING OF FRANCHISED BUSINESS</u>

- Independent Advisor agrees to furnish and equip the Independent Financial Advisor Business at Independent Advisor's own expense.

- Independent Advisor may use the Premises only for the operation of the Independent Financial Advisor Business and such other authorized activities for which Independent Advisor has obtained written consent or notice from AEFA or has provided notice to AEFA as specified in the Manuals.

- Independent Advisor agrees to be responsible for obtaining, at Independent Advisor's expense, all appropriate permits, certificates, licenses, and training, which may be required by NASD, AEFA, and other governmental and regulatory agencies.

- Independent Advisor agrees to obtain AEFA's written approval prior to opening the Independent Financial Advisor Business, which approval shall not be unreasonably withheld, and shall open the Independent Financial Advisor Business within sixty (60) days after the date of this Agreement.

7.    ORIENTATION AND TRAINING

- Independent Advisor represents that he or she has the requisite experience, skills and training to operate the Independent Financial Advisor Business in a manner consistent with the high standards of quality of advice and customer service of other Independent Financial Advisor Business operating under the System.  Prior to the opening of the Independent Financial Advisor Business, Independent Advisor agrees to attend and complete to AEFA's satisfaction the initial orientation program for Independent Advisors offered by AEFA.   Independent Advisor agrees to attend regulatory compliance seminars as set forth in the Manuals.  For a fee, Independent Advisor and Independent Advisor's employees may attend optional courses, seminars, and other training programs offered by AEFA.

- AEFA agrees to offer, as AEFA deems appropriate, advanced education programs ("Advanced Programs") that may (i) relate to certain Products & Services, (ii) enable Independent Advisor to offer additional Products & Services, (iii) enable Independent Advisor to obtain permits, certificates, and licenses to offer additional Products & Services, (iv) satisfy regulatory requirements,  and (v) cover customer service, marketing to Clients, promotion, and other topics related to operation of the Independent Financial Advisor Business.  Independent Advisor shall not be required to attend such Advanced Programs, except as necessary to satisfy regulatory requirements.  Independent Advisor agrees to pay a fee, if any, specified by AEFA to participate in all Advanced Programs.

- Orientation programs, regulatory compliance programs and Advanced Programs shall be at such times and places or through other methods, such as computer software or websites, as may be designated by AEFA.  For the initial orientation program, AEFA agrees to provide, at no additional charge to Independent Advisor, instructors and program materials; and Independent Advisor agrees to be responsible for any and all other expenses incurred by Independent Advisor or its employees in connection with any such program, including, without limitation, the costs of transportation, lodging, meals, and wages.

8.    PROPRIETARY MARKS

- AEFA represents with respect to the Proprietary Marks that AEFA has the right to use, and to license others to use, the Proprietary Marks.

- With respect to Independent Advisor's use of the Proprietary Marks:

   a.    Independent Advisor agrees to use only the Proprietary Marks designated by AEFA, and shall use them only in the manner authorized and permitted by AEFA.  If AEFA is no longer authorized to use the Proprietary Marks, Independent Advisor will not be able to continue to use the Proprietary Marks;

   b.    Independent Advisor agrees to use the Proprietary Marks only (i) for the operation of the Independent Financial Advisor Business, (ii) in connections with Products & Services approved in the Manuals for use in connection with the Proprietary Marks, or (iii) in advertising approved by AEFA for the Independent Financial Advisor Business;

c.  Unless otherwise authorized or required by AEFA, Independent Advisor agrees to operate and advertise the Independent Financial Advisor Business only under the Proprietary Marks, and shall use all Proprietary Marks without prefix or suffix in the manner required by AEFA;

d.  Independent Advisor agrees to identify himself or herself as the owner of the Independent Financial Advisor Business in conjunction with any use of the Proprietary Marks in the manner required by AEFA;

e.  Independent Advisor's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of rights of AEFA;

f.  Independent Advisor agrees to not use the Proprietary Marks to incur any obligation or indebtedness on behalf of AEFA;

g.  Independent Advisor agrees to execute any documents deemed necessary by AEFA to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability; and

h.  Independent Advisor agrees to promptly notify AEFA of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to AEFA's ownership of, AEFA's right to use and to license others to use, or Independent Advisor's right to use, the Proprietary Marks.  Independent Advisor acknowledges that AEFA has the sole right and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. AEFA has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. AEFA agrees to defend Independent Advisor against any third-party claim, suit, or demand arising out of Independent Advisor's use of the Proprietary Marks. Independent Advisor agrees to execute any and all documents and do such acts as may, in the opinion of AEFA, be necessary or advisable to protect and maintain the interests of AEFA and Independent Advisor in the Proprietary Marks.  Except to the extent that such litigation is the result of Independent Advisor's use in a manner inconsistent with the terms of this Agreement, AEFA agrees to reimburse Independent Advisor for his or her out-of-pocket costs in doing such acts.

● Independent Advisor expressly understands and acknowledges that:

a.  AEFA and/or its affiliates are the owners of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and AEFA has the right to use, and license others to use, the Proprietary Marks;

b.  The Proprietary Marks are valid and serve to identify the System, the AEFA Distributed Products & Services, and those who are authorized to operate under the System;

c.  During the term of this Agreement and after its expiration or termination, Independent Advisor agrees to not directly or indirectly contest the validity of, or

AEFA's ownership of, or right to use and license others to use, the Proprietary Marks;

d.  Independent Advisor's use of the Proprietary Marks does not give Independent Advisor any ownership interest or other interest in or to the Proprietary Marks;

e.  Any and all goodwill arising from Independent Advisor's use of the Proprietary Marks shall inure solely and exclusively to the benefit of AEFA, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Independent Advisor's use of AEFA's System or the Proprietary Marks;

f.  The license of the Proprietary Marks granted hereunder to Independent Advisor is nonexclusive, and AEFA thus has and retains the rights, among others: (a) to use the Proprietary Marks itself in connection with selling products and services (including Products & Services that Independent Advisor will offer and sell); (b) to grant other licenses for the Proprietary Marks, including to licensees outside of the System; and (c) to develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Independent Advisor; and

g.  AEFA reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder at AEFA's sole discretion.

9.    **MANUALS**

*   To promote the highest standards of operation under the System, AEFA has prepared Confidential Operations Manuals ("Manual" or "Manuals") which include manuals, bulletins, and other written policies and procedures setting forth the minimum standards regarding Quality of Advice, Client Satisfaction, Client Relations and the Code of Conduct. In addition, the Manuals set forth standards regarding the use of Proprietary Marks, signage, communications, privacy principles, processing procedures and the Compensation Schedule.

*   To comply with all applicable laws and regulations and to protect the reputation and goodwill of AEFA and the System, Independent Advisor agrees to operate the Independent Financial Advisor Business in accordance with the professional standards specified in the Manuals, one copy of which Independent Advisor agrees to receive on loan from AEFA for the term of this Agreement upon completion by Independent Advisor of AEFA's initial orientation program to AEFA's satisfaction. In lieu of, or in addition to, providing Independent Advisor with a paper copy of the Manuals, AEFA may provide Independent Advisor with electronic access to the Manuals (or such updates to the Manuals as AEFA may determine).

*   Independent Advisor agrees to treat the Manuals, any other materials created for or approved for use in the operation of the Independent Financial Advisor Business, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential. Independent Advisor agrees to not copy, duplicate,

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

12

record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

- The Manuals shall remain the sole property of AEFA and shall be kept in a secure place on the Premises.

- To comply with regulatory requirements, AEFA may make reasonable interpretations and revise the contents of the Manuals from time to time. For business changes to the Manuals, AEFA will provide Independent Advisor with reasonable notice. AEFA further agrees to provide Independent Advisor with 90 days' written notice of any non-regulatory changes to the Manuals resulting in a reduction in the GDC (Gross Dealer Concession) Payout Rate as defined in such Manuals. Independent Advisor agrees to comply with the revised Manuals.

- Independent Advisor agrees to ensure that the Manuals are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the most recently communicated Manuals supercede all previous Manuals.

10.    **CONFIDENTIAL INFORMATION**

- Independent Advisor has had and/or may have access to AEFA trade secrets and confidential information that Independent Advisor agrees has great value to AEFA. Independent Advisor agrees that because of such access, Independent Advisor is in a position of trust and confidence with respect to this information. To protect client confidentiality, AEFA goodwill, trade secrets, and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this Agreement or thereafter, except as permitted under Section 14 regarding transfers of the Independent Financial Advisor Business, communicate, divulge, or use for himself or herself except pursuant to the System, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the System and the business franchised hereunder which may be communicated to Independent Advisor or of which Independent Advisor may be apprised by virtue of Independent Advisor's operation under the terms of this Agreement. Independent Advisor also shall not reveal any information about potential clients to whom a presentation has been made by any Independent Advisor who might reasonably be expected to do business with AEFA. Independent Advisor agrees to divulge such confidential information only to such of his or her employees as must have access to it in order to operate the Independent Financial Advisor Business. Except as otherwise permitted in Section 19, Independent Advisor agrees that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information even if of otherwise public information if such compilations or lists were the result of substantial effort, time and/or money expended pursuant to the System. Independent Advisor further agrees to use this confidential information only in furtherance of this Agreement or in accordance with the Manuals and for no other purpose. Confidential information does not include information which is generally known outside of AEFA other than as a result of a disclosure by Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of

any contractual, legal or fiduciary obligation of confidentiality to AEFA or to any other person or entity with respect to such information.

- At AEFA's request, Independent Advisor agrees to require any personnel having access to any confidential information of AEFA or information about Clients or potential clients to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by or association with Independent Advisor in the Independent Financial Advisor Business. Such covenants shall be in a form satisfactory to AEFA, including, without limitation, specific identification of AEFA as a third-party beneficiary of such covenants with the independent right to enforce them.

11.    ACCOUNTING AND RECORDS

- Independent Advisor agrees to record all sales on a computer system that meets the specifications of AEFA, or on any other equipment specified by AEFA in the Manuals or otherwise in writing. Independent Advisor agrees to prepare, and shall preserve for at least seven (7) years from the dates of their preparation, complete and accurate books, records, and accounts in accordance with the Manuals and Compliance Rules as defined in this Agreement.

- Independent Advisor agrees to, at Independent Advisor's expense, submit to AEFA, in the form prescribed by AEFA, such reports, forms, records, information, and data as AEFA may require to comply with regulatory requirements or to respond to a Client complaint or lawsuit.

- All original books and records containing Client lists and/or information and transactions belong to AEFA and must be returned to AEFA upon termination or expiration of this Agreement, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14. In order to permit AEFA to fulfill its regulatory requirements, AEFA and its designated agents shall have the right at all reasonable times, with or without notice to Independent Advisor, to examine and copy any books and records, including computerized books and records related to the Independent Financial Advisor Business.

12.    ADVERTISING AND PROMOTION

A.    AEFA Advertising Fund

- Recognizing the value of advertising and promotion to AEFA and the Independent Financial Advisor Business, and the importance of coordinated advertising and promotion programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

  a.    AEFA has the right, but not the obligation, to establish the System's advertising fund (the "Fund"). Part of the Association Fee paid by Independent Advisors may be used for this Fund.

  b.    If established, the Fund shall be maintained and administered by AEFA as follows:

(i)  AEFA agrees to direct all advertising programs conducted through the Fund, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. Independent Advisor agrees and acknowledges that the Fund is intended to maximize general public recognition, acceptance, and use of the System, Products & Services; and that AEFA is not obligated, in administering the Fund, to make expenditures for Independent Advisor which are equivalent or proportionate to Independent Advisor's contribution, or to ensure that any particular advisor benefits directly or pro rata from expenditures by the Fund.

(ii)  The Fund, all contributions thereto, and any earnings thereon, shall be used exclusively to meet the costs of preparing, directing, conducting, and administering advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which AEFA believes will enhance the image of the System, including, the costs of preparing and conducting media advertising campaigns; direct mail advertising; marketing surveys; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; conducting and administering in-office promotions; and providing promotional and other marketing materials and services to the businesses operating under the System.

B.  Regional/Local Advertising Campaigns

•  AEFA may designate any geographical area for purposes of establishing a regional or local advertising and promotional campaign ("Campaign"), and to determine whether a Campaign is applicable to the Independent Financial Advisor Business. If a Campaign has been established applicable to the Independent Financial Advisor, at Independent Advisor's option and expense, Independent Advisor may become a member of such Campaign. The following provisions shall apply to each Campaign.

a.  Each Campaign shall be coordinated by AEFA or AEFA's designees (such as AEFA's Group Vice Presidents), and shall commence operation on a date approved in advance by AEFA in writing.

b.  Each Campaign shall be established and organized for the exclusive purpose of administering regional or local advertising programs and developing, subject to AEFA's approval, standardized advertising materials for use by the members in local advertising.

c.  No promotional or advertising plans or materials may be used by a Campaign or furnished to its members without the prior approval of AEFA to conform to regulatory requirements and to protect the value of the Proprietary Marks. All such plans and materials shall be submitted to AEFA in accordance with the procedure set forth in this Section.

d. Each Independent Advisor who is a member of the Campaign agrees to submit to the Campaign, his or her contribution together with such other statements or reports as may be required by AEFA or by the Campaign.

e. Only Independent Advisors who are members of the Campaign will receive the leads resulting from the Campaign.

C.   Independent Advisor Advertising

• All advertising and promotion by Independent Advisor shall be in such media and of such type and format as AEFA may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as AEFA may specify to conform to regulatory requirements and to protect the value of the Proprietary Marks. Independent Advisor agrees to not use any advertising or promotional plans or materials unless and until Independent Advisor has received written approval from AEFA, pursuant to the procedures and terms set forth in this Section. Independent Advisor agrees to submit samples of all advertising and promotional plans and materials to AEFA, for AEFA's prior approval if such plans and materials have not been prepared or previously approved by AEFA within the prior one year period. Independent Advisor agrees to not use such plans or materials until they have been approved in writing by AEFA.

• AEFA may make available to Independent Advisor, at Independent Advisor's expense, pre-approved advertising plans and promotional materials, including newspaper mats, merchandising materials, sales aids, point-of-purchase materials, special promotions, direct mail materials, and similar advertising and promotional materials.

• If Independent Advisor has the appropriate licenses and satisfies all regulatory requirements, Independent Advisor may obtain listings for the Independent Financial Advisor Business in telephone directories. The content and appearance of any telephone listing shall conform to AEFA's pre-approved format, to conform to regulatory requirements and to protect the value of the Proprietary Marks.

• If AEFA believes that any advertising or promotional materials may cause a conflict with protecting the value of the Proprietary Marks, AEFA will initiate a process to review and/or coordinate the advertising or promotional materials and has final approval authority over the materials.

D.   Websites

• Independent Advisor specifically acknowledges and agrees that any Website (as defined below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) AEFA's approval under this Section. (As used in this Agreement, the term "Website" means an interactive electronic document, contained in a network of computers linked by communications software, that Independent Advisor operates or authorizes others to operate and that refers to the Independent Financial Advisor Business, Products & Services, Proprietary Marks, AEFA, and/or the System. The term Website includes, but is not limited to, Internet and World Wide Web home pages.) In connection with any Website, Independent Advisor agrees to the following:

a.  Any Website shall be in the format of AEFA's template for Websites.

b.  Before establishing the Website, Independent Advisor agrees to submit to AEFA a sample of the Website format and information in the form and manner AEFA may reasonably require.

c.  Independent Advisor agrees to not establish or use the Website without AEFA's prior written approval to conform to regulatory requirements and to protect the value of the Proprietary Marks.

d.  In addition to any other applicable requirements, Independent Advisor agrees to comply with AEFA's standards for Websites as prescribed by AEFA from time to time in the Manuals or otherwise in writing.  If required by AEFA, Independent Advisor agrees to establish its Website as part of AEFA's Website and/or establish electronic links to AEFA's Website.

e.  If Independent Advisor proposes any material revision to the Website or any of the information contained in the Website, Independent Advisor agrees to submit each such revision to AEFA for AEFA's prior written approval.

13.   ERRORS AND OMISSIONS PROGRAM AND INSURANCE

• As part of the Association Fee, AEFA agrees to provide, during the term of this Agreement, participation in AEFA's errors and omissions program protecting Independent Advisor, AEFA, AEFA's affiliates, and their respective officers, directors, partners, agents, and employees against demands or claims arising or occurring in connection with the Independent Financial Advisor Business as a result of errors or omissions as defined in the Manuals.  Such program may be provided by AEFA or written by a carrier or carriers approved by AEFA, shall name AEFA and AEFA's affiliates as additional insured parties as specified by AEFA, and shall provide at least the types and minimum amounts of coverages specified in the Manuals.

• AEFA recommends that Independent Advisor procure, prior to the commencement of any operations under this Agreement, and maintain in full force and effect at all times during the term of this Agreement, at Independent Advisor's expense, an insurance policy or policies protecting Independent Advisor against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Independent Financial Advisor Business, including, but not limited to, comprehensive general liability insurance.  For good risk management purposes, AEFA recommends that any insurance policy or policies procured by Independent Advisor with respect to the Independent Financial Advisor Business, also protect AEFA, and AEFA's affiliates, and their respective officers, directors, partners, agents and employees. Independent Advisor acknowledges and agrees that Independent Advisor indemnify AEFA as provided in Section 21.

14.    **TRANSFER OF INTEREST**

- AEFA shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, and any designated assignee of AEFA agrees to become solely responsible for all obligations of AEFA under this Agreement from the date of assignment. Independent Advisor agrees to execute such documents of acknowledgment or otherwise as AEFA shall request.

- Independent Advisor understands and acknowledges that the rights and duties set forth in this Agreement are personal to Independent Advisor, and that AEFA has granted this franchise in reliance on Independent Advisor's business skill, financial capacity, and personal character. Accordingly, neither Independent Advisor nor any immediate or remote successor to any part of Independent Advisor's interest in this Agreement or in the Independent Financial Advisor Business shall sell, assign, transfer, convey, pledge, encumber, merge, or give away (collectively, "transfer") any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business without the prior written consent of AEFA. Any purported assignment or transfer not having the written consent of AEFA required by this Section 14 shall be null and void and shall constitute a material breach of this Agreement, for which AEFA may immediately terminate without opportunity to cure pursuant to Section 17 of this Agreement.

- Independent Advisor agrees to notify AEFA in writing of any proposed transfer of any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business at least thirty (30) days before such transfer is proposed to take place. AEFA agrees to not unreasonably withhold its consent to any transfer, provided, however, that (i) the transferee is eligible to enter into and actually executes a franchise agreement, and (ii) AEFA will not consent to a transfer to a corporation, partnership, or limited liability company. Upon a transfer, AEFA may, in its sole discretion, require any or all of the following as conditions of its approval:

  a.  That all of Independent Advisor's accrued monetary obligations and all other outstanding obligations to AEFA and its affiliates related to the Independent Financial Advisor Business have been satisfied;

  b.  That Independent Advisor is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Independent Advisor and AEFA or its affiliates;

  c.  That Independent Advisor agrees to have executed a general release, in a form satisfactory to AEFA, of any and all claims against AEFA and its affiliates, and their respective officers, directors, shareholders, and employees;

  d.  That (i) if the transferee is not an Independent Advisor under the System, the transferee execute, for a term ending on the expiration date of this Agreement and with such renewal term(s) as may be provided by this Agreement, the then-current form of franchise agreement and other ancillary agreements, including the applicable Addendum No. 3, as AEFA may require for the Independent Financial Advisor Business, which agreements shall supersede this

Agreement in all respects or (ii), if the transferee is an Independent Advisor under the System, the transferee enter into a written assignment, in a form satisfactory to AEFA, assuming and agreeing to discharge all of Independent Advisor's obligations under the terms of the transferee's existing franchise agreement with AEFA;

e. That the transferee demonstrate to AEFA's satisfaction that it meets AEFA's educational, managerial, and business standards; possesses a good moral character and business reputation; has the aptitude and ability to operate the Independent Financial Advisor Business (as may be evidenced by prior related business experience or otherwise); has all appropriate permits, certificates, licenses, and training which may be required by AEFA, NASD, and governmental and regulatory agencies; be in compliance with the minimum requirements to be in good standing with this Agreement as set forth in Section 5 and has adequate financial resources and capital to operate the Independent Financial Advisor Business;

f. That Independent Advisor remain liable for all of the obligations to AEFA in connection with the Independent Financial Advisor Business which arose prior to the effective date of the transfer and execute any and all instruments reasonably requested by AEFA to evidence such liability;

g. That the transferee, as part of the Association Fee, complete any orientation programs then in effect for Independent Advisors upon such terms and conditions as AEFA may reasonably require; and

h. That Independent Advisor pay a transfer fee of One Thousand Dollars ($1,000) to reimburse AEFA for its costs and expenses associated with reviewing the application to transfer and administration of the transfer.

• Independent Advisor agrees to not grant a security interest in the Independent Financial Advisor Business or in any of the assets of the Independent Financial Advisor Business, without the prior written consent of AEFA, which consent will not be unreasonably withheld.

• If Independent Advisor desires to accept any *bona fide* offer from a transferee to purchase the Independent Financial Advisor Business, Independent Advisor agrees to notify AEFA as provided in this Section, and shall provide such information and documentation relating to the offer as AEFA may require. If, prior to the actual date of a proposed transfer, Independent Advisor has entered into a continuity of practice agreement with the transferee, AEFA has the right to approve the transferee under the conditions of Section 14, paragraph 3, subsection (e) of this Agreement both at the time the continuity of practice agreement was entered into and at the time of the proposed transfer. If Independent Advisor has entered into a continuity of practice agreement with a transferee, AEFA shall have the right and option, exercisable within thirty (30) days of Independent Advisor entering into a continuity of practice, agreement to purchase the Independent Financial Advisor Business on the same terms and conditions as described below and consistent with the continuity of practice agreement. If upon AEFA's offer to purchase the Independent

Financial Advisor Business on similar terms and conditions, Independent Advisor chooses not to sell to AEFA, Independent Advisor has the right to withdraw the offer to enter into a continuity of practice agreement and continue operating his or her Independent Financial Advisor Business. If ninety (90) days prior to the proposed transfer, Independent Advisor has entered into a continuity of practice agreement and AEFA has not exercised the opportunity to buy or right of first refusal, described below, AEFA agrees to not have a right or option to purchase the Independent Financial Advisor Business at the time of the proposed transfer. In addition, if Independent Advisor has not entered into a continuity of practice agreement at least ninety (90) days prior to the proposed transfer, AEFA also shall have the right and option to purchase the Independent Financial Advisor Business on the same terms and conditions as described below. If AEFA elects to purchase the Independent Financial Advisor Business, closing on such purchase shall occur within thirty (30) days from the date of notice to the seller of the election to purchase by AEFA. If AEFA elects not to purchase the Independent Financial Advisor Business, any material change thereafter in the terms of the offer from a transferee shall constitute a new offer subject to the same rights of first refusal by AEFA as in the case of the transferee's initial offer. Failure of AEFA to exercise the option afforded by this Section shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a transferee are such that AEFA may not reasonably be required to furnish the same consideration, terms, and/or conditions, then AEFA may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the transferee, an independent appraiser shall be designated and mutually agreed upon by AEFA and Independent Advisor, at AEFA's expense, and the appraiser's determination shall be binding.

- AEFA encourages Independent Advisor, for a variety of business reasons, including anticipation of death or mental or physical incapacity, to execute an agreement with another Independent Advisor, consistent with the transfer of interest policies in this Section 14. The Independent Financial Advisor Business will immediately transfer to that Independent Advisor, upon the death or mental or physical incapacity of Independent Advisor. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer. In the event an agreement does not exist, AEFA, for a management fee, will manage the Independent Financial Advisor Business for up to ninety (90) days from the death or mental incapacity of Independent Advisor, until the executor can find a buyer for AEFA to approve. The management fee (further described in the Compensation Manual) is the compensation on the Independent Financial Advisor Business while a buyer is being located and approved. The estate is responsible for all expenses relating to the Independent Financial Advisor Business during this time. If the Independent Financial Advisor Business is not disposed of within ninety (90) days after such death or mental incapacity, AEFA may terminate this Agreement, pursuant to Section 17 hereof.

- AEFA's consent to a transfer of any interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business shall not constitute a waiver of any

claims it may have against the transferring party, nor shall it be deemed a waiver of AEFA's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

15.   **COMPLIANCE AND INSPECTIONS**

- Independent Advisor agrees to comply with the Compliance Rules as defined herein and the Individual Treatment Policy. Compliance with such laws, regulations, policies and procedures is required to ensure that AEFA and Independent Advisor are in good standing with the regulators. Independent Advisor agrees to timely obtain and maintain all licenses with AEFA necessary for the full and proper conduct of the Independent Financial Advisor Business and the offering of Products & Services, including any required NASD, state securities and/or insurance licenses, licenses to do business, state investment advisor registrations, sales tax permits, and/or clearances. Independent Advisor is an associated person of AEFA and agrees to be supervised for regulatory compliance purposes by the OSJ Branch Manager, Field Compliance Director or Field Compliance Supervisor, as described in the Client Relations Manual, and this compliance supervisor must be located in Independent Advisor's Market Group. To ensure a high level of securities and regulatory compliance, Independent Advisor agrees to promptly respond to requests for information and records from OSJ Branch Managers and AEFA employees and agents, and Field Compliance Directors.

- Independent Advisor agrees to, within 24 hours of the occurrence of any of the following events, notify AEFA of any: (i) inspection, investigation, or citation of Independent Advisor or the Independent Financial Advisor Business by NASD, state securities regulators, state insurance commissioners or any other governmental or regulatory agencies; (ii) suspension of any license related to the Independent Financial Advisor Business or the sale of any Products or Services; (iii) alleged violation of any federal, state, local, or NASD laws or regulations related to Products or Services, or to the Independent Financial Advisor Business; (iv) action, suit, disciplinary proceeding or other proceeding, and/or the issuance of any fine, sanction, order, writ, injunction, award, or decree of NASD or any court, regulator, agency, or other governmental instrumentality, against Independent Advisor or which may adversely affect Independent Advisor or the operation or financial condition of the Independent Financial Advisor Business; or (v) Client complaints.

- Independent Advisor agrees to permit AEFA, the OSJ Branch Managers, AEFA's agents, and governmental and regulatory agencies required to have access by law (collectively, the "Inspectors") to enter upon the Premises at any time, with or without notice to Independent Advisor, during normal business hours for the purpose of conducting inspections to confirm compliance with the terms of this Agreement, the Manuals and Compliance Rules; shall cooperate with Inspectors in such inspections by rendering such assistance as they may reasonably request, including access to all books and records, including computerized books and records; and, upon notice from Inspectors, and without limiting AEFA's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection within a reasonable time as determined by AEFA.

- In accordance with NASD requirements, AEFA agrees to investigate and resolve complaints and compliance issues involving Independent Advisor. AEFA agrees to provide Independent Advisor with an opportunity to respond to complaints and supply documentation, but AEFA maintains the right to settle these issues. Independent Advisor will have access to an internal appeals process should a dispute on the resolution of a case occur. AEFA may assess applicable settlement costs, subject to whatever offsets, if any, are afforded Independent Advisor by the AEFA errors and omissions program, and fines against Independent Advisor for failure to comply with regulatory requirements and company policies as set forth in the Client Relations Manual. These costs and fines may be deducted directly from Independent Advisor's Compensation or any amounts otherwise due to Independent Advisor by AEFA; however, AEFA agrees to allow either or both to be paid directly to AEFA should the Independent Advisor so choose.

16.   **SPECIAL REGULATORY SUPERVISION**

- Upon the occurrence of any of the following events, AEFA may place Independent Advisor on special regulatory supervision for a period of time determined by AEFA ("Special Regulatory Supervision") and place certain restrictions on Independent Advisor and the Independent Financial Advisor Business (the "Terms of Special Regulatory Supervision") which may, at AEFA's option, include: (i) terminating some of Independent Advisor's rights to offer Products & Services; (ii) suspending or placing restrictions on Independent Advisor's rights to operate the Independent Financial Advisor Business and/or offer Products & Services; (iii) requiring Independent Advisor to obtain additional training; (iv) imposing heightened supervision of Independent Advisor and the Independent Financial Advisor Business; (v) reducing the payout to which Independent Advisor would otherwise be entitled; and (vi) such other requirements that AEFA may require, effective immediately upon the provision of notice to Independent Advisor (in the manner provided under Section 23 hereof):

   a.   If Independent Advisor shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy, or such a petition is filed against and not successfully opposed by Independent Advisor; if Independent Advisor is adjudicated a bankrupt or insolvent; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or if Independent Advisor makes a compromise with creditors;

   b.   If Independent Advisor is under investigation by NASD or other self-regulatory organizations, state securities regulators, or any other governmental or regulatory agencies;

   c.   If there is an allegation (including any allegation by a Client) that Independent Advisor violated any Compliance Rules related to the Independent Financial Advisor Business; or

   d.   If Independent Advisor fails to substantially comply with any of the requirements imposed by this Agreement (including, without limitation, those identified in Section 17 below) or failure to carry out the terms of this Agreement in good faith.

- Upon notice from AEFA that Independent Advisor has been placed on Special Regulatory Supervision and the Terms of Special Regulatory Supervision, Independent Advisor agrees to immediately comply with the Terms of Special Regulatory Supervision. Independent Advisor's failure to comply with the Terms of Special Regulatory Supervision shall be a default under the "Immediate Termination" provision of Section 17, below.

17.    DEFAULT AND TERMINATION

- Termination by Independent Advisor.  Independent Advisor may terminate this Agreement upon fourteen (14) days written notice to AEFA in the manner provided in Section 23 hereof and, if applicable, Addendum No. 3 hereto.  The termination shall take effect on the date specified in the notice or as directed by AEFA.

- Immediate Termination with Cause.  Upon the occurrence of any of the following events of default, AEFA may, at its option, terminate this Agreement and all rights granted hereunder, which events shall constitute good cause to the extent permitted by law, without affording Independent Advisor any opportunity to cure the default, effective immediately upon the provision of notice to Independent Advisor (in the manner provided under Section 23 hereof).  In the event AEFA believes any law may prohibit the immediate termination of this Agreement. AEFA may immediately suspend Independent Advisor, who shall remain suspended until such time as AEFA either terminates this Agreement or ends the suspension. Any Independent Advisor who is suspended must temporarily cease operations, although such Independent Advisor will receive all Compensation that Independent Advisor is entitled pursuant to the Manuals to receive at the time the suspension is lifted.

  a.  If Independent Advisor fails to locate an approved site or to open the Independent Financial Advisor Business within the time limits provided in Section 6 of this Agreement;

  b.  If Independent Advisor fails to complete the initial orientation program described in Section 7 hereof to AEFA's satisfaction;

  c.  If Independent Advisor at any time ceases to operate or otherwise abandons the Independent Financial Advisor Business, enters into an unauthorized agency agreement with a competitor or imminently plans to do so, or otherwise forfeits the right to do or transact business in the jurisdiction where the Independent Financial Advisor Business is located.  However, if, through no fault of Independent Advisor, the Premises are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter or Independent Advisor loses the right to possession of the Premises, then Independent Advisor agrees to have sixty (60) days after such event in which to apply for AEFA's approval to relocate the Independent Financial Advisor Business, which approval shall not be unreasonably withheld;

  d.  If Independent Advisor is charged with, pleads nolo contendere to, or is convicted of a felony, a crime involving moral turpitude or dishonesty, or any other crime or offense that AEFA believes is reasonably likely to have an

adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or AEFA's interest therein;

e.  If Independent Advisor fails to obtain or loses any appropriate licenses which may be required by AEFA, NASD, and governmental and regulatory agencies to operate the Independent Financial Advisor Business or offer Products & Services;

f.  If any purported assignment or transfer of any direct or indirect interest in this Agreement or in all or substantially all of the assets of the Independent Financial Advisor Business is made to any transferee without AEFA's prior written consent, contrary to the terms of Section 14 hereof;

g.  If an approved transfer is not effected within the time provided following death or mental incapacity, as required by Section 14 hereof;

h.  If Independent Advisor fails to comply with the covenants in Section 19 hereof or fails to obtain execution of the covenants required under Sections 10 or 19 hereof;

i   If, contrary to the terms of Sections 9 or 10 hereof, Independent Advisor discloses or divulges the contents of the Manuals or other confidential information provided to Independent Advisor by AEFA;

j.  If Independent Advisor knowingly maintains false books or records, or submits any false reports to AEFA;

k.  If Independent Advisor is involved in misappropriating monies, fails to timely transmit Client funds or securities to AEFA, or engages in unauthorized activities or violates the Compliance Rules and/or the Individual Treatment Policy.

l.  If Independent Advisor misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the System, or otherwise materially impairs the goodwill associated therewith or AEFA's rights therein;

m.  If Independent Advisor refuses to permit an Inspector to inspect the Premises, or the books, records, or accounts of Independent Advisor upon demand;

n.  If Independent Advisor, upon receiving a notice of default under Section 17 hereof entitled "Termination with an Opportunity to Cure Within Thirty (30) Days," fails to initiate immediately a remedy to cure such default;

o.  If Independent Advisor, after curing a default pursuant to Section 17 hereof entitled "Termination with an Opportunity to Cure Within Thirty (30) Days," commits the same default again, whether or not cured after notice;

p.  If Independent Advisor fails to comply with the Terms of Special Regulatory Supervision; or

q.  If Independent Advisor is alleged to have violated Federal or state civil or common law that AEFA believes is reasonable likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or AEFA's interest therein.

- <u>Termination with an Opportunity to Cure Within Thirty (30) Days</u>.  Except as otherwise provided in Section 17 entitled "Immediate Termination" and Section 17 entitled "Termination with an Opportunity to Cure within One (1) Year," upon any other default by Independent Advisor, AEFA may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Independent Advisor at least thirty (30) days prior to the effective date of termination; provided, however, that Independent Advisor may avoid termination by immediately initiating a remedy to cure such default, curing it to AEFA's satisfaction, and by promptly providing proof thereof to AEFA within the thirty (30) day period.  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Independent Advisor, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require and AEFA may re-assign any Clients assigned to the Independent Advisor.  Defaults which are susceptible of cure hereunder include the following illustrative events:

   a.  If Independent Advisor fails to substantially comply with any of the requirements imposed by this Agreement.

   b.  If Independent Advisor fails, refuses, or neglects promptly to pay any monies owing to AEFA or its affiliates when due, or to submit the financial or other information required by AEFA under this Agreement;

   c.  Except as provided in Section 17 entitled "Immediate Termination," if Independent Advisor fails, refuses, or neglects to obtain AEFA's prior written approval or consent as required by this Agreement; or

   d.  If Independent Advisor engages in any business or markets any service or product under a name or mark which, in AEFA's opinion, is confusingly similar to the Proprietary Marks.

- <u>Termination with an Opportunity to Cure within One (1) Year</u>.  Upon the occurrence of any of the following events of default, determined as of the first anniversary of this Agreement and annually thereafter, AEFA may, at its option, terminate this Agreement and all rights granted hereunder, by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Independent Advisor one (1) year prior to the effective date of termination; provided, however, that Independent Advisor may avoid termination by immediately initiating a remedy to cure such default, curing it to AEFA's satisfaction, and by providing proof thereof to AEFA within such one (1) year period.  If any such default is not cured within the one (1) year period, this Agreement shall terminate

without further notice to Independent Advisor, effective immediately upon the expiration of such one (1) year period.

    a. If Independent Advisor fails to maintain Quality of Advice Standards of at least level three (3).

    b. If Independent Advisor fails to maintain Client Satisfaction Standards of at least seventy percent (70%), as more fully described in the Manuals.

    c. If Independent Advisor fails to maintain an office with the fixtures, furnishings and equipment necessary to maintain professional standards for the operation of the Independent Financial Advisor Business or if Independent Advisor fails to install signs as provided in the Manuals.

    d. If Independent Advisor fails to meet the financial planning standards set forth in Section 5.

- Subject to AEFA and affiliated broker-dealer policies, AEFA agrees to allow the Independent Advisor to terminate this Agreement and move to an affiliated broker-dealer. (e.g. Securities America).

18.   <u>OBLIGATIONS UPON TERMINATION OR EXPIRATION</u>

Upon termination or expiration of this Agreement, all rights granted hereunder to Independent Advisor shall forthwith terminate although Independent Advisor's duties under this Agreement shall continue as specified in this Section 18, and:

- Independent Advisor agrees to immediately cease to operate the Independent Financial Advisor Business, and Independent Advisor agrees to not thereafter, directly or indirectly, represent to the public or hold himself or herself out as a present or former franchisee of AEFA.

- If this Agreement is terminated for reasons outlined in Section 17, AEFA will honor any agreement with another Independent Advisor, consistent with the transfer of interest policies in Section 14, or, Independent Advisor can attempt to locate a buyer for AEFA to approve. AEFA, for a management fee, will manage the Independent Financial Advisor Business for up to ninety (90) days until a buyer can be found and approved. The management fee (further defined in the Compensation Manual) is the compensation on the Independent Financial Advisor Business while a buyer is being located and approved. If a buyer is not found and approved within the ninety (90) days after such termination, the Independent Financial Advisor Business terminates the right to the equity. In the interests of good client relationships, AEFA will assume continuous service to all Clients.

- Independent Advisor agrees to immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; the Proprietary Marks; and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Independent Advisor agrees to cease to use.

without limitation, all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

- Independent Advisor agrees to make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the Premises from that of the Independent Financial Advisor Business under the System, and shall make such specific additional changes thereto as AEFA may reasonably request for that purpose. In the event Independent Advisor fails or refuses to comply with the requirements of this Section 18, AEFA agrees to have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Independent Advisor, which expense Independent Advisor agrees to pay upon demand.

- Independent Advisor agrees to immediately cease using any telephone number used by Independent Advisor in the Independent Financial Advisor Business. AEFA agrees to immediately cease using the telephone number unless the telephone number is for an Area Office or other AEFA-leased space. At AEFA's expense, AEFA reserves the right to add a forwarding message to any such telephone number, indicating the telephone number for AEFA and for the departing Independent Advisor.

- Independent Advisor agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in AEFA's sole discretion, is likely to cause confusion, mistake, or deception, or which, in AEFA's sole discretion, is likely to dilute AEFA's rights in and to the Proprietary Marks. Independent Advisor further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to AEFA, the System, or the Proprietary Marks) which, in AEFA's sole discretion, suggests or represents a present or former association or connection with AEFA, the System, or the Proprietary Marks.

- Independent Advisor agrees to promptly pay all sums owing to AEFA and its affiliates. In the event of termination for any default of Independent Advisor, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by AEFA as a result of the default.

- Independent Advisor agrees to immediately deliver to AEFA the Manuals and all other original records, including most recent financial plans and recommendations, computer databases and files, correspondence, and instructions containing confidential information relating to the System (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of AEFA. To satisfy regulatory requirements, Independent Advisor agrees to immediately deliver to AEFA the originals of all Client records, including records containing Client lists and/or information and transactions belonging to AEFA, unless Independent Advisor transfers the Independent Financial Advisor Business as provided in Section 14.

- Independent Advisor agrees to immediately (i) discontinue use of any computer software developed for the System or AEFA, (ii) deliver to AEFA all such computer software in Independent Advisor's possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices under the control of Independent Advisor, and (iv) remove such computer software from any other computer programs or software in Independent Advisor's possession or control that incorporates or used such computer software in whole or in part.

- Independent Advisor agrees to comply with the covenants contained in Section 19 of this Agreement.

19.   **COVENANTS**

- Independent Advisor covenants that, during the term of this Agreement, Independent Advisor agrees to (i) devote best efforts to the management and operation of the Independent Financial Advisor Business, and (ii) except as otherwise approved in writing by AEFA or after providing notice to AEFA as specified in the Manuals, not be employed or engage in other business activities outside the Independent Financial Advisor Business.

- Independent Advisor specifically acknowledges that, pursuant to this Agreement, Independent Advisor will receive additional substantive rights as a franchisee of AEFA. Independent Advisor also recognizes he or she will receive valuable and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of AEFA and the System. In recognition of and in consideration for these and other benefits, to protect the confidentiality of AEFA's Client information and to protect AEFA's goodwill, Independent Advisor covenants that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within which Independent Advisor operates or operated, Independent Advisor agrees to not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

    a.  (1)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate an agreement with AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System;

        (2)    Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products & Services acquired or ordered from or through AEFA, AEFA's affiliates, Issuers, or any financial advisor business under the System, except as provided in the Manuals or with AEFA's written approval and consent;

        (3)    Solicit any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement to open an account other than an AEFA account or to sell any investment, financial or insurance products or services other than through AEFA with AEFA's written approval and consent; or

(4)    Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients that Independent Advisor contacted, serviced or learned about while operating under this Agreement.

b.   (1)    Employ, or retain as an independent contractor, any person who is at that time employed by AEFA or associated with AEFA as an independent contractor or agent or by any other Independent Advisor of AEFA, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with AEFA; or

(2)    Disparage AEFA, its affiliates, employees, advisors, and Products & Services.

For purposes of this Section, an "Issuer" is a company or entity that issues Products & Services distributed or offered by AEFA, AEFA's affiliates, or AEFA as the agent of another company.

- Independent Advisor understands and acknowledges that if Independent Advisor terminates this Agreement, AEFA shall have the right to continue to actively offer all Products and Services to Clients the Independent Advisor serviced at AEFA.

- Upon expiration of this Agreement, Independent Advisor may have a right to revenue based on past Products & Services that have been purchased by Clients through the Independent Financial Advisor Business, as provided for in the Manuals, or with AEFA's approval and consent.

- Independent Advisor understands and acknowledges that AEFA shall have the right, in its sole discretion, to reduce the scope or restrictiveness of any covenant set forth above, or any portion thereof, without Independent Advisor's consent, effective immediately upon receipt by Independent Advisor of written notice thereof; and Independent Advisor agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 24 hereof.   Independent Advisor agrees and understands that AEFA's exercise of such discretion, as to the Independent Advisor who is the subject of this Agreement, or of any other Independent Advisor, shall not constitute a waiver of any of AEFA's right to enforce this or any other agreements.

- Independent Advisor expressly agrees that the existence of any claims it may have against AEFA, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by AEFA of the covenants in this Section 19.

- At AEFA's request, Independent Advisor agrees to obtain and furnish to AEFA executed covenants similar in substance to those set forth in this Section 19 and, at the Independent Advisor's discretion, Addendum No. 3 (including covenants applicable upon the termination of a person's relationship with Independent Advisor and the provisions of Section 10 of this Agreement) from personnel (identified in the Manuals) employed or retained as an

independent contractor by Independent Advisor or his/her agent. Every covenant required by this Section shall be in a form approved by AEFA, including, without limitation, specific identification of AEFA as a third-party beneficiary of such covenants with the independent right to enforce them.

- Independent Advisor agrees that to the fullest extent permitted by applicable law, AEFA will be entitled to injunctive relief from a court or NASD arbitration should Independent Advisor violate any of the covenants in this Section 19 and in Sections 10 and 18 (the "Sections") of this Agreement. Independent Advisor recognizes that AEFA's remedies solely at law will be inadequate, that AEFA will be irreparably harmed by violations of the provisions in the Sections, and thus that AEFA will be entitled to injunctive relief to prevent future violations of the provisions in the Sections until a full and final resolution of any dispute may be had on the merits. If Independent Advisor has signed Addendum No. 3 but fails to comply with it, AEFA shall be entitled to immediate injunctive relief to enforce at AEFA's option, the covenants in Section 19, including 19(a) (1), (2), (3), and (4) and/or of Addendum 3. AEFA has the right to seek such injunctive relief in a court of competent jurisdiction, which relief shall extend until, and if, a decision on the merits of the same issue is rendered by an NASD arbitration panel. Such election by AEFA to seek judicial relief shall not waive any rights AEFA may have to arbitrate disputes arising under this Agreement, including rights to obtain damages from Independent Advisor in arbitration for violations of this Agreement.

- Nothing in this Agreement will prevent Independent Advisor from engaging in a competitive business consistent with the covenants in this Section 19, including serving as a financial advisor or consultant affiliated with another firm, after this Agreement expires or is terminated. Nothing in this Agreement will prohibit Independent Advisor from soliciting and servicing any Clients that Independent Advisor contacted, serviced or learned about while operating under an agreement with AEFA more than one year after this Agreement terminates or expires, provided that Independent Advisor makes no use directly or indirectly of any confidential or trade secret information, including but not limited to client files and lists obtained from AEFA.

- Upon Independent Advisor's request, AEFA may in its complete discretion release Independent Advisor from any provisions in this Section 19, in whole or in part, for example to exclude specified family members from the provisions in this Section 19. Such requests by Independent Advisor must be in writing and any release to Independent Advisor must be in writing and signed by an officer of AEFA. Any such release shall not act as a waiver of any other of AEFA's rights under this Agreement as such rights apply to any other Independent Advisor.

- AEFA agrees that clients who Independent Advisor purchased a direct or indirect interest in or obtained outside of the AEFA System and transferred to AEFA are not subject to Section 19 (a) (1), (2), (3) and (4).

## 20. TAXES, PERMITS, AND INDEBTEDNESS

- Independent Advisor agrees to promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Independent Advisor in the operation of the

Independent Financial Advisor Business. Independent Advisor agrees to pay to AEFA an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on AEFA with respect to any payments to AEFA required under this Agreement, unless the tax is credited against income tax otherwise payable by AEFA.

- In the event of any bona fide dispute as to Independent Advisor's liability for taxes assessed or other indebtedness, Independent Advisor may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Independent Advisor permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the Premises of the Independent Financial Advisor Business, or any improvements thereon.

21.  **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

- This Agreement does not create a fiduciary duty on behalf of AEFA to the Independent Advisor. Independent Advisor agrees to be an independent contractor, and nothing in this Agreement is intended to constitute AEFA as an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the Independent Advisor for any purpose whatsoever.

- During the term of this Agreement, Independent Advisor agrees to hold himself or herself out to the public as an independent contractor operating the Independent Financial Advisor Business. Independent Advisor agrees to take such action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place at the Premises, the content of which AEFA reserves the right to specify. Nothing in this Agreement authorizes Independent Advisor to make any contract, agreement, warranty, or representation on AEFA's behalf, or to incur any debt or other obligation in AEFA's name; and AEFA agrees to in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall AEFA be liable by reason of any act or omission of Independent Advisor in his or her operation of the Independent Financial Advisor Business or for any claim or judgment arising therefrom against Independent Advisor or AEFA.

- To the extent permitted by law and not covered by the errors and omission program pursuant to Section 13, Independent Advisor agrees to indemnify and hold harmless AEFA and its affiliates, and their respective officers, directors, agents, employees, successors and assigns (the "**Indemnitees**"), against any and all causes of action, claims, demands, liabilities, losses, damages, actions, litigation or other expenses (including, but not limited to, interest, costs of investigation, settlement costs, and attorneys' fees) arising out of or relating to Independent Advisor's establishment or operation of the Independent Financial Advisor Business, except for any claim based solely on the willful misconduct or gross negligence of AEFA or its officers, agents and employees, or based solely on nonperformance by AEFA of its obligations hereunder. Independent Advisor agrees that with respect to any threatened or actual litigation, proceeding or dispute which could directly or indirectly affect any of the Indemnitees, the Indemnitees shall have the right, but not the obligation, to: (i) choose counsel, (ii) direct, manage and/or control the handling of the matter; and (iii) settle on behalf of the Indemnitees, and/or Independent Advisor, any claim against the Indemnitees in their sole discretion. All vouchers, canceled checks, receipts, receipted bills or other evidence of payments for any such losses, liabilities, costs, damages, charges or expenses of

whatsoever nature incurred by any Indemnitee shall be taken as prima facie evidence of Independent Advisor's obligation hereunder. AEFA may require Independent Advisor to reimburse AEFA for all expenses (including attorneys' fees) reasonably incurred by AEFA to enforce the terms of this Agreement or any obligation owed by Independent Advisor to AEFA under this Agreement or otherwise, including, without limitation, Independent Advisor's indemnification obligations.

22.   **APPROVALS AND WAIVERS**

- Whenever this Agreement requires the prior approval or consent of AEFA, Independent Advisor agrees to make a timely written request to AEFA therefor, and such approval or consent must be obtained in writing from an officer of AEFA. AEFA will respond to such requests within a timeframe reasonable under the circumstances.

- AEFA makes no warranties or guarantees upon which Independent Advisor may rely, and assumes no liability or obligation to Independent Advisor, by providing any waiver, approval, consent, or suggestion to Independent Advisor in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

- No failure of AEFA to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Independent Advisor with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of AEFA's right to demand exact compliance with any of the terms hereof. Waiver by AEFA of any particular default of Independent Advisor shall not affect or impair AEFA's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of AEFA to exercise any power or right arising out of any breach of default by Independent Advisor of any of the terms, provisions, or covenants hereof, affect or impair AEFA's right to exercise the same, nor shall such constitute a waiver by AEFA of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by AEFA of any payments due to it hereunder shall not be deemed to be a waiver by AEFA of any preceding breach by Independent Advisor of any terms, covenants, or conditions of this Agreement.

23.   **NOTICES**

Any and all notices required or permitted under this Agreement shall be in writing and shall be: personally delivered; sent by facsimile/telecopier (if confirmed by mail); mailed by certified mail, return receipt requested; or dispatched by overnight delivery envelope, to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

> Notices to AEFA:
> American Express Financial Advisors Inc.
> IDS Tower 10
> 733 Marquette Avenue
> Minneapolis, Minnesota 55440
> Attn: Unit 1523

Notices to Independent Advisor will be made to the Independent Advisor's preferred business address on record at AEFA.

Any notice by a means which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given and received at the date and time of receipt or rejected delivery.

24.  ENTIRE AGREEMENT

This Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between AEFA and Independent Advisor concerning the subject matter hereof, and supersede all prior and contemporaneous agreements, negotiations and representations (written and oral), no other representations having induced Independent Advisor to execute this Agreement. No party is relying on any agreement or representation, or bound by any other agreement or obligation concerning the subject matter of this Agreement that is not expressly set forth herein. Except for those permitted to be made unilaterally by AEFA hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

25.  SEVERABILITY AND CONSTRUCTION

- If, for any reason, any section, part, term, provision, and/or covenant herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, provisions, and/or covenants of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, provisions, and/or covenants shall be deemed not to be a part of this Agreement.

- Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination) shall survive such expiration, termination, or assignment, including but not limited to Sections 10, 19, 21, and 26.

- Independent Advisor expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court, regulator, or agency having valid jurisdiction may hold to be unreasonable and unenforceable in an unappealed final decision to which AEFA is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court, regulator, or agency order.

26.  APPLICABLE LAW

- This Agreement shall be interpreted and construed exclusively under the laws of the State of Minnesota. In the event of any conflict of law, the laws of Minnesota shall prevail, without regard to the application of Minnesota conflict-of-law rules; except that all issues relating to

American Express Financial Advisors Inc.
Franchise Agreement - 10/25/99

33

REDACTED

- Except as provided in Section 19, any claim or controversy arising out of, or related to, this Agreement, or the offer, making, performance, or interpretation thereof, shall be finally settled by arbitration unless otherwise agreed to by the parties. Except as provided in Section 19, arbitration shall be conducted pursuant to the NASD Code of Arbitration Procedure and other applicable rules of the NASD. By agreement of the parties, disputes may be resolved in arbitration conducted by a mutually agreed upon organization.

- No right or remedy conferred upon or reserved to AEFA or Independent Advisor by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

- AEFA and Independent Advisor irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

- AEFA and Independent Advisor hereby waive to the fullest extent permitted by law any right to, or claim of, any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

- Nothing herein contained shall bar AEFA's right to obtain injunctive relief against conduct or threatened conduct that (i) will cause it loss or damage or (ii) violates the Terms of Special Regulatory Supervision or (iii) is in violation of AEFA's obligation to comply fully with government agency laws or regulations under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

## 27. ACKNOWLEDGMENTS

- Independent Advisor acknowledges that it has conducted an independent investigation of the Independent Financial Advisor Business, and recognizes that the business venture contemplated by this Agreement involves significant business risks and that its success will be largely dependent upon the ability of Independent Advisor as an independent businessperson. AEFA expressly disclaims the making of, and Independent Advisor acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

- Independent Advisor acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Independent Advisor further acknowledges that it received the disclosure document required by the Trade Regulation Rule

of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.

• Independent Advisor acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that AEFA has accorded Independent Advisor ample time and opportunity to consult with advisors of Independent Advisor's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

| Independent Advisor | American Express Financial Advisors Inc. |
|---|---|
| By: _Donna M. Oliam_ | By: _____ |
| Name: _Donna M. Oliam_ | Name: _____ |
| Title: _Personal Financial Advisor_ | Title: _____ |
| Date: _Dec. 17th 1999_ | Date: _____ |
| Social Security No.: _____ REDACTED | |
| Advisor No.: _____ | |

MAY-01-2008 THU 12:51 PM AMERIPRISE FINANCIAL        FAX NO. 012 011 0000        P. 24

## SCHEDULE A

Independent Financial Advisor office location:   6833 Stalter #200
                                                 Rockford ll,
                                                           6408

Name:   Donna M. Quam
Title:  Personal Financial Advisor
Date:   Dec 17th  1999
Social Security No.:  _____  REDACTED
Advisor No.:  _____

American Express Financial Advisors Inc.                    Schedule A
Franchise Agreement – 10/25/99

36

MAY-01-2008 THU 12:31 PM AMERIPRISE FINANCIAL       FAX NO. 612 671 0586       P. 20

Addendum 1

### ADDENDUM TO THE
### AMERICAN EXPRESS FINANCIAL ADVISORS INC.
### INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the "Agreement") and agree as follows:

1. This Addendum to the Agreement shall supplement the terms of the Agreement. In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2. Section 4 of the Agreement, under the heading "FEES AND COMPENSATION" the paragraph entitled "Initial Franchise Fee", shall be replaced with the following:

   - Initial Franchise Fee. In consideration of Independent Advisor's previous financial planning agreements with AEFA, AEFA agrees to waive Independent Advisor's initial franchise fee of One Thousand Five Hundred Dollars ($1,500).

3. Section 5 of the Agreement, under the heading "Ongoing Duties of the Independent Advisor", the paragraph entitled "Premises and Signage", shall be modified by adding the following:

   - Alternatively, Independent Advisor may meet Clients at the Area Office or other location of Client's choice.

4. Independent Advisor acknowledges that it has read and understood this Addendum.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

| Independent Advisor | American Express Financial Advisors Inc. |
|---|---|
| By: _Donna M. Quam_ | By: _____ |
| Name: _Donna M. Quam_ | Name: _____ |
| Title: _Personal Financial Advisor_ | Title: _____ |
| Date: _Dec 17th 1999_ | Date: _____ |
| Social Security No.: | |
| Advisor No.: _____ REDACTED | |

### ADDENDUM TO THE
### AMERICAN EXPRESS FINANCIAL ADVISORS INC.
### INDEPENDENT ADVISOR BUSINESS FRANCHISE AGREEMENT
### OFFICE OF SUPERVISORY JURISDICTION AGREEMENT

AEFA and Independent Advisor are parties to the attached American Express Financial Advisors Inc. Independent Advisors Business Franchise Agreement (the "Agreement") and agree as follows:

1. This Addendum to the Agreement shall supplement the terms of the Agreement. In the event of any inconsistency between this Addendum and the Agreement, this Addendum shall control.

2. This Addendum defines Independent Advisor's relationship with AEFA as an Office of Supervisory Jurisdiction Branch Manager and, in setting forth such relationship in this Addendum, Independent Financial Advisor shall be referred to as the OSJ Branch Manager (the "**OSJ Branch Manager**") in this Addendum.

3. Undertakings by OSJ Branch Manager. OSJ Branch Manager will serve as a Registered Principal and maintain an Office Of Supervisory Jurisdiction and perform these functions according to the rules and regulations of the NASD, the Securities and Exchange Commission and the AEFA Manuals.

   A. The regulatory activities as described in the Manuals include, but are not limited to, the compliance with the specific regulatory requirements for:

   |      |                              |
   |------|------------------------------|
   | (i)   | advertising and correspondence |
   | (ii)  | annual compliance review       |
   | (iii) | annual compliance meeting      |
   | (iv)  | branch office inspections      |
   | (v)   | complaint handling             |
   | (vi)  | continuing education           |
   | (vii) | mail handling                  |
   | (viii)| outside activities disclosure  |
   | (ix)  | record keeping requirements    |
   | (x)   | supervision                    |

   B. As provided in the Manuals, OSJ Branch Manager will provide, at his or her own expense, adequate support personnel and systems sufficient to perform the functions described above in Section 3.A. necessary to supervise Independent Advisors assigned to the Branch Office in _____ (the "**Branch Office**").

   C. OSJ Branch Manager may also provide services to Independent Advisors that are not related to compliance supervision, as described in the Manuals.

4. Section 4 of the Agreement, under the heading "FEES AND COMPENSATION", shall be supplemented with the following:

- As provided in the Manuals, (i) OSJ Branch Manager shall negotiate with each Independent Advisor the amount of compensation such Independent Advisor agrees to pay OSJ Branch Manager for Compliance supervision and prevision of additional services; (ii) OSJ Branch Manager and each Independent Advisor agrees to formalize their agreement with respect to the Compliance supervision and additional services in a branch agreement that complies with the Manuals (the "Branch Agreement"); (iii) OSJ Branch Manager's compensation for Compliance supervision may be a percentage of an Independent Advisor's sales of securities or a fixed dollar amount; and (iv) OSJ Branch Manager shall receive each Accounting Period the compensation provided for in each Branch Agreement for an Independent Advisor that OSJ Branch Manager has a Branch Agreement with.

5. Termination.

   A. This Addendum terminates in the event of:

      (i)   OSJ Branch Manager's death or retirement;
      (ii)  OSJ Branch Manager's total and permanent disability;
      (iii) Cancellation or non renewal of any license, registration or bond you are required to have by the states, the NASD, SEC or the Agreement;
      (iv)  OSJ Branch Manager's violation of any provision of this Addendum or the Agreement; or
      (vi)  Any transfer by OSJ Branch Manager under Section 14 of the Agreement.

   B. This Addendum may be terminated by either party with or without cause at any time and for any reason.

6. Termination Claims. Upon termination or expiration of this Addendum, OSJ Branch Manager shall have no claim against AEFA for profits, anticipated profits or earnings. OSJ Branch Manager also shall have no claim for a refund or reimbursement of any funds OSJ Branch Manager has advanced or expenses OSJ Branch Manager has paid or incurred in connection with OSJ Branch Manager's responsibilities under this Addendum or for any other reason.

7. Miscellaneous.

   A. This Addendum may be amended only by a written amendment signed by the parties and executed by their authorized officers or agents.

   B. If AEFA waives any provision of this Addendum, the waiver applies only to that provision, not to any other part of the Addendum. A waiver is effective only when it is in writing and signed by an authorized officer of AEFA.

   C. If the laws of any state prohibit any provision of this Addendum, the laws apply only to that provision. They do not invalidate the remaining portion of the Addendum.

   D. OSJ Branch Manager and AEFA both acknowledge that no oral or written representations were made about this Addendum or about the relationship between OSJ Branch Manager and AEFA that are not set forth in this Addendum.



American Express Financial Advisors Inc.                                          Addendum 2
Franchise Agreement - 10/25/99

E.  All capitalized terms not otherwise defined in this Addendum shall have the same meaning as in the Agreement.

8.  <u>Effective Date</u>.  In witness of the provisions of this Addendum as described above, OSJ Branch Manager and AEFA have entered into this Addendum with the understanding that it becomes effective on _____, _____.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum in duplicate on the date first above written.

Independent Advisor _____        American Express Financial Advisors Inc. _____

By: _____                        By: _____
Name: _____                      Name: _____
Title: _____                     Title: _____
Date: _____                      Date: _____
Social Security No.: _____
Advisor No.: _____

MAY-01-2008 THU 12:31 PM AMERIPRISE FINANCIAL          FAX NO. 612 671 0586          P. 21

REDACTED

## ADDENDUM 3-R
### (Rollout)

## (RESTRICTIVE COVENANT ADDENDUM)

This Contract Addendum is entered into by and between _____ ("Advisor") and American Express Financial Advisors Inc. ("AEFA"), IDS Life Insurance Company, and, if applicable, IDS Life Insurance Company of New York on this _____ day of _____. AEFA and the Advisor agree as follows:

A.    The terms of this Addendum become effective no earlier than June 30, 2001, and are hereby incorporated into the following Agreements: 1) the Franchise Agreement(s) between AEFA and Advisor; and 2) the Independent Advisor Agreement(s) between Advisor and IDS Life Insurance Company and, if applicable, IDS Life Insurance Company of New York ("IDS Life") (hereinafter, collectively referred to as "AEFA").

B.    AEFA will suffer irreparable harm should Advisor violate Section 19(a)(1)(2)(3) and/or (4) of the Franchise Agreement, or Section IV 1(a)(1)(i)(ii)(iii) and/or 2(ii) of the IDS Life Independent Advisor Agreements (hereinafter, collectively "Restrictive Covenant") without fully and timely satisfying the terms of this Addendum.

C.    **Terms of Forbearance Agreement.** As a mitigation of this irreparable harm, AEFA agrees to forbear from enforcement of its rights against Advisor under the Restrictive Covenant if Advisor timely and fully complies with the following conditions:

1.    **Two Weeks' Notice.** Advisor must provide AEFA with at least two-weeks' written notice of the termination of the Franchise Agreement ("Termination Notice"), with a copy to be delivered personally to the Advisor's Group Vice President ("GVP") designate; or if no designate is timely provided, to the Advisor's immediate AEFA leader; and, in either event, a copy, by facsimile or overnight mail, to AEFA Corporate Office, Licensing Unit.

2.    As of the date of the Termination Notice, the Advisor must:

   (a)    **Length of Service.** Have served at least six consecutive years as an advisor for AEFA.

   (b)    **Compliance Obligations.** Not be subject to discipline as a result of a violation of the Compliance Rules as defined in Section 3, of the Franchise Agreement ("Compliance Rules"). This discipline may include, but not be limited to, suspension, strict supervision, involuntary termination or otherwise "permitted to resign".

Addendum 3-R

(c)    Regulatory Obligations. Not be the subject of an ongoing Compliance Rule related (i) investigation by AEFA, the Securities and Exchange Commission, the National Association of Securities Dealers, Regulation, Inc., any of the other self-regulatory organizations, a state securities or insurance commissioner or regulatory authority; (ii) AEFA client complaint; or (iii) adversary proceeding involving an AEFA client or AEFA. (Upon Advisor's reasonable request, AEFA may waive conditions 2(c)(ii) and (iii)).

3.    Return of Complete Files and Proprietary Materials. Within five (5) business days after the date of the Termination Notice (including the date of such Notice), Advisor must return all original client files and AEFA proprietary materials, as defined in the Franchise Agreement, to the Advisor's GVP designate or, if no designation is provided by AEFA within five (5) business days, to the Advisor's immediate AEFA leader.

To the extent consistent with privacy laws and policies, in order to allow Advisor to service portable products and to fulfill compliance duties, Advisor may retain copies of consolidated statements, financial plans, tax returns, advisor notes, insurance policies, AEFA or AEFA approved product applications and trust or other legal documents for the clients Advisor serviced at AEFA, but may not retain copies of any AEFA/American Express Company proprietary materials, or AEFA/American Express Company trademarked, or copyrighted materials, software or property, as defined in the Franchise Agreement.

4.    Franchise Agreement Compliance. On and before the effective date of the termination of the Franchise Agreement between AEFA and Advisor, Advisor shall comply fully with Section 18 (Obligations upon Termination or Expiration) of the Franchise Agreement.

5.    No Disparagement or Recruiting. Both before and after the effective date of the termination of the Franchise Agreement between AEFA and Advisor, the Advisor:

(a)    must not make disparaging or defamatory comments to anyone about AEFA, its affiliated companies, their products, services or personnel; and

(b)    must not recruit or solicit any other AEFA independent contractor, employee or franchisee to terminate their respective relationship with AEFA; and

(c)    continue to comply with Section 18 of the Franchise Agreement, to the extent such section requires Advisor to meet obligations subsequent to the termination of the Franchise Agreement.

6.    No Pre-Termination Solicitation of Clients. Departing Advisor agrees not to send notification of termination to clients prior to the effective date of termination. Further, any notice Advisor does send to clients, announcing Advisor's termination from AEFA, must not be on AEFA (or affiliated company) stationery or use AEFA's proprietary marks, and may not be mailed in any envelope marked with any AEFA proprietary marks. Advisor also must not, prior to the effective date of termination, solicit or otherwise assist any AEFA client to transfer AEFA client assets from AEFA to another broker/dealer, insurance company or investment advisor.

---

American Express Financial Advisors Inc.                                Addendum 3-R
Franchise Agreement - 10/25/99

42

D.    Preliminary Agreement as to Addendum Compliance.  If AEFA has a reasonable basis to believe that Advisor has satisfied, and Advisor certifies in writing that Advisor has satisfied subparagraphs C.1. through C.6. above, AEFA, prior to the effective date of termination, or, in the event of extenuating circumstances, within a reasonable time period subsequent to termination not to exceed five (5) business days, will notify Advisor, in writing, that AEFA believes, based on the information available to it at that time, that Advisor appears to have satisfied those provisions.

E.    Exception for Continuity of Practice Agreements.  As to any clients or financial planning practices which Advisor acquires from AEFA or another AEFA Advisor, for value paid, a direct or indirect interest, as defined in the Franchise Agreement or in a Continuity of Practice, or similar agreement, this Addendum will not be effective for a period of three (3) years after Advisor becomes an AEFA Advisor, as well as for one (1) year after any such acquisition.

F.    Compliance with Addendum Mitigates AEFA's Damage.  Through Advisor's timely and complete compliance with this Addendum, Advisor will have mitigated, to the extent deemed reasonable by the parties hereto, the irreparable harm AEFA would otherwise suffer through the Advisor's violation of the Restrictive Covenant without compliance with this Addendum or the Restrictive Covenant.

G.    Remedies.  Should AEFA, before or after the effective date of Advisor's termination of the Franchise Agreement, discover that the Advisor:

1.    has, in fact, not fully or timely complied with the provisions of paragraph C; and, if applicable, paragraph E; or

2.    has defamed or disparaged AEFA in any manner; or

3.    has recruited or solicited any other AEFA employee or franchisee to terminate their respective relationship with AEFA; or

4.    has otherwise breached the terms of the Franchise Agreement or this Addendum;

then AEFA shall be entitled to all remedies at law and equity including but not limited to injunctive relief, actual, compensatory and punitive damages, and its reasonable attorneys' fees and costs.

H.    No Waiver.  This Addendum does not modify, amend or otherwise alter any provision of the Franchise Agreement except the Restrictive Covenant set forth at Sections 19(a)(1)(2)(3) and (4) of the Franchise Agreement(s) and Section IV(1)(a)(1)(i)(ii)(iii) and 2(ii) of the IDS Life Independent Advisor Agreement(s).  Should any court, arbitration panel or quasi-judicial body of competent jurisdiction determine that any provision of the Franchise Agreement or this Addendum is unenforceable or invalid, such a determination shall not render the Franchise Agreement or this Addendum, or any provision thereof, otherwise unenforceable or invalid.

I.    Injunctive Relief.  If AEFA has a reasonable basis for concluding that the Advisor has not timely or fully complied with one or more of the requirements of this Addendum, notwithstanding an Advisor's alleged compliance, Advisor agrees that AEFA shall immediately be entitled to a forty-five (45) day injunction which enforces fully the terms of the Franchise Agreement including the Restrictive Covenant.  AEFA shall be entitled to a Temporary Restraining Order or Preliminary Injunction from a court of competent jurisdiction, for fifteen (15) days, pending a decision on the merits by an NASD

arbitration panel, further emergency injunctive relief of at least thirty (30) days from an NASD expedited arbitration panel, and, thereafter, or contemporaneously, as part of any injunctive award, enforcement of the full Restrictive Covenant, from an NASD panel of arbitrators. The filing by Advisor of an NASD arbitration claim, seeking to declare any part of this Addendum or the Franchise Agreement invalid or unenforceable, shall be conclusive proof of a violation of and intent to violate such Agreements and a basis for immediate court ordered injunctive relief in favor of AEFA, upholding the Franchise Agreement, pending a decision on the merits by an NASD arbitration panel.

    J.    <u>Primary Purpose of This Addendum</u>.  AEFA and the Advisor agree and acknowledge that (1) AEFA has invested substantial sums and resources in the training, marketing and development of Advisor, which has been to the benefit of Advisor's business; and (2) in agreeing to this Addendum, the parties are intending to:

    1.    protect the welfare and interests of AEFA clients;

    2.    protect both parties against disparagement and unfair competition;

    3.    protect AEFA's interests in its proprietary and confidential information and trademarks; and

    4.    give AEFA reasonable parity with the departing Advisor in competing for the continued business of the clients.

IN WITNESS of the provisions of this Contract Addendum as described above, you and AEFA have entered into this Addendum with the understanding that it becomes effective on the date(s) previously specified herein.

| Independent Advisor | American Express Financial Advisors Inc. |
|---|---|
| By: _Donna M Diana_ | By: _____ |
| Name: _Donna M Diana_ | Name: _____ |
| Title: _Registered Financial Advisor_ | Title: _____ |
| Date: _Dec 17th 1999_ | Date: _____ |
| Social Security No.: ____ REDACTED | |
| Advisor No.: ____ | |

|  | IDS Life Insurance Company |
|---|---|
| | By: _____ |
| | Name: _____ |
| | Title: _____ |
| | Date: _____ |

|  | IDS Life Insurance Company of New York |
|---|---|
| | By: _____ |
| | Name: _____ |
| | Title: _____ |
| | Date: _____ |

(To be executed in duplicate — one copy to be returned to Advisor.)

Addendum 3-R



Jim Wilson
Director
Field Operations/Risk Mitigation

Ameriprise Financial, Inc.
Ameriprise Financial Services, Inc.
1835 Ameriprise Financial Center
Minneapolis, MN 55474
Tel: 612.671.8073
Fax: 612.671.0586

April 25, 2008

Donna Quam
12271 Ayrshire Lane
Loves Park IL 61111-8900

I have learned of your termination with Ameriprise Financial℠ and its affiliated companies. In connection with that affiliation with Ameriprise Financial, you have had access to confidential information of Ameriprise Financial clients. That information is protected by your Franchise Agreement with Ameriprise Financial. It is also protected, among other things, by state and federal privacy laws. For example, the Gramm Leach Bliley Financial Services Modernization Act clearly prohibits the unauthorized disclosure of non-public information to third parties. Third parties would include anyone other than Ameriprise Financial, including but not limited to you (after your termination) and any competitor of Ameriprise Financial. Based upon the information available to me, it appears that you are in direct violation of your Franchise Agreement [and/or federal and state privacy laws].

With this letter, you must:

1) make no attempt to solicit anyone associated with Ameriprise Financial or cause them to breach their contractual obligations to Ameriprise Financial;
2) take no further actions to attempt to induce any Client to move his or her business from Ameriprise Financial with the use of any Ameriprise Financial confidential information;
3) send no more communications to and initiate no further contact with clients you learned about or serviced while you were with Ameriprise Financial based upon the use of any Ameriprise Financial confidential information;
4) if you have not already done so, immediately cease using any telephone number used by you as an independent advisor associated with Ameriprise Financial; and
5) if you have not already done so, immediately return the originals *and all copies* of all confidential client information, including client lists, client files, client leads, etc., to Ameriprise Financial and cease all use of confidential client information at once.
6) refrain from using such client information even to contact clients unless and until the client consents to the release of said information, either by opting-out or opting-in to the Ameriprise Financial privacy policy, depending on their state of residence, and Ameriprise Financial approves of and notifies you of such consent.

EXHIBIT B

2006014

More specifically, and in addition to any of your other post-termination obligations to Ameriprise Financial, you must also comply with state and federal financial privacy laws (such as the Gramm Leach Bliley Financial Services Modernization Act which clearly prohibits the unauthorized disclosure of non-public information to third parties). To that end, you must return any and all client information, including originals and all copies, to Ameriprise Financial. In addition, you must refrain from contacting any such client with the use of said client information.

As an Ameriprise Financial franchisee, you were the beneficiary of high quality training, equipment, supervision and regulatory oversight. Ameriprise Financial assisted you in developing and expanding the client base, which you served. You had the benefit of the decades of experience lodged within Ameriprise Financial. Ameriprise Financial made an investment in you, and you reaped the benefits of that investment.

Under the terms of your Franchise Agreement, Section 19, you agreed, among other things, that the identity of Ameriprise Financial clients is confidential information and that you would not use any confidential information in connection with business in competition with Ameriprise Financial. I trust that you are not under the mistaken impression that the Franchise Agreement Addendum you signed allows you to engage in such activities. **Pursuant to addendum 3-R, you are not eligible to compete for your clients for a 12 month period based upon your violation of compliance rules.**

You are obligated to comply with the terms of the Franchise Agreement, and state and federal law, and have failed to do so. We will continue to monitor this situation and if we determine that you have any further violations of any provisions of the Independent Advisor Franchise Agreement specifically Sections 18 and 19, we will take whatever action available to bring an appropriate resolution to the matter. **Please respond to me in writing that you agree to abide by Franchise Agreement obligations as listed above no later than Friday May 2, 2008.** You may contact me at Ameriprise Financial, 1835 Ameriprise Financial Center, Minneapolis, MN 55474.

Sincerely,

James Wilson
Director-Legal Operations-Ameriprise Financial

Cc: John Greiber, GVP
    Brad Sabol, FVP

2006014

# EXHIBIT

# B

# SAME AS EXHIBIT A TO K. WILSON AFFIDAVIT

# EXHIBIT
# C

05/09/2008  11:27    8153997534                    AMERIPRISE_FINANCIAL                    PAGE  02

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

AMERIPRISE FINANCIAL SERVICES, INC.

          Plaintiff,

v.

DONNA QUAM,

          Defendant.

File No. _____

**AFFIDAVIT OF
KIRK J. OSBORNE**

STATE OF ILLINOIS    )
                    ) SS.
COUNTY OF WINNEBAGO)

    I, KIRK OSBORNE, being first duly sworn on oath, depose and state as follows:

    1.    I am affiliated with Ameriprise Financial Services, Inc. as a franchisee. I was also the Registered Principle for Donna Quam when she was a franchisee of Ameriprise Financial. As her Registered Principle, I provided compliance supervision. After Ms. Quam was suspended for compliance related reasons I also acted as the temporary servicing advisor while Ms. Quam was on suspension. As a temporary servicing advisor, I assisted clients formerly serviced by Ms. Quam during her suspension. After Ms. Quam was terminated, the clients were reassigned to other advisors.

    2.    Based on information provided to Ameriprise Financial advisors by clients, I gathered information over the last week about the contacts Ms. Quam has had with clients whom she serviced while at Ameriprise Financial. Through conversations with

05/09/2008  11:27   8153997534              AMERIPRISE_FINANCIAL                    PAGE  03

clients and/or Ameriprise Financial advisors, I have learned that Ms. Quam contacted

clients after her suspension and in some instances after her termination as well. For

example, Ms. Quam told Client A that she had placed her accounts on hold until she

moved to "Fidelity" and then would move Client A's account over to "Fidelity." Based

upon my investigation to date, I have further learned that: (1) Ms. Quam has met with

Clients B and C; (2) Clients B, C and D-N received at least one call from Ms. Quam after

her termination from Ameriprise Financial; (3) Clients C-G, I, J and O intend to move

their accounts to Ms. Quam; and (4) other clients are uncertain about their plans whether

to continue their relationship with Ameriprise Financial.

     3.     I have redacted the client names in paragraph 2 of my affidavit because of

client confidentiality concerns related to the disclosure of their names and the fact they

are clients of Ameriprise Financial.

     4.     Attached hereto as Exhibit A is a true and correct copy of a letter sent by

Ms. Quam to clients that she serviced while affiliated with Ameriprise Financial. The

name of the client on this particular letter has been redacted to protect her confidentiality.

     5.     As with other financial advisors, Ms. Quam was the primary contact with

the clients that she serviced while an Ameriprise Financial advisor. In addition to

providing clients with financial advice, Ms. Quam worked to build relationships with her

clients so that they would look to her for their financial service needs. Ameriprise

Financial has policies to protect that client relationship with Ms. Quam by prohibiting

05/09/2008  11:27    8153997534    AMERIPRISE_FINANCIAL    PAGE  04

other advisors from poaching the clients while Ms. Quam was affiliated with the

Company.

FURTHER AFFIANT SAITH NOT.

Kirk J. Osborne

Subscribed and sworn to before me
this 9 day of May, 2008.

Notary Public

-3-

AMERIPRISE FINANCIAL                    PAGE 82

04/30/2008  09:04   8163997534



**BREWER**
FINANCIAL SERVICES

CREATING AND MANAGING WEALTH

NON SOLICITATION LETTER

APRIL 24, 2008

Dear

This is to let you know that, effective today, I am pleased to be affiliated with

Brewer Investment Group LLC
200 South Michigan Avenue, 21st Floor
Chicago, IL  60604

815-895-6929 Home
815-289-9704 Cell
Email Donna@BrewerInvestmentGroup.com

Although I am sure you are aware of your right to transfer your securities and insurance accounts to the financial advisor of your choice, that decision is entirely up to you. However, if you do not choose to transfer your accounts to me, I will be unable to continue working with you on a personal basis regarding your investments and financial future. If you wish to discuss the matter further, I will leave it to you to call me. I have very much enjoyed and valued our relationship and wish you every success.

Warm Regards,

Donna M. Quam, CFP®
Certified Financial Planner Practitioner

200 South Michigan Ave., 21st Floor • Chicago, IL • 60604 • www.BrewerInvestmentGroup.com
800.971.2440 • 312.896.3930 • fax 312.896.3920



EXHIBIT
A

# EXHIBIT

# D

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC. | File No. _____ |
| Plaintiff, | **AFFIDAVIT OF** |
| v. | **DINA MALSTAFF** |
| DONNA QUAM, | |
| Defendant. | |

STATE OF ILLINOIS     )
                    ) SS.
COUNTY OF STEPHENSON)

    I, DINA MALSTAFF, being first duly sworn on oath, depose and state as follows:

    1.    Until she left Ameriprise Financial, Donna Quam was my and my husband's financial advisor. My husband and I are retired. I am 87 years old and my husband is 89 years old. We live in Freeport, Illinios.

    2.    Donna called my husband and I a couple of times after she was suspended from Ameriprise Financial. She said that people at Ameriprise Financial were trying to take away her business and ruin her integrity. She also said that she wanted us to stay with her. At one point she said that she was going to Wachovia. She later said she was going to Fidelity. When I received Donna's letter dated April 24, 2008, I learned that Donna was instead going to Brewer Financial. When I spoke with Donna, she told me not to tell anyone she had called because she is not supposed to be contacting clients.

3.    About two or three weeks after Donna was suspended (I do not know whether it was before or after her termination), Donna called my husband and I telling us that Ameriprise Financial had frozen our assets.  We were beside ourselves with grief.  In fact, we were so upset that we could not sleep.  We had to take sleeping pills for four or five nights just so we could sleep.  We later learned that the accounts had never been frozen by Ameriprise Financial.

FURTHER AFFIANT SAITH NOT.

_Dina Malstaff_
Dina Malstaff

Subscribed and sworn to before me
this _9th_ day of May, 2008.

_D.T. Schroeder_
Notary Public

"OFFICIAL SEAL"
Daniel T. Schroeder
Notary Public, State of Illinois
My Commission Exp. 02/09/2010

-2-

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC. | File No. _____ |
| Plaintiff, | **AFFIDAVIT OF RON MALSTAFF** |
| v. | |
| DONNA QUAM, | |
| Defendant. | |

STATE OF ILLINOIS      )
                    ) SS.
COUNTY OF STEPHENSON)

I, RON MALSTAFF, being first duly sworn on oath, depose and state as follows:

1.      Donna Quam was the financial advisor for my wife and I while she was with Ameriprise Financial. I have been with Honeywell at its Freeport, Illinois facility for 31 years.

2.      Donna called my house one month or so ago. I know the call was after she had been suspended, but do not know for certain whether it was before or after her actual termination. At one point she said she was going to move to Wachovia, and then Fidelity. She wanted my wife and I to move our assets with her. She also asked us not to tell anyone that she had called our house because she was not supposed to do that.

3.      When I received Donna's letter dated April 24, 2008, I learned that Donna was going to Brewer Financial instead of Wachovia or Fidelity.

4.    On May 2, 2008, I went to lunch with a group of people. After we were finished, and I started to leave the restaurant, I heard someone call out my name. It was Donna Quam. I saw Donna sitting at a table with two elderly people who I assumed were clients. Donna asked if she could talk to me for a second. She asked me if I got her letter about her move to Brewer Financial. I told her I had. She asked me what I thought. I told her that I had met with Joan Kelley at Ameriprise Financial and that I was planning on staying with Joan. She asked me why Joan, reminded me that I had her phone number, and asked her to call me so she could tell me what went on and she could give me the scoop. There were people around so I just said ok, and left.

FURTHER AFFIANT SAITH NOT.

Ron Malstaff

Subscribed and sworn to before me
this 9th day of May, 2008.

Notary Public

"OFFICIAL SEAL"
Daniel T. Schroeder
Notary Public, State of Illinois
My Commission Exp. 02/09/2010

-2-