IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

AMERIPRISE FINANCIAL SERVICES, INC.,   )
                                        )
            Plaintiff,                  )
                                        )   Civil No.: 08 C 50081
    vs.                                 )
                                        )
DONNA QUAM,                             )
                                        )
            Defendant.                  )

**AFFIDAVIT OF DONNA QUAM**

STATE OF ILLINOIS        )
                         ) ss.
COUNTY OF WINNEBAGO      )

F I L E D

MAY 1 4 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DONNA QUAM, being duly sworn, deposes and says:

1. I submit this Affidavit on personal knowledge in opposition to the attempt by plaintiff Ameriprise Financial Services, Inc. ("Ameriprise") to prevent me from continuing to provide professional services to my clients.

2. I am 43 years old and live in Rockford, Illinois, where I was born and raised. I am a single mother, and am the primary breadwinner for me and my two daughters, ages 19 and 10. My oldest daughter, who lives at home, is a freshman at a local community college; I pay her tuition. I receive only $500 a month in child support for my youngest daughter.

3. After graduating high school in 1982, I began working for Dale Hoglunds Carpet-Line Inc., in Rockford, Illinois, a carpet company owned and operated by my former brother-in-law. I worked in various capacities, from customer service to bookkeeping.

4. In 1992, I decided to switch careers and become a financial advisor in the securities business. I was hired by American Express Financial Advisors, Inc. ("AEFA") – the predecessor to Ameriprise – and its related company, IDS Life Insurance Company, in July 1992. In October 1992, I took (and passed) the Uniform Securities Agent State Law Examination, and obtained my Series 63 license. In 1992, I also obtained my licenses to sell life, accident and health insurance. In April 1993, I also took (and passed) the Series 7 General Securities Representative Examination to become a fully licensed financial advisor. In 2006, I became a Certified Financial Planner – again, all at my own expense.

5. On November 24, 1993, AEFA then appointed me as a Financial Advisor. Prior to my appointment, I received no compensation from AEFA. Indeed, I paid all my own exam and licensing fees. In 2005, AEFA was spun off into Ameriprise. AEFA and Ameriprise are collectively referred to herein as Ameriprise.

6. After my appointment, I opened my own office in Rockford, Illinois. Essentially, I was self-employed and affiliated with Ameriprise in name alone. I had to rent my own office space in Rockford. During the entire time I was associated with Ameriprise, I paid all of my own expenses, including rent, phones, furniture, photocopier, computers, insurance, licensing fees and for compliance supervision. Ameriprise neither subsidized nor reimbursed these costs.

7. Upon becoming appointed, I immediately began to build my client book of business. I started with cold-calling potential clients, using area telephone books. I have lived my whole life in Rockford, and have cultivated clients from my immediate community in Rockford, as well as in Chicago, Freeport, Forreston, Woodstock, and Crystal Lake, Illinois. I have cultivated as clients my "natural market" of family and friends. Indeed, some of my clients

are friends I have known for 35 years. I have also cultivated as clients my fellow congregants at the Holy Family Catholic Church, where I extensively volunteer, including teaching the Catechism to children. I also placed ads in my Church's bulletin. I have also cultivated as clients teachers and parents from my youngest daughter's elementary school, where I have done everything from helping out in the classroom to working on fundraisers.

8. In addition to my extensive community involvement, I have also acquired clients through seminars I have conducted. I have conducted seminars everywhere from hospitals to the local box company and plastics' company. I have conducted both lunch and dinner seminars, without any reimbursement from Ameriprise. My clients have been extremely happy with me; indeed, approximately 98 percent of my book of business consists of referrals from other clients.

9. The vast majority of my book of business consists of clients whom I cultivated and acquired on my own, at my own expense, with no assistance from Ameriprise. The remaining clients are those who were assigned to me from other Ameriprise financial advisors, or those that I acquired through "recycled leads" – i.e., leads for prospective customers whom other Ameriprise financial advisors had been unsuccessful in obtaining. I had to pay for the "recycled leads"; Ameriprise did not give them to me. The total number of assigned clients was approximately 14 (and I still had to cultivate and service those clients) out of approximately 171 total clients. None of the "recycled leads" became my clients. I have not serviced, and will not service, any of the assigned clients. Moreover, as is noted above, I have had longstanding relationships with most of my clients, some of them going back as far as 35 years.

10.    In 1999, AEFA decided to unilaterally alter its relationship with me to one of franchisor-franchisee. I, along with other financial advisors, was told I had one of two options: (i) I could become a franchise "owner," where I could build and have equity in my practice (which I could later sell), and pay for everything on my own; or (ii) I could be on a salary, with much lower compensation. Moreover, these options were presented to me as "take it or leave it" – i.e., if I wished to remain with the company, I would have to choose one of these two options. Because I already had built my practice from the ground up, through my own efforts, I agreed to sign the Franchise Agreement that Ameriprise now sues me upon. Because I was told I would be a franchise "owner," I had no reason to expect that Ameriprise would use the Franchise Agreement to attempt to prevent me from continuing to service my clients. Considering my status as an independent contractor with Ameriprise, and that I not only developed my customers on my own, but at my own financial expense, Ameriprise cannot claim an interest in my relationships with my clients.

11.    I have reviewed Ameriprise's papers, and must address some of the false allegations made against me. At no time have I "attempted to move clients away from Ameriprise Financial by scaring clients in a deceptive and untruthful manner." Complaint ¶ 10. At no time did I tell any of my clients that Ameriprise had "frozen their assets." Complaint ¶ 13. At no time did I tell any of my clients that I had placed client accounts "on hold." Affidavit of Kirk J. Osborne ¶ 2. Subsequent to my termination on April 21, 2008, I did notify my clients that I am no longer affiliated with Ameriprise Financial, and provided them with my new contact information. Because I brought the vast majority of my clients to Ameriprise Financial solely through my own efforts, I believe it is my obligation to let them know where I am, and what is

4

06/17/2013 09:22 FAX                                                              ☒006
Case 3:08-cv-50081    Document 12    Filed 05/14/2008    Page 5 of 7

happening with their accounts. Indeed, the vast majority of my clients have told me that they wish to keep me as their financial advisor.

    12.    What Ameriprise Financial has failed to mention in its papers is what its own financial advisors have been saying to my clients. Some of my clients have contacted me, greatly concerned because at least three Ameriprise financial advisors have told them that I (i) had done illegal things; (ii) would lose my license; and (iii) will not be in business anymore. My clients have been shocked and upset by these false allegations made to them by Ameriprise advisors. These Ameriprise advisors have also told my clients that they will lose money if they transfer their accounts out of Ameriprise, and that the fees will be too high. It is Ameriprise that is "scaring [my] clients in a deceptive and untruthful manner," not me. Complaint ¶ 10.

    13.    While affiliated with Ameriprise and its predecessors, I generated substantial profits for the firm, and made a living that permitted me to support myself and my family. As a result of an enormous amount of hard work, I have built a faithful and strong client following. Nonetheless, there is nothing to prevent Ameriprise from competing with me for my clients' business and my clients have every right to keep their accounts at Ameriprise, to continue working with me, or to take their business elsewhere.

    14.    I understand that Ameriprise seeks to enjoin me from soliciting my own clients. An injunction would cause the clients, as well as me, great hardship.

    15.    It would take any new financial advisor substantial time to gain the trust of these clients, and the intimate knowledge of their portfolios and goals required to make investment decisions for them. During that time, my clients would undoubtedly miss financial opportunities and possibly suffer unnecessary financial losses. Moreover, I have not dealt with, and will not deal with, those clients that were assigned to me by Ameriprise.

16. When I left Ameriprise, I left behind all of my original Ameriprise files entirely intact. Nothing proprietary or confidential to Ameriprise, or otherwise concerning Ameriprise's business, is in my possession. I took no information proprietary or confidential to Ameriprise.

17. All of my clients have put their trust in me to assist them in planning for their futures, their children's education and other important, personal matters. None of these clients should be prevented from continuing to receive the valuable services that I provide them if that is their choice.

18. If Ameriprise is able to obtain <u>any</u> injunctive relief against me for <u>any</u> period of time, it will hurt or destroy my career and my ability to support myself and my family.

19. For all of the above reasons, I ask that the Court deny Ameriprise's attempt to prevent me from working with my clients.

_____
Donna Quam

Subscribed and sworn to before me
this _13_ day of May, 2008

_____
Notary Public

OFFICIAL SEAL
HOLLY NORTHROP
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/17/07