IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No.: 08 C 50081 |
| | ) | |
| vs. | ) | **F I L E D** |
| | ) | |
| DONNA QUAM, | ) | MAY 1 4 2008 |
| | ) | |
| Defendant. | ) | MICHAEL W. DOBBINS |
| | ) | CLERK, U.S. DISTRICT COURT |

## DECLARATION OF WILLARD KNOX

WILLARD KNOX declares under penalty of perjury:

1.  I am admitted to practice law before the courts of the State of New York, and am an associate of the firm Paduano & Weintraub LLP, counsel <u>pro</u> <u>hac</u> <u>vice</u> (admission pending) for defendant Donna Quam in this action. Robert Christie of Henderson & Lyman, an attorney admitted to practice law before the courts of the State of Illinois, is co-counsel for Ms. Quam in this action. I submit this Declaration in opposition to the motion of plaintiff Ameriprise Financial Services, Inc. ("Ameriprise") for injunctive relief preventing Ms. Quam from continuing to provide financial services to her customers.

2.  Courts have routinely denied similar requests for injunctive relief by Ameriprise's predecessor entity, American Express Financial Advisors, Inc. ("AEFA"). For example, on or about May 26, 2004, the United States District Court for the District of Massachusetts in <u>American Express Financial Advisors Inc. v. Mary R. DeGon and Matthew M. Bruce</u>, Civil Action No. 04-10979-RGS, denied AEFA's request for injunctive relief on the papers alone, and directed the parties to arbitration before the NASD. A true and correct copy of

the Court's decision is annexed hereto as <u>Exhibit 1</u>. In denying injunctive relief, the District Court noted the "uniquely monetary nature of the damages." <u>See</u> <u>Exhibit 1</u> at 2.

3.    Similarly, in <u>American Express Financial Advisors, Inc. v. Suzanne Osborne</u>, Civil Action No. 7:01CV00949 (Dec. 19, 2001) (Turk, J.), the United States District Court for the Western District of Virginia denied AEFA's request for injunctive relief because AEFA had failed to provide any evidence that it would be irreparably harmed by the departure of its former financial advisor, and because "any harm [AEFA] suffers can be remedied by the [NASD] arbitration panel." A true and copy of the <u>Osborne</u> decision is annexed hereto as <u>Exhibit 2</u>.

4.    Likewise, in <u>American Express Financial Advisors, Inc. v. Williams</u>, No. 98-2398C (Mass. Super. Ct. November 10, 1998), the Court denied injunctive relief to AEFA. A true and correct copy of the <u>Williams</u> decision is annexed hereto as <u>Exhibit 3</u>. The <u>Williams</u> court found that "any loss or harm sustained by AEFA as a result of any breach of the Agreement by [the former financial advisor] . . . may be adequately redressed by money damages." <u>See</u> <u>Exhibit 3</u> hereto, slip op. at 5. In <u>American Express Financial Advisors, Inc. v. O'Brien</u>, No. 95-1249(Mass. Super. Ct. June 23, 1995), the Court found that "[a]lthough issuance of an injunction would not bar the defendant from conducting his financial planning business, it could harm [the defendant], as a single financial advisor, far more than the risk of harm which a denial of the injunction could have on [AEFA's] billion-dollar business." A true and correct copy of the O'Brien decision is annexed hereto as <u>Exhibit 4</u> (slip op. at 5-6).

5.    Other courts similarly have denied AEFA's requests for injunctive relief. <u>See, e.g., American Express Financial Advisors, Inc., et ano. v. Temm, et al.</u>, 241 F. Supp. 2d 30 (D. Me. 2003) (a true and correct copy of which is annexed hereto as <u>Exhibit 5</u>); <u>American</u>

Express Financial Advisors, Inc. v. Butt, et ano., Case No. 3:03-CV-509-S (D. Ky. Aug. 28, 2003) (a true and correct copy of which is annexed hereto as Exhibit 6); American Express Financial Advisors, Inc. v. Botwinick, et al., Civil Action No. 98-4552 (NHP) (D. N.J. Oct. 21, 1998) (a true and correct copy of which is annexed hereto as Exhibit 7); American Express Financial Advisors, Inc. v. Conoway, Index No. 8486/98 (N.Y. Sup. Ct. Aug. 18, 1998) (a true and correct copy of which is annexed hereto as Exhibit 8); American Express Financial Advisors, Inc. v. Lanpher, Index No. 7578/98 (N.Y. Sup. Ct. July 24, 1998) (a true and correct copy of which is annexed hereto as Exhibit 9); American Express Financial Advisors, Inc. v. Welch, Case No. 96-2792 (Fla. Cir. Ct. June 18, 1996) (a true and correct copy of which is annexed hereto as Exhibit 10).

6.      Pursuant to Rule 13804 of the NASD Code of Arbitration Procedure for Industry Disputes, a true and correct copy of which is annexed hereto as Exhibit 11, a party may seek temporary injunctive relief from a court.[1]  Pursuant to Rule 13804(a)(2), however, a party must seek permanent injunctive relief in an arbitration before a FINRA arbitration Panel consisting of three industry arbitrators.  See Exhibit 11 hereto.

7.      For the convenience of the Court, annexed hereto as Exhibits 12 and 13 are true and correct copies of NASD Rule 11870 and NYSE Rule 412, which recognize that a customer is always free to direct a brokerage firm to transfer his or her account to another firm.[2] Section 11870(a) of the NASD Rule 11870 requires that, when a customer of one NASD member firm (the "carrying member") "wishes to transfer securities account assets, in whole or

---

[1]      In July 2007, the National Association of Securities Dealers, Inc. (the "NASD") was consolidated with the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. (the "NYSE") to form the Financial Industry Regulatory Authority ("FINRA").
[2]      Notwithstanding the FINRA merger, the NASD and NYSE continue to maintain separate rules concerning the transfer of customer accounts.

in specifically designated part, to another member (the "receiving member") and gives authorized instructions to the receiving member, <u>both members must expedite and coordinate activities with respect to the transfer.</u>" (Emphasis added). Further, Section 11870(b)(1) states that upon receipt of a transfer instruction from a customer, "the receiving member <u>must</u> immediately submit such instructions to the carrying member." (Emphasis added). In the absence of one of the enumerated exceptions -- none of which apply here[3] – the carrying member (Ameriprise) "<u>must</u> transfer the securities positions and/or money balance reflected on its books for the account." (Emphasis added). These rules absolutely bind member firms.

8.    The NASD (now FINRA) reaffirmed its rules prohibiting any member firm from taking any action that interferes with a customer's right to transfer his or her account by issuing interpretive material. Rule IM 2110-7 of the NASD Manual, a true and correct copy of which is annexed hereto as <u>Exhibit 14</u>, provides:

> It shall be inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer's ability to transfer his or her account in connection with the change in employment of the customer's registered representative, provided that the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account. Nothing in this interpretation shall affect the operation of Rule 11870. (<u>Exhibit 14</u> hereto)

9.    While this rule does not prohibit member firms (such as AEFA) from suing their former financial advisors, it unequivocally requires such firms to honor a customer's request -- including those serviced by Defendant -- to transfer his or her accounts. Moreover, it

---

[3]    The exceptions to the mandatory transfer of accounts set forth in Section 11870(d)(3) concern, <u>inter alia</u>, instances where additional documentation is necessary, the account has no assets, in which the firms' information does not match, where the transfer violates a firm's credit policy, and other technical (and for these purposes, irrelevant) issues.

affirms the FINRA's serious concerns regarding the harm that can befall customers when the transfer of their accounts is delayed due to disputes such as the instant one.

10.    Arbitration panels have also denied AEFA's requests for injunctive relief. See, e.g., American Express Financial Advisors, Inc. v. Suzanne Osborne, NASD No. 01-06713 (a true and correct copy of which is annexed hereto as Exhibit 15) (NASD arbitration panel denied AEFA's demand for injunctive relief, awarded the respondent financial advisor $100,000 in damages, and ordered AEFA to pay all forum fees associated with the hearings) See also American Express Financial Advisors, Inc. v. VonLange (NASD May 15, 1998) (a true and correct copy of which is annexed hereto as Exhibit 16) (single arbitrator rejected every attempt by AEFA to restrict its former brokers from working with their clients and using documents concerning their clients).

WHEREFORE, Ms. Quam respectfully requests that the Court deny Ameriprise's application for injunctive relief.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America and the laws of the State of New York that the foregoing is true and correct.**

Willard Knox

Dated: New York, New York
        May 13, 2008

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10979-RGS

AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.

v.

MARY R. DeGON and
MATTHEW M. BRUCE

MEMORANDUM AND ORDER
ON PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION

May 26, 2004

STEARNS, D.J.

This matter came before the court on May 21, 2004, after the issuance of a short

order of notice.  Attorneys for American Express Financial Advisors, Inc. (American

Express), appeared.  Defendant Matthew Bruce also appeared pro se, indicating that he

and his co-defendant Mary DeGon were in the process of obtaining counsel.  The court

agreed to postpone any decision on the requested preliminary injunction to May 25, 2004,

to permit defendants' retained counsel to file a reply.  Counsel filed a timely reply as

instructed by the Court.

An award of a preliminary injunction requires (1) consideration of the movant's

likelihood of success on the merits, and (2) the potential for irreparable harm, (3) a

balancing of the relevant equities, and (4) a weighing of the effect that the award of an

injunction might have on the public interest.  Campbell Soup Company v. Giles, 47 F.3d

467, 470 (1st Cir. 1995). "Likelihood of success is the main bearing wall of the four-factor

framework."  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.

1996).

Based on the pleadings and the defendants' sworn affidavits, I am persuaded that the extraordinary relief requested by American Express is not warranted. I agree with defendants, that given American Express's right to expedited arbitration before a panel of the National Association of Securities Dealers (NASD) (which it has already requested), and the uniquely monetary nature of the damages, if any, that American Express might incur in the interim, the requisite showing of irreparable harm has not been made. See American Express Financial Advisors Inc. v. Temm, 241 F. Supp. 2d 30, 33 (D. Me. 2003). Cf. Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 61-62 (1st Cir. 1998). I am further persuaded by the sworn affidavit of defendant Mary DeGon, submitted under penalty of perjury, that the likelihood of American Express prevailing on the most serious of the allegations contained in its Complaint is not high. Ms. DeGon, supported by the sworn affidavit of her co-defendant, Matthew Bruce, swears that neither she nor Mr. Bruce are in possession of any proprietary material belonging to American Express, are not using any mark owned by American Express, are not holding themselves out to be representatives of American Express to existing or potential clients, and are not in possession of any American Express software. To the extent that a dispute of fact exists over whether defendants complied with the requirement that they give two weeks notice of their resignations, as required by Addendum 3-R to their agreement with American Express, the documentary evidence submitted by both sides favors the defendants' contention that they did so. Whether the notice given was strictly compliant with the terms of Addendum 3-R is a matter for the arbitration panel to decide.

ORDER

      For the foregoing reasons, American Express's request for a preliminary injunction is DENIED.

                SO ORDERED.

                /s/ Richard G. Stearns

                _____

                UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

12-19-01: 3:35PM:USDC WDVA CIVIL           ;540 857 5110        # 2/ 3

**ENTERED**

12-19-01

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Roanoke Division**

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 1 9 2001

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

| | |
|---|---|
| AMERICAN EXPRESS FINANCIAL ADVISORS, INC. | ) |
| | ) |
| Plaintiff, | )   **Civil Action No. 7:01CV00949** |
| | ) |
| | )   **ORDER** |
| | )   **By: Judge James C. Turk** |
| SUZANNE OSBORNE, | )   **United States District Judge** |
| | ) |
| Defendant. | ) |

This matter is before the Court on plaintiff American Express Financial Advisors, Inc.

("AEFA") motion for a preliminary injunction pursuant to Rule 65(a), Federal Rule of Civil

Procedure. The Temporary Restraining Order the Court issued on December 6, 2001 expired on

December 17, 2001. Upon consideration of the record, the arguments of counsel on December

17, 2001, and the applicable law, the Court will deny plaintiff's motion for a preliminary

injunction for the concerns expressed by the undersigned in open Court.

     In determining whether to issue a preliminary injunction, the Court applies the well-

established "balance of the hardships" test as set forth in <u>Blackwelder Furniture Company v.

Seilig Manufacturing Company, Inc.</u>, 550 F.2d 189, 195-96 (4th Cir. 1977). The four

"<u>Blackwelder</u> factors" include: (1) irreparable harm to the plaintiff if the motion for a preliminary

injunction is denied; (2) substantial harm to the defendant if the motion for a preliminary

injunction is granted; (3) plaintiff's likelihood of success on the merits of the underlying case; and

(4) the public's interest in the requested preliminary injunction. See <u>id.</u>, see also <u>Microstrategy

Inc. v. Motorola, Inc.</u>, 245 F.3d 335, 339 (4th Cir. 2001) (reaffirming the <u>Blackwelder</u> standard).

11

The first step the Court must consider is to "balance the "likelihood" of irreparable harm

to the plaintiff against the "likelihood" of harm to the defendant..." Blackwelder, 550 F.2d at 195.

The only evidence AEFA submitted to the Court regarding any harm done to it includes the

Affidavit of Mr. Paul Tiller and the Contract between AEFA and defendant Osborne. Because the

Court can find no evidence of irreparable harm to the plaintiff, the plaintiff must lose the balance

of hardships test. The Court believes that any harm the plaintiff suffers can be remedied by the

arbitration panel. Denial in this Court does not in any way prohibit Plaintiff from seeking an

injunction from the arbitration panel.

Because this Court has found that the plaintiff has not provided the Court with any

evidence that it will be irreparably harmed, it is hereby

### ADJUDGED AND ORDERED

That the Plaintiff's Motion for a Preliminary Injunction be DENIED.

The Clerk of Court is directed to send certified copies of this Order to all counsel of

record for the parties.

ENTER:     This 19th day of December, 2001.

UNITED STATES DISTRICT JUDGE

;540 857 5110                    2/ 3

12-19-01; 3:35PM;USDC WOVA CIVIL

ENTERED
12-19-01

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Roanoke Division

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 19 2001

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

AMERICAN EXPRESS FINANCIAL        )
ADVISORS, INC.                    )
                                  )    Civil Action No. 7:01CV00949
            Plaintiff,            )
                                  )    ORDER
                                  )    By: Judge James C. Turk
SUZANNE OSBORNE,                  )    United States District Judge
                                  )
            Defendant.            )

This matter is before the Court on plaintiff American Express Financial Advisors, Inc.

("AEFA") motion for a preliminary injunction pursuant to Rule 65(a), Federal Rule of Civil

Procedure. The Temporary Restraining Order the Court issued on December 6, 2001 expired on

December 17, 2001. Upon consideration of the record, the arguments of counsel on December

17, 2001, and the applicable law, the Court will deny plaintiff's motion for a preliminary

injunction for the concerns expressed by the undersigned in open Court.

In determining whether to issue a preliminary injunction, the Court applies the well-

established "balance of the hardships" test as set forth in Blackwelder Furniture Company v.

Seilig Manufacturing Company, Inc., 550 F.2d 189, 195-96 (4th Cir. 1977). The four

"Blackwelder factors" include: (1) irreparable harm to the plaintiff if the motion for a preliminary

injunction is denied; (2) substantial harm to the defendant if the motion for a preliminary

injunction is granted; (3) plaintiff's likelihood of success on the merits of the underlying case; and

(4) the public's interest in the requested preliminary injunction. See id., see also Microstrategy

Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (reaffirming the Blackwelder standard).

11

12-19-01; 3:35PM;USDC WDVA CIVIL                                1 540 857 5110                # 3/  3

The first step the Court must consider is to "balance the "likelihood" of irreparable harm to the plaintiff against the "likelihood" of harm to the defendant..." Blackwelder, 550 F.2d at 195. The only evidence AEFA submitted to the Court regarding any harm done to it includes the Affidavit of Mr. Paul Tiller and the Contract between AEFA and defendant Osborne. Because the Court can find no evidence of irreparable harm to the plaintiff, the plaintiff must lose the balance of hardships test. The Court believes that any harm the plaintiff suffers can be remedied by the arbitration panel. Denial in this Court does not in any way prohibit Plaintiff from seeking an injunction from the arbitration panel.

Because this Court has found that the plaintiff has not provided the Court with any evidence that it will be irreparably harmed, it is hereby

### ADJUDGED AND ORDERED

That the Plaintiff's Motion for a Preliminary Injunction be **DENIED**.

The Clerk of Court is directed to send certified copies of this Order to all counsel of record for the parties.

ENTER:   This 19th day of December, 2001.

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
C.A. NO. 98-2398C

AMERICAN EXPRESS FINANCIAL ADVISORS, INC.,

vs.

MARK WILLIAMS, & another[1]

## MEMORANDUM OF DECISION AND ORDER ON THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The plaintiff, American Express Financial Advisors, Inc. ("AEFA"), instituted this action to enforce an employee non-competition agreement signed by the defendant, Mark Williams ("Williams"), and to recover damages arising out of an alleged breach of that agreement. This matter is before the Court on the plaintiff's motion for a preliminary injunction to enforce the restrictive covenant barring Williams from continuing to provide financial planning services to clients with whom he dealt while employed by AEFA. After hearing and consideration of the affidavits and arguments of counsel, AEFA's motion for a preliminary injunction will be <u>denied</u> for the following reasons.

### BACKGROUND

The facts set forth in the submissions by the parties are as follows: AEFA is a large provider of financial services including, among other things, personal financial planning services and various investment products. Williams began his employment with AEFA in 1989 and worked as a Personal Financial Advisor ("Advisor") for over nine years. Williams had no background in financial planning when he began his employment with AEFA. During his first year with AEFA, Williams represented AEFA as an employee

---

[1] Commonwealth Equity Services, Inc.

/mjm

Counsel called in the A.M.

Entered & copies mailed to Counsel.

/12/98

Worcester Civil Action                          2                     No. 98-2398C

and received extensive training. After the first year, Williams provided financial services
to AEFA clients as an independent contractor.

     During his nine years of association with AEFA, Williams received training,
support, supervision, client leads and existing clients from AEFA. As an AEFA Advisor,
Williams was authorized to use its trademarks, logo, and proprietary financial services
information to maintain and develop relationships with AEFA clients.

     After his initial training and orientation, Williams executed and delivered to AEFA
a written Personal Financial Planner Agreement (the "Agreement"). The execution of the
agreement was a condition of his employment by AEFA. The Agreement contained non-
disclosure and non-competition clauses that generally prohibited departing Advisors from
retaining and using documents obtained or generated while affiliated with AEFA and
further prohibited departing Advisors from selling or attempting to sell competitive
services or products to AEFA clients after departure. Specifically, the Agreement
prohibited any departing Advisor from using any information acquired from AEFA in a
manner adverse to the interests of AEFA. Moreover, the Agreement prohibited a
departing Advisor from encouraging or inducing anyone to terminate an agreement with
AEFA, from encouraging or inducing any client to stop carrying out any action related to
an AEFA product or service, and from encouraging or inducing any client to sell,
surrender or redeem any product or service distributed or offered by AEFA. The
Agreement also contained the following non-competition agreement:

          For one year after this Agreement ends, you agree that you will not,
          in the territory where you sought applications for Products or
          Services under this or any other Agreement with [AEFA] or an
          Affiliate, directly or indirectly offer for sale, sell, or seek an
          application for any Product or Service issued or provided by any
          company to or from a Client you contacted, dealt with or learned

about while you represented [AEFA] or an Affiliate or Issuer or
because of that representation.

The purpose of the Agreement was to prevent AEFA Advisors from taking AEFA clients
with them for a period of one year after termination of employment.

In the spring of 1998, Williams began investigating the possibility of becoming
affiliated with Commonwealth Equity Services, Inc. ("Commonwealth") after he
experienced delays in promised changes that would increase the career paths available to
him as a financial advisor at AEFA. On or about September 11, 1998, Williams notified
AEFA that he was terminating their relationship. Williams subsequently became affiliated
with Commonwealth Equity on or about September 13, 1998.

Williams contacted his AEFA clients and informed them of his decision to leave
AEFA, thanked them for their prior business and confidence, and informed them that they
would be assigned a new financial planner by AEFA. Pursuant to Rule 401 of the
Certified Financial Planner Code of Ethics and Professional Responsibility, Williams was
required to disclose to his clients changes in his business affiliation. Williams explained to
some clients the benefits of continuing to hold their AEFA accounts and completely
discouraged some former AEFA clients from transferring assets because it was not in their
best interests to do so. Williams claims to have counseled clients not to transfer accounts
or assets simply because they wanted to continue to work with him, but rather they should
stay with the sound investments they have with AEFA and not incur unnecessary fees,
loads, redemption costs, or capital gains. Williams' father is among those clients he has
counseled to stay with AEFA.

AEFA now claims that Williams has engaged in conduct in violation of the
Agreement and that Commonwealth Equity has assisted Williams' breach of the

Agreement. AEFA seeks a preliminary injunction prohibiting either from continuing this conduct.

## DISCUSSION

### Irreparable Harm

In determining whether to grant a preliminary injunction, this Court applies the balancing test set forth in *Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 616-617 (1990). Thus, this Court evaluates "the moving party's claim of injury and its chance of success on the merits." *Id.* at 617. If failure to issue an injunction "would subject the moving party to a substantial risk of irreparable harm the court must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party." *Id.* Where money damages, however, provide an adequate remedy, irreparable harm cannot be found. *Id.* Thus, a moving party must "show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits." *Id.*; see also *Planned Parenthood Leagues of Massachusetts, Inc. v. Operation Rescue*, 496 Mass. 701, 710 (1990).

AEFA contends that the damage caused by alleged violations of the Agreement are difficult to calculate and that it would be nearly impossible to quantify the damage to its reputation or goodwill caused by a former Advisor who counsels clients to obtain products and services from a competitor of AEFA. In essence, AEFA claims that it has no adequate remedy at law. However, "[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The *possibility* that adequate

Worcester Civil Action                5                    No. 98-2398C

compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, *weighs heavily against a claim of irreparable harm.*" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 73-74 (D. Me. 1993).

AEFA's real harm caused by an alleged breach of the Agreement, is not the damage to its "reputation" or "goodwill," but the lost revenue it will incur should clients choose to follow Williams. Lost revenue due to any breach of the Agreement can be readily calculated from the detailed documentation that the parties are required by law to keep. Indeed, AEFA has submitted copies of "redemption forms" in support of its motion which exemplify the type of detailed record keeping that is common in the financial services industry. Other courts have declined to grant injunctive relief in the context of restrictive covenant cases finding that money damages would provide an adequate remedy. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cuppels*, No. 95-0036, slip op. (Middlesex Super. Ct., December 23, 1994) (Houston, J.); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. DeForest*, No. 94-6784, slip op. at 4 (Suffolk Super. Ct. Dec. 23, 1994) (Quinlan, J.); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere*, 572 F. Supp. 246, 248-249 (N.D. Ga. 1983). Thus, this Court finds that any loss or harm sustained by AEFA as a result of any breach of the Agreement by Williams, or any action by Commonwealth Equity, may be adequately redressed by money damages.

AEFA further contends that it is entitled to an injunction pursuant to the terms of the Agreement. The Agreement provides that a breach of the Agreement "will result in damage to [AEFA] that cannot be determined exactly and for which [AEFA] has no adequate remedy at law." The Agreement further provided that AEFA would be entitled to an injunction in order to enforce the Agreement. This Court, however, is not bound to

Worcester Civil Action                    6                    No. 98-2398C

issue an injunction, nor find that money damages would be inadequate, due to the mere presence of such terms in a restrictive covenant, *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 501 (1986); and, as previously stated, AEFA has an adequate remedy at law.

Moreover, the balance of equities, the risk of harm to AEFA, who admittedly is a "large provider of financial services" and "possibly one of the most recognized trade names in the world," as compared to Williams, a single financial planner dependent upon his income to provide for his family, tips decidedly in favor of Williams.

The Public Interest

In addition to foregoing, this Court is concerned about the effects a preliminary injunction would have on the public interest, namely current and former AEFA clients, to freely choose their professional financial advisors. *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 501 (1986) (covenant not to compete is enforceable to the extent it is consonant with the public interest). "In determining whether a restrictive covenant will be enforced, . . . the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and *the public interest*." *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778 (1974) (emphasis added).

Many courts, including some in Massachusetts, have recognized the right of the public to freely choose their financial advisors, much like attorneys and physicians. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cuppels*, No. 95-0036, slip op. (Middlesex Super. Ct., December 23, 1994) (Houston, J.); *Fenner & Smith, Inc. v. DeForest*, No. 94-6784, slip op. at 4 (Suffolk Super. Ct., Dec. 23, 1994) (Quinlan, J.); *Merrill Lynch,*

Worcester Civil Action                    7                    No. 98-2398C

*Pierce, Fenner & Smith, Inc. v. de Liniere*, 572 F. Supp. 246, 248-249 (N.D. Ga. 1983).

The reasoning in *Meehan v. Shaughnessy*, 404 Mass. 419 (1989) is applicable in this case.

In *Meehan*, the Supreme Judicial Court held that a law firm could not restrict a departing

partner's right to remove any clients who freely chose to retain him or her as their legal

counsel. The Court noted that "the strong public interest in allowing clients to retain

counsel of their choice outweighs any professional benefits derived from a professional

covenant." *Id.* at 431. The same concerns are present in the instant case. If an injunction

were to issue in accordance with the Agreement, Williams would be prohibited from doing

business with former clients who seek his services, even in the absence of active

solicitation on his part. This class of persons could conceivably include Williams' parents,

his spouse, and his child, all of whom Williams provided services to while affiliated with

AEFA. A financial planner, such as Williams, stands in a position of trust, much like an

attorney or physician, and this Court declines at this stage of the proceedings to interfere

with the public's right to choose from whom it seeks professional financial services.

## ORDER

For the reasons set forth above, it is hereby ORDERED that the plaintiff's Motion

for a Preliminary Injunction is DENIED.

Patrick J. King
Justice of the Superior Court

DATE: November 10, 1998.

@010

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

**FILED**

WORCESTER, ss.

OCT 2 6 1998    CIVIL ACTION NO.
98-2398 C

:TTEST:

_Louis P. Lemieux_
CLERK

AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.,                          )
                                         )
          Plaintiff                      )
                                         )
vs.                                      )    PLAINTIFF'S MOTION FOR
                                         )    PRELIMINARY INJUNCTION
MARK WILLIAMS and                        )
COMMONWEALTH EQUITY                      )
SERVICES, INC.,                          )
                                         )
          Defendants                     )

 

Plaintiff American Express Financial Advisors, Inc., formerly known as IDS Financial Services, Inc ("AEFA"), moves pursuant to Rule 65 of the Massachusetts Rules of Civil Procedure and Chapter 93A of the Massachusetts General Laws, for a preliminary injunction prohibiting Defendant Mark Williams ("Williams") from violating the terms of his written agreements with AEFA, including the selling, or attempting to sell products or services to clients of Americans Express, utilizing and disclosing AEFA's confidential business information, and such other acts of unfair and deceptive business practices as found by this Court. AEFA also seeks a preliminary injunction prohibiting Defendant Commonwealth Equity Services, Inc. ("Commonwealth Equity") from assisting and supporting Williams in violating the terms of his written agreements with AEFA, including the selling, or attempting to sell products or services to clients of Americans Express, utilizing and disclosing AEFA's confidential business information, and from servicing former AEFA clients for a period of one year. Specifically, AEFA requests this Court order as follows:

_11/10/98 Denied - See Memorandum of Decision & Order._

# EXHIBIT 4

JUN 23 '95  15:03    FROM WORC SUPER COURT              TO 6172374545      PAGE.002

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 95-1249

AMERICAN EXPRESS FINANCIAL ADVISORS, INC.,
f/k/a IDS FINANCIAL SERVICES, INC.,
and IDS LIFE INSURANCE COMPANY,

vs.

KEVIN M. O'BRIEN

### MEMORANDUM OF DECISION AND ORDER
### ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

The plaintiffs move this court to enjoin a former employee from breaching non-compete and non-disclosure contract provisions. For the following reasons, the plaintiffs' motion for a preliminary injunction is denied in part.

### BACKGROUND

The defendant, Kevin O'Brien, worked for the plaintiffs, American Express Financial Advisors, Inc., formerly known as IDS Financial Services, Inc., and IDS Life Insurance Company, as an independent financial advisor from November 2, 1988 until May 25, 1995. O'Brien worked as an independent contractor, providing clients with financial consulting services relating to the plaintiffs' products.

Worcester Civil Action                    -2-                         No. 95-1249

On November 2, 1988, O'Brien and the plaintiffs executed three contracts, each containing the following non-competition and non-disclosure provisions:

> I.  "Records and Materials" means all records, files, manuals, forms, materials, supplies, stationery . . . that IDS, and Affiliate, or an Issuer furnishes or leases to you for use, . . . or that you create, including notes, memos and works of authorship, in connection with the performance of this agreement.
>
> III. 3(f).  You understand and agree that information about Clients, including Client identities, is confidential information and a trade secret.  This Client Information is the sole and exclusive property of IDS and its Affiliates and Issuers.
>
> IV. 1(c).  All records and Materials are the property of IDS, an Affiliate or an Issuer.  All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to IDS.

The contract further provides that IDS is entitled to an injunction to keep O'Brien from violating the contracts provisions while arbitration is pending. (IV. 3(b)).

Both the plaintiffs and O'Brien are members of the National Association of Securities Dealers (NASD), which is the mandated forum for dispute resolution between the parties.

On May 25, 1995, O'Brien informed the plaintiffs that he was terminating their relationship. He subsequently became affiliated with Commonwealth Equities. American Express demanded that O'Brien return its materials, records and documents. On June 8, 1995, O'Brien returned to American Express computer equipment, marketing materials and seven boxes of documents. On June 12, 1995, O'Brien returned to American Express more documents which, he claims, constitute the remainder of American Express' property. O'Brien has refused to turn over some contents of client files, including client-generated records such as tax returns, to wit, Form 1040 materials.

Worcester Civil Action                    -3-                    No. 95-1249

On June 13, 1995, the plaintiffs filed this action requesting that the court:
1) preliminarily and permanently enjoin the defendant from violating the contracts and
violating G.L. c. 93A, and 2) enter judgment for the plaintiffs for damages sustained as a
result of the defendant's breaches of contract and/or tortious interference with contractual
and business relations.[1] In their instant motion seeking a preliminary injunction pursuant to
M.R.Civ.P. 65 and M.G.L. c. 93A, the plaintiffs specifically ask the court:

> 1. To enjoin O'Brien from offering to sell, selling, or seeking an
> application for any product or service to or from any client
> O'Brien contacted, dealt with or learned about while associated
> with the plaintiffs, and

> 2. To order O'Brien to return all records, files, manuals, forms,
> materials, supplies, literature, computer software, licenses,
> papers and books, including all notes and memoranda, whether
> provided to O'Brien or created or prepared by O'Brien, in
> connection with the performance of services under the
> contracts, including but not limited to all information and
> documents relating to clients and their products and services.[2]

On June 15, O'Brien commenced an arbitration proceeding against the plaintiffs
before the NASD, seeking expedited arbitration and a declaration that he is not liable to the
plaintiffs.

---

[1] The complaint also contains the counts for theft of trade secrets and conversion.

[2] The plaintiffs waived in court a third part of injunctive relief sought, viz, that O'Brien
be ordered not to use any information obtained during the course of performance of services
under the contracts for any business in competition with the plaintiffs.

Worcester Civil Action                    -4-                    No. 95-1249

## DISCUSSION

Non-compete provisions are to be enforced to the extent that they reasonably protect the employer's legitimate business interests. Shipley Co., Inc. v. Clark, 728 F. Supp. 818, 826 (D. Mass. 1990), citing Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 (1974). The issuance of a preliminary injunction rests, however, within the sound discretion of the trial judge. General Accident Insurance Co. of America v. Bank of New England-West N.A., 403 Mass. 473, 475 (1988).

In deciding whether to allow a preliminary injunction to enforce the non-compete provisions at issue, the court must first evaluate the moving party's claim of injury and chance of success on the merits. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). If denial of the preliminary injunction would subject the moving party to a substantial risk of irreparable harm, the court must then balance that risk against any risk of irreparable harm an injunction would create for the opposing party. Id. The court will consider the risk of harm in light of the moving party's chance of success on the merits. Id. The court should allow the injunction only if the balance suggests that the moving party is exposed to greater risk. Id. Additionally, the court should consider the risk of harm to the public interest by granting or denying the injunction. GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993).

To obtain injunctive relief, the moving parties must show that their claim of injury rises to the level of irreparable harm. Irreparable harm is immediate harm; it is not harm merely expected to occur at some indefinite time in the future. M.P.S. Equitable Remedies § 140, citing State of Connecticut v. Commonwealth of Massachusetts, 282 U.S. 660, 674 (1931). A court may find that a plaintiff suffers irreparable harm if there is no adequate

Worcester Civil Action                   -5-                    No. 95-1249

remedy at final judgment. GTE Products Corp. v. Stewart, 414 Mass. at 724. In determining
the harm to the plaintiff, the court need only consider the harm that would not be redressed
by final relief. Id.


A.  THE REQUEST TO ENJOIN

       The plaintiffs have not demonstrated that they will suffer irreparable harm as defined,
supra. Because the plaintiffs have demonstrated no likelihood that their former customers
will follow O'Brien, their concerns are merely speculative and do not rise to the level of a
showing of irreparable harm. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cuppels,
Civil No. 95-0036 (Middlesex Super. Ct., Jan. 10, 1995)(Houston, J.)(no irreparable harm
found to justify an injunction enforcing a noncompetition clause where defendant's former
employee accepted job with competing business, and where plaintiff not certain that clients
would follow defendant). Moreover, the plaintiffs have an adequate remedy at law, since they
can be made whole by a damage award from the arbitration proceedings.

       The plaintiffs' reliance upon IDS Financial Corporation v. Dube, Civil No. 92-0530
(Worcester Super. Ct. May 22, 1992)(Roseman, J.) is misplaced. Unlike the instant case,
the court in Dube was not ruling on a motion for a preliminary injunction, and therefore it
did not have to find immediate and irreparable harm in order to grant the relief sought. See
Id. Similarly, the court in Dube had no occasion to consider, as this court does, the
availability of an adequate remedy at law through arbitration.

       Moreover, although issuance of an injunction would not bar the defendant from
conducting his financial planning business, it could harm O'Brien, as a single financial advisor,
far more than the risk of harm which a denial of the injunction could have on the plaintiffs'

Worcester Civil Action                    -6-                    No. 95-1249

billion-dollar business. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cippels, C.A. No.
95-0036 (Middlesex Super. Ct., January 10, 1995) (Houston, J.) (on similar facts, risk of
harm of denying injunction to large brokerage firm outweighed by risk of harm from issuing
injunction to single broker).

Therefore, since the plaintiffs have an adequate remedy at law in the event that they
prevail in arbitration proceedings, and since they have not demonstrated a likelihood of
success on the merits of their claim, the motion for a preliminary injunction will be denied.

## B. THE REQUEST FOR DELIVERY OF DOCUMENTS

The plaintiffs have failed to demonstrate their likelihood of success on the merits with
respect to their claim to client-generated documents retained by O'Brien. The plaintiffs have
not shown that they have a right to such documents. The contracts provide that documents
created by American Express, IDS, or O'Brien become, by virtue of that creation, the
plaintiffs' property, but are silent with respect to the property interests of the parties in
client-generated records. Therefore, even issuance of a preliminary injunction tracking the
language of the contracts would not clearly resolve the parties' dispute regarding their rights
to these documents.

Expedited arbitration before the NASD is the appropriate forum for determining the
parties' rights with respect to such documents. As the mandated forum with expertise in
securities matters, the NASD is in a better position than this court to resolve the question of
the right to possession of client-generated items.[3] Accordingly, the defendant is ordered to

_____

[3] The interests of the clients with respect to which of the contestants is favored with
the right of possession ought also to be factored into the mix. It may be that an inquiry of
each client who generated disputed items would be appropriate; whether or not to engage
such an inquiry is a fit subject for the arbitrator.

JUN 23 '95  15:17    FROM WORC SUPER COURT                    TO 6172352333        P.9

Worcester Civil Action                    -7-                       No. 95-1249

segregate and hold client-generated records currently in his possession, so that the NAS

be able to ascertain the contracts' mandates as to their disposition. Making the docur

available to NASD will also facilitate NASD's task of calculating damages, if any are awa

in connection with clients who continued to use O'Brien as a financial planner followir

termination with the plaintiffs.

In sum, O'Brien will be required to return all documents, not heretofore retur

that were prepared or created by him in connection with his employment pursuant to

Agreement, and he will be ordered to maintain all documents generated or furnished to

by clients in connection with said employment.

### ORDER

For the foregoing reasons, it is hereby ORDERED that: 1) the plaintiffs' motion

a preliminary injunction be DENIED without prejudice for reconsideration upon a show

by the parties that an arbitration determination has not been made within three (3) mo

from the date of this decision; and 2) the defendant return defendant-generated docum

and collect and hold in a secure location client-generated documents currently in

possession pending resolution by arbitration of this matter.

Daniel F. Toomey
Justice of the Superior Court

DATED: June 23, 1995.
[ckz]

# EXHIBIT 5

http://web2.westlaw.com/print/printstream.aspx?utid=%7bF6CB14A...

# Westlaw.

241 F.Supp.2d 30                                                                                          Page 1
241 F.Supp.2d 30
(Cite as: 241 F.Supp.2d 30)

**c**

American Express Financial Advisors Inc. v. **Temm**
D.Me.,2003.

United States District Court,D. Maine.
AMERICAN EXPRESS FINANCIAL ADVISORS INC. and IDS Life Insurance Company, Plaintiffs
v.
William **TEMM**, Michael Reid, Bruce Sawyer and Andrew Stickney, Defendants
**No. CIV. 03-17-P-H.**

Jan. 22, 2003.

Franchisor sought temporary restraining order (TRO) to stop its former franchisees from having access to their former customers or using former telephone number, pending arbitration of claims that franchisees breached agreement. The District Court, Hornby , J., held that: (1) franchisor did not demonstrate likelihood of success on merits; (2) hearsay statements regarding franchisees' alleged actions of soliciting customers after they left franchisor were admissible for purposes of determining appropriateness of TRO; and (3) franchisor would not be irreparably injured, in the absence of TRO.

Motion denied.

West Headnotes

**[1] Injunction 212 ☞138.1**

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
      212IV(A) Grounds and Proceedings to Procure
         212IV(A)2 Grounds and Objections
           212k138.1 k. In General. Most Cited Cases
To award preliminary injunctive relief, district court must find: (1) that plaintiff will suffer irreparable injury if injunction is not granted, (2) that such injury outweighs any harm which granting of injunctive relief would inflict on defendant, (3) that plaintiff has exhibited likelihood of success on merits, and (4) that public interest will not be adversely affected by granting of motion.

**[2] Injunction 212 ☞150**

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
      212IV(A) Grounds and Proceedings to Procure
         212IV(A)4 Proceedings

212k150 k. Restraining Order Pending Hearing of Application. Most Cited Cases

Franchisor, seeking temporary restraining order (TRO) enjoining former franchisees from having access to their former customers or using former telephone number, pending arbitration of claim that franchisees breached agreement with franchisor, did not demonstrate that it was likely to succeed merits of its claims that franchisees breached agreement by soliciting or recruiting each other to leave franchisor, by leaving message indicating their new phone number at old phone number, or by soliciting customers.

**[3] Injunction 212** 🔗**150**

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
      212IV(A)4 Proceedings
       212k150 k. Restraining Order Pending Hearing of Application. Most Cited Cases

Hearsay statements regarding former franchisees' alleged actions of soliciting customers after franchisees left franchisor were admissible for purposes of determining appropriateness of temporary restraining order (TRO) enjoining franchisees from contacting former customers and using former telephone number.

**[4] Injunction 212** 🔗**150**

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
      212IV(A)4 Proceedings
       212k150 k. Restraining Order Pending Hearing of Application. Most Cited Cases

Franchisor would not be irreparably injured, absent temporary restraining order (TRO) enjoining former franchisees from soliciting former customers and from using former telephone number, pending arbitration of claim that franchisees breached agreement with franchisor; franchisor had adequate remedy at law, in that, any damages caused by loss of customers could be calculated from consumer account records and expert testimony.

**\*31** Robert E. Mittel, Esq., Mittel, Asen, Hunter & Cary, LLC, Portland, ME, for American Express Financial Advisors Inc., IDS Life Insurance Company, plaintiffs.

John C. Lightbody , Esq., Christopher B. Branson , Esq., Murray, Plumb & Murray, Portland, ME, for William **Temm**, Michael L Reed, Bruce Sawyer, Andrew Stickney, defendants.

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

HORNBY , District Judge.

[1] The four defendants were employees, then independent contractors, then franchisees of American Express Financial Advisors Inc.[FN1] They have now left that organization and have gone to a competitor. American Express seeks a temporary restraining order to stop the defendants from having access to their former customers or using a former telephone number.[FN2] The agreement in question is subject to NASD arbitration, but American Express seeks injunctive relief prior to that arbitration. The four part test is well known.

    FN1. After becoming an independent contractor, the defendant Bruce Sawyer transformed his affiliation with American Express back to an employee and then to a franchisee. Compl. ¶¶ 62-63 (Docket No. 1).

FN2. The plaintiffs, American Express and IDS Life Insurance Company (together, "American Express"), filed a complaint seeking injunctive relief against the four defendants and an accompanying motion for a temporary restraining order (Docket No. 2) on January 16, 2003. I heard oral argument on the motion on January 21, 2003.

To award preliminary injunctive relief, [t]he Court must find: (1) that the plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which the granting of injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the motion.

**\*32** *Merrill Lynch, Pierce, Fenner & Smith v. Bennert,* 980 F.Supp. 73, 74 (D.Me.1997) (citations omitted); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996) . I **DENY** the motion based upon the degree of likelihood of success on the merits and the lack of irreparable injury.

The agreement (it is the same for each of the four defendants <u>FN3</u> ) provides a way for the franchisees to leave the American Express organization without running afoul of the prohibition on access to former customers. American Express argues that the defendants have violated three important provisions, however: (1) no recruitment or solicitation of others to leave the American Express organization; (2) no use of their former telephone number; and (3) no notice to customers that they are leaving or solicitation of their business until the effective date of termination.

> FN3. I recognize that the defendant Andrew Stickney may not be able to take advantage of the rider specifying how to leave the organization because it requires more seniority than he has. Nevertheless, the irreparable injury part of the analysis leads me to the same conclusion for him as the other three defendants.

### RECRUITMENT/SOLICITATION OF OTHER FRANCHISEES

[2] American Express's case on this point is circumstantial. Because the four defendants all left simultaneously and together, American Express infers that they must have solicited or recruited each other to leave. By individual affidavits the four defendants each deny that. I find little likelihood of success on this point. It is quite reasonable that four people working together could reach a decision to leave, one following the example of another, with no recruitment or solicitation.

### USE OF TELEPHONE NUMBER

According to the agreement, the "Independent Advisor agrees to immediately cease using any telephone number used by Independent Advisor in the Independent Financial Advisor Business." Compl., Ex. 1, at 27. Here, the four defendants put a voice message on their previously used number that said:

Hello, if you are trying to reach Michael Reed, Bill **Temm**, Bruce Sawyer, or Andy Stickney please dial 207-885-8827. Thank you.

Kondal Aff. ¶ 5 (Docket No. 4).

After this lawsuit was filed, they changed the message to:

Hello. You have reached 207-885-8825. If you are trying to reach American Express Financial Advisors, please call 603-668-1273. If you are trying to reach Michael Reed, Bill **Temm**, Bruce Sawyer, or Andy Stickney, they have left American Express Companies and can be reached at 207-885-8827. Thank you.

**Temm** Aff. ¶ 8 (Docket No. 10).<u>FN4</u>

FN4. Under the franchise agreement, American Express reserves the right at its expense "to add a forwarding message to any such telephone number, indicating the telephone number for [American Express] and for the departing Independent Advisor." Compl., Ex. 1, at 27. It appears that the defendants attempted to modify their message to conform to this provision.

Did they immediately cease using the number by leaving the first forwarding message? Perhaps. Perhaps not. That will be for the arbitrator to determine. But the prohibition is sufficiently ambiguous in meaning in these circumstances to make American Express's temporary restraining order case weak.

## *33 NOTIFICATION TO AND SOLICITATION OF CUSTOMERS

[3] The record is very unsatisfactory on this point. For American Express, I have the affidavit of Martha Kondal who was in charge of an intensive calling campaign with respect to the customers in question. She summarizes in her affidavit what she believes she learned from these customers about what the defendants did. The information is, of course, hearsay, not inadmissible for purposes of this preliminary relief, but subject to careful treatment. What is more troubling is that the specific records she refers to are capable of different interpretation, and the four defendants in their affidavits explicitly deny engaging in the prohibited activity and provide a substitute explanation for customer confusion. (Docket Nos. 10-13) Of course, their affidavits in turn are self-serving and therefore also subject to question. I would much prefer to have heard the testimony of live witnesses under oath subject to cross-examination to determine what really happened during the two-week termination process. The parties did not offer me that and, because I am in the midst of a lengthy criminal trial, I did not have the luxury of demanding it. But based upon the conflicting affidavits and weighing the specifics of the information the affiants are able to provide, I conclude that American Express has not shown a likelihood of success on this point.

## IRREPARABLE INJURY

[4] Judge Carter of this District has ruled more than once on the question of irreparable injury in a dispute like this over former customers. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Bennert,* 980 F.Supp. 73 (D.Me.1997) ; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F.Supp. 68 (D.Me.1993) . While issues of confidentiality and the former employer's right to its records justify injunctive relief to restore improperly taken records (not the situation here), he has also ruled clearly that money damages for lost business are available if former employees improperly solicit former customers. *Bennert,* 980 F.Supp. at 75; *Bishop,* 839 F.Supp. at 74-75 . This availability "cuts heavily against a conclusion that the injury ... is irreparable in nature." *Bishop,* 839 F.Supp. at 74 . Citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8 (1st Cir.2000) , American Express argues that the injury to its good will, relationships and morale are not easily quantifiable. American Express's reliance on *Ross-Simons* is misplaced, however. In *Ross-Simons,* the First Circuit held that the loss of a prestigious product line would cause irreparable harm to a dealer because the impact on the dealer's bridal registry (the number of couples who would register elsewhere, the disappointment to former registrants, and the harm to the dealer's image) could not be calculated. *Ross-Simons,* 217 F.3d at 13; *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19-20 (1st Cir.1996) . Here, any damages caused by the loss of customers could be calculated from consumer account records and expert testimony. I therefore conclude that American Express has an adequate remedy at law.

## CONCLUSION

For these reasons, American Express's motion for temporary restraining order is **DENIED**.

**SO ORDERED**.

D.Me.,2003.
American Express Financial Advisors Inc. v. Temm
241 F.Supp.2d 30

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5/13/2008 3:00 PM

# EXHIBIT 6

1

1

2                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
3                       LOUISVILLE DIVISION

4

5    AMERICAN EXPRESS FINANCIAL      )  Case No. 3:03-CV-509-S
     ADVISORS, INC. ET AL.,          )
6                                    )
              Plaintiff,             )
7                                    )
     VS.                             )
8                                    )
     RONALD D. BUTT                  )
9    PATRICK J. REEVES               )
                                     )  AUGUST 28, 2003
10            Defendant.             )

11

              ******************************************
12            TRANSCRIPT OF JUDGE'S RULING IN TRO HEARING
                    BEFORE CHARLES R. SIMPSON, III
13                  UNITED STATES DISTRICT JUDGE
              ******************************************

14

     APPEARANCES:
15

     For the Plaintiff         BYRON E. LEET
16                             EDWARD B. MAGARIAN
                               500 W. Jefferson Street, #2600
17                             Louisville, KY 40202

18   For the Defendants        LEONARD WEINTRAUB
                               1251 Avenue of the Americas
19                             Ninth Floor
                               New York, NY 10020

20

21

22
                          CAROLA G. STRIJEK, RPR
23                         Official Court Reporter
                          United States Courthouse
24                        601 W. Broadway, Suite 221A
                           Louisville, KY 40202
25                            (502)625-3778

2

P R O C E E D I N G S

1

2          THE COURT:  Okay.  All right.  Anything else?

3          MR. MAGARIAN:  I'll leave the rest to our papers.

4          THE COURT:  All right.  Well, the Court thanks

5    Counsel for the comprehensive and full some presentation this

6    afternoon.  It appears to the Court that Kentucky law and

7    Minnesota law basically are the same in these matters and if

8    Kentucky law is less favorable, then the Plaintiff has not

9    taken upon itself to take advantage of that so we have the

10   considerations here of likelihood of success on the merits,

11   irreparable harm to others or public policy serving the

12   public interest.  The primary focus is success on the merits

13   because there is a wealth of case law that seems to indicate

14   some presumption regarding irreparable harm; although, in

15   these circumstances, I'm not certain that any harm is

16   completely irreparable.

17          But with respect to the likelihood of success on

18   the merits, the question here is whether the Plaintiff has

19   shown by a preponderance of the evidence that it is able to

20   take advantage of the restrictive covenant and that the

21   forbearance agreement will not save the Defendants from

22   application of the restrictive covenant or non-compete

23   agreement.

24          With respect to this document it has to be

25   construed if it is ambiguous against the author, but I don't

3

1    find that it's ambiguous here.  The primary contentions here

2    have to do with whether or not there is -- the Defendants

3    have been shown to have sent notification of termination to

4    clients prior to the effective date of their termination.

5    I've reviewed the statements of some of the clients here and

6    I cannot find any clear statement nor testimony here today

7    that these Defendants sent notification of termination to

8    clients prior to the effective date of their termination.

9         The other aspect of this is whether or not they

10   have been shown prior to the effective date of termination

11   have solicited or assisted the clients to switch from

12   American Express.  And, again, I find that there has simply

13   not been a showing by the Plaintiff that that has occurred.

14        Some of the statements that were made here by some

15   of the people that filed affidavits indicated that they may

16   have received oral information that the Defendants were

17   leaving or that they may have had appointments with clients

18   set up during this two-week period, but that there's no

19   showing that these are anything other than the ordinary

20   course of business, and I'm going to reject the contention

21   that the setting up of the appointment constitutes a

22   solicitation and find that any solicitation, if any occurred,

23   would have occurred during the meeting or during any

24   conversation.  But simply the setting up of an appointment in

25   the neutral manner would not constitute a solicitation.

4

1          So on this basis I'm going to find that there has

2     been not a showing by the requisite level of proof in this

3     case that there is a likelihood of success on the merits that

4     the Defendants have violated the prohibition against

5     pretermination solicitation of clients, paragraph 6 of the

6     covenant.

7          Now, with respect to this compliance rule, this is

8     apparently some investigation that American Express had

9     instigated on its own as to whether its name was being

10    properly put forth by the Defendants.  It's odd to have that

11    brought up here when there has been significant questioning

12    and argument that the Defendants took advantage of their

13    connection with American Express during the period of time

14    prior to the effective date of their termination.

15         But in any case, this appears to be nothing more

16    than a boot strap here in which the American Express could

17    instigate in an investigation without any finding or showing

18    of good cause or probable cause or reason or that there was

19    any meat on those bones or that the complaint or notion that

20    American Express had any legs to it; that American Express

21    can simply instigate an investigation and then say that the

22    Defendants, because of its own action, are not able to take

23    advantage of the forbearance agreement.

24         I think that on this matter that the Court would

25    require more of American Express than to say we were

5

1   investigating for some reason that was known to us and we

2   don't know whether there was any truth to it.  We don't know

3   if it was successful.  We don't know who complained or what

4   the basis of it is or whether there was going to be really

5   any possibility that any violation of their franchise

6   agreement could be shown.  So I agree with Defense counsel

7   that this is nothing more than a boot strap and I'm not going

8   to consider the fact that American Express instigated on its

9   own an investigation as a likelihood of success on the

10  merits; that because of that alone, the forbearance agreement

11  doesn't apply here.

12          So from what I've heard, Counsel, the motion for

13  restraining order is going to be denied and also the motion

14  for preliminary injunction since I think this hearing was

15  comprehensive enough to consider that both issues were

16  addressed.  So that will be the order of the Court.  Anything

17  further, Counsel, at this time?  Thank you.  Be careful.

18  Don't get wet.

19          Oh, my law clerk is pointing out to me that I

20  didn't say anything about the fact that there was a

21  contention that certain documents had not been returned.

22  There's been some issues raised as to whether that was just

23  lately produced in these CDs.  Nobody knows what's on the

24  CDs.  Defendants both testified that they clearly and

25  unequivocally attempted to return and did return every

6

1    original client file to American Express.  So while there

2    were varying contentions on that, I simply am constrained to

3    hold on that basis that there simply hasn't been a showing by

4    the necessary burden by the Plaintiff that there was a

5    violation in that regard.  Also, there is a motion hereby

6    American Express to seal these certain affidavits here.

7    These are affidavits --

8            MR. MAGARIAN:  It's the transcripts, Your Honor.

9            THE COURT:  Of the recordings of American Express

10    contact with clients.  I can't see that there's anything in

11    here that is at all confidential.  If they were revealing

12    anything that would be problematic, I can't -- I would be

13    willing to grant this in a heartbeat because these people

14    obviously don't have a dog in this fight.  But in looking at

15    these, I just didn't see that there was anything particularly

16    problematic here in the public record.

17            MR. MAGARIAN:  The only reason we did it out of

18    excess of caution.  Any time we name or clients.

19            THE COURT:  Well, I understand, but, you know,

20    sealing stuff just creates a whole big problem in the clerk's

21    office with where you put half the file or a few items of the

22    file.  It's obviously appropriate when necessary, but I'm

23    going to deny it here because I don't see there's any reason

24    to do it.  Okay.  Thank you.

25            THE PROCEEDINGS WERE THEN CONCLUDED

7

1

2                         C E R T I F I C A T E

3          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

4     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6     _____          9-15-03
      CAROLA G. STRIJEK, RPR            DATE
7     Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHAMBERS OF
NICHOLAS H. POLITAN
JUDGE

MARTIN LUTHER KING JR.
FEDERAL BUILDING & U.S COURTHOUSE
50 WALNUT ST_ ROOM 5076
P.O BOX 999
NEWARK, N.J. 07101-0999

FILED

OCT 2 1 1998

AT 8:30 .........~..P..M
WILLIAM T. WALSH
CLERK

NOT FOR PUBLICATION

October 21, 1998

LETTER OPINION
ORIGINAL ON FILE WITH CLERK OF THE COURT

Michael J. Zaretsky, Esq.
CHORPENNING, GOOD, CARLET & GARRISON
1135 Clifton Ave.
Clifton, NJ 07017

Eliott R. Good, Esq.
77 East Nationwide Blvd.
Columbus, Ohio 43215
 Attorneys for Plaintiff

John J. DeLaney, Jr., Esq.
Bruce S. Goodman, Esq.
COOPER, ROSE & ENGLISH, LLP
480 Morris Ave.
Summit, NJ 07901
 Attorneys for Defendants

       Re:  American Express Financial Advisors, Inc.
            v. Michael G. Botwinick, Gregory M. Emr,
            Elizabeth A. Emr, James J. Dickinson, and
            Linda L. Eckert
            Civil Action No. 98-4552 (NHP)

Dear Counsel:

       This matter comes before the Court on the Order to Show

Cause of plaintiff American Express Financial Advisors, Inc.

("AEFA") wherein AEFA seeks a Preliminary Injunction.  An

emergent hearing was conducted on October 5, 1998.  For the

reasons stated herein, AEFA's request for this Court to issue a

Planners secure information such as the net worth of an individual, the extent of their investments, and financial goals and objectives.

The clients with whom the defendants came into contact during their tenure at AEFA can be divided into three categories: (1) "Natural Market" clients; (2) "House Accounts" clients; and (3) "Advisors Own Marketing" clients.  See Affidavit of Linda L. Eckert dated October 6, 1998, page 2.  The "Natural Market" clients include those persons who are family members, friends, or referrals from family and friends.  See id.  The House Accounts include those clients that were assigned to the advisors by AEFA.  See id.  Finally, the "Advisors Own Marketing" clients includes clients that were obtained as a result of the Financial Planners own marketing efforts through seminars and leads purchased by the Financial Planners from AEFA.  These leads were purchased using the Financial Planners' personal funds. See id, ¶6.

On or about September 18, 1998, defendants resigned from AEFA and, upon AEFA's information and belief, became affiliated with Linsco/Private Ledger, Inc., a financial services company. AEFA contends that, at the time of their resignation, defendants appropriated confidential AEFA information including, but not limited to, clients' names, addresses, investment mix, net worth, financial plans and goals which, in all, amount to what AEFA refers to as "confidential information" or "trade secrets."  See

3

solicited and acquired with their own funds, and, therefore, are

persons with whom they are entitled to continue their

relationship.  Additionally, defendants contend that the dispute

between the parties is entirely arbitrable and should be heard

before a duly constituted panel convened by the National

Association of Securities Dealers, Inc. ("NASD").

On October 8, 1998, this Court issued an Order <u>Pendente Lite</u>

ordering, in part, that:

> any requests to transfer or redeem any funds
> under investment and/or management of
> Plaintiff, in whatever form, from clients
> serviced or learned about by Defendants while
> affiliated with plaintiff shall be held in
> escrow by Plaintiff or Defendants, if such
> request was signed by the client on or after
> October 5, 1998. . .

<u>See</u> Order dated October 8, 1998.

The present matter was filed at the same time an action was

filed by AEFA for an arbitration before the National Association

of Securities Dealers, Inc. (hereafter "NASD") pursuant to the

NASD Code of Arbitration Procedure §10335 and as set forth in the

Agreements.


## DISCUSSION

The standards for the issuance of a preliminary injunction

are well-settled.  In order to prevail on an application for a

preliminary injunction, the Court must consider: (1) the

likelihood that the plaintiff will prevail on the merits; (2) the

to preserve the status quo.  See Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1150 (3d Cir. 1982).  Finally, a preliminary injunction cannot be issued when there are disputed issues of fact.  Apollo Technologies, Corp. v. Centrosphere Industrial Corp., 805 F. Supp. 1157, 1191 (D.N.J. 1992).

## A. Applicable law:

In scrutinizing requests for preliminary injunctions, federal standards are applied.  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989).  The Third Circuit has opined that "although the right upon which this cause of action is based is state created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions."  Id. at 799.  As this case arises under the Court's diversity jurisdiction pursuant to 28 U.S.C. §1332, the Court will address the issue in accordance with the substantive laws, including choice of law principles, that would be applied by a New Jersey state court in this case.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

In this matter, the contractual relationship between the parties is subject to a choice of law provision which designates Minnesota law as the controlling legal authority.  The Agreement provides that:

of the "confidentiality" and the "non-solicitation" provisions of the Agreements.

Minnesota law provides that restrictive covenants "are looked upon with disfavor, cautiously considered, and carefully scrutinized." Kallock v. Medtronic, Inc., 573 N.W.2d 356, 361 (Minn. 1998) (citing Bennett v. Storz Broadcasting Co., 270 Minn. 525, 533 (1965)). See also Overholt Crop Insurance Service Co. Inc. v. Bredeson, 437 N.W.2d 698, 703 (Minn. Ct. App. 1989). A restrictive covenant in an employment setting will be specifically enforceable only to the extent that it is for the protection of a "legitimate interest" of the employer, is for a "just and honest purpose," is reasonable as between the parties, and not "injurious to the public." Haynes v. Monson, 301 Minn. 327, 330 (Minn. 1974) (citing Bennett v. Storz Broadcasting Co., 270 Minn. 525, 533 (1965)).[3]

Therefore, the first step to showing a reasonable likelihood of success on the merits requires that the moving party demonstrate that the employer is protecting a "legitimate interest." Cf. Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26, 29 (3d Cir. 1961) (referring to that interest under New

_____

[3] Similarly, New Jersey law provides that a covenant not to compete in an employment setting will be enforceable only to the extent that it "protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." Solari Industries, Inc. v. Malady, 55 N.J. 571, 576 (1970). See also Coskey's Television & Radio Sales and Service v. Foti, 253 N.J. Super. 626, 634 (App. Div. 1992).

and exclusive property of IDS and its
Affiliates or Insurers.

(g) For one year after this Agreement ends,
you agree that you will not, in the territory
where you sought applications for Products or
Services under this or any other agreement
with IDS or an Affiliate, directly or
indirectly offer for sale, sell or seek an
application for any Product or Service issued
or provided by any company to or from a
Client you contacted, dealt with or learned
about while you represented IDS or an
Affiliate or issuer or because of that
representation.  You are excepted from this
restriction only if you carry out these
activities as a Planner or manger of IDS or
with the written consent of IDS.

See Affidavit of Walter K. Booker dated September 30, 1998,
Exhibit A, page 5(f) (emphasis added).

Presumably then, it is the clients' names, addresses, investment

mix, net worth, financial plans and goals which AEFA contends

constitutes confidential information and/or trade secrets.

In evaluating whether information of a company is elevated

to the level of being "confidential" information or a "trade

secret," the Minnesota courts have articulated a four-part test

to aid in such a determination.  Cherne Industrial, Inc. v.

Grounds & Associates, Inc., 278 N.W.2d 81, 90 (Minn. 1979).  The

elements comprising the test are:

(1) the protected matter is not generally
known or readily ascertainable, (2) it
provides a demonstrable competitive
advantage, (3) it was gained at [the] expense
to the employer, and (4) it is such that the
employer intended to keep it confidential.

filed a Statement of Claim with the NASD, the parties should continue to proceed with the arbitration hearing on an expedited track and allow the arbitrator to adjudicate this matter on the merits.[6] In so doing, this Court orders that the October 8, 1998 Order _Pendente Lite_ issued in connection with this matter be DISSOLVED.

**B.   Balancing the Equities- Irreparable harm:**

In deciding whether injunctive relief is appropriate, the degree of irreparable harm to each party must be balanced.

AEFA contends that it is necessary for this Court to issue a preliminary injunction because AEFA will suffer irreparable harm if their clients continue to transfer or redeem their accounts with AEFA and forward their business to defendants' new place of business.  AEFA further contends that if defendants are not enjoined from contacting AEFA's clients for the purpose of transferring and/or redeeming their accounts, AEFA will suffer an

---

analysis, namely, whether the restrictive covenant was for a "just and honest purpose," is reasonable as between the parties, and not "injurious to the public."  Haynes v. Monson, 301 Minn. 327, 330 (Minn. 1974) (citing Bennett v. Storz Broadcasting Co., 270 Minn. 525, 533 (1965)).

[6] Since the issue of whether the information was confidential is directly related to the issue of "solicitation" and, clearly, impacts the legal analysis of the "non-solicitation" provision of the restrictive covenant, this Court will refrain from addressing the likelihood of success on that issue as well.

harm] may be rebutted by evidence that the former employee has no hold on the good will of the business or its clientele." Id. (citing Webb Publishing Co. v. Fosshage, 426 N.W.2d 445, 448 (Minn. Ct. App. 1988)).

A trade secret, however, will not be protected by the extraordinary remedy of an injunction based upon "mere suspicion or the apprehension of injury." International Business Machine Corp. v. Seagate Technology, Inc., 941 F. Supp. 98, 101 (D. Minn. 1992). See also Hideaway, Inc. v. Gambit Investments, Inc., 386 N.W.2d 822, 824 (Minn. Ct. App. 1986). Essentially, "[m]ore than a risk of irreparable harm must be demonstrated. . .[an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights. . .[i]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." Id. (citing E.R. Squibb & Sons, Inc. v. Hollister, C.A. No. 91-2103, 1991 WL 15296 (D.N.J. 1991), aff'd, 941 F.2d 1201 (3d Cir. 1991)). Thus, preliminary injunctions should only be issued when it is clear that rights of a party will be irreparably injured before a trial on the merits. Morse v. City of Waterville, 458 N.W.2d 728, 729 (Minn. 1990); Miller v. Foley, 317 N.W.2d 710, 712 (Minn. 1982).

In the present matter, the balance of irreparable harm to the parties supports a finding of denying the preliminary

to reap the benefits of defendants' labor.[1]  Thus, since
defendants developed a good measure of their client base solely
through their own efforts and expenses, the balance of
irreparable harm to the parties supports a finding of denying the
preliminary injunction.


C.  Public Interest:

     Although "good will" is certainly important to a company, it
is inevitable, however, that where a former employee has dealt
with customers, "those customers will want to continue to deal
with him in his new association.  This is so natural, logical and
part of human fellowship, that an employer who fears this kind of
future competition must protect himself by a preventive contract
with his employee."  Spring Steels v. Molloy, 162 A.2d 370, 375
(1960).  See also Merrill Lynch, Pierce, Fenner & Smith Inc. v.
Liniere, 572 F. Supp. 246, 249 (N.D. Ga. 1983) (holding that
"[t]he public has a greater interest in being able to choose
whether to follow its broker to a new firm or to remain at the
old firm with a new broker.")  This Court believes that the
public's interest in selecting the persons with whom they want to
trust in dealing with their financial endeavors is very
compelling.  Moreover, there is no indication on the record,

----

     [1] See generally Meadox Medicals, Inc. v. Life Systems, Inc.,
3 F. Supp. 2d 549, 553 (D.N.J. 1998).

17

## CONCLUSION

As more fully set forth above, plaintiff American Express Financial Advisor Inc.'s Order to Show Cause for a Preliminary Injunction is DENIED. Furthermore, this Court's Order Pendente Lite dated October 8, 1998 is hereby DISSOLVED. Finally, both parties are ordered to partake in an expedited arbitration proceeding.

An appropriate Order accompanies this Letter Opinion.

NICHOLAS H. POLITAN
U.S.D.J.

affiliated with AEFA, be held in escrow by Plaintiff or
Defendants; and the Court having considered the record and the
arguments of the parties; and for good cause shown;

IT IS on this ___ day of October, 1998

ORDERED that plaintiff American Express Financial
Advisor Inc.'s Order to Show Cause for a Preliminary Injunction
DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that this Court's Order *Pendente*
*Lite* dated October 8, 1998 is hereby DISSOLVED.

IT IS FURTHER ORDERED that this Court will STAY THE
MATTER AND ADMINISTRATIVELY TERMINATE THE CASE PENDING
ARBITRATION.


NICHOLAS H. POLITAN
U.S.D.J.

# EXHIBIT 8

716 256 2321    P.02/05

At a Motion Part of the Supreme Court of the State of New York, County of Monroe, held at the Hall of Justice in the City of Rochester, New York, on the 18 day of August, 1998.

PRESENT: Honorable Thomas A. Stander, Justice Presiding

STATE OF NEW YORK SUPREME COURT
MONROE COUNTY

---

AMERICAN EXPRESS FINANCIAL ADVISORS
INC. and IDS LIFE INSURANCE COMPANY OF
NEW YORK,

                    Plaintiffs,

    v.

DOUGLAS CONOWAY,

                    Defendant.

Index No.: 8486/98

Assigned Judge:
Thomas A. Stander, J.S.C.

ORDER TO SHOW CAUSE
AND TEMPORARY
RESTRAINING ORDER

---

PLEASE TAKE NOTICE THAT upon the annexed affidavit of Michael Keys, sworn to on August 11, 1998, and the affidavit of David Jacobus sworn to on August 7, 1998, together with the exhibits annexed thereto, and the annexed Summons and Complaint dated August 12, 1998, and after hearing Underberg & Kessler, LLP Russell I. Zuckerman, Esq., of counsel, on behalf of the plaintiffs, and sufficient cause appearing, it is

ORDERED, that the defendant show cause before this Court at 9:30 a.m. on Wed. Sept 30, 1998, or as soon thereafter as counsel can be heard before the Honorable Thomas A. Stander, J.S.C., at a Special Term of the Supreme Court, Hall of Justice, Rochester, New York, why an order should not be made and entered granting

TAS

-1-

plaintiffs the following relief pursuant to Article 63 of New York Civil Practice Law and Rules:

(a)    Enjoining defendant from (1) for a period of one year, directly or indirectly, soliciting any further business from and providing any investment products or services to any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs; (2) making false or misleading descriptions of fact that misrepresent the nature of defendant's relationship with plaintiffs or the characteristics, and/or qualities of plaintiffs' goods and services; (3) revealing, disclosing or using in any manner information contained in the records of plaintiffs, including the names, addresses, or any financial information of any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs; (4) encouraging or inducing any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs to terminate any agreement with plaintiffs or to withdraw any investment or account currently with plaintiffs for one year; (5) encouraging or inducing any of plaintiffs' Financial Planners to breach his or her Planner Agreement with plaintiffs;

(b)    Directing defendant to identify all individuals or entities who received defendant's solicitations;

(c)    Directing defendant to return all copies of plaintiffs' documents, including all of plaintiffs' customer records, financial plans, financial inventories, and plaintiffs' computer software, in his possession or control;

(d)     Ordering defendant to turn over to plaintiffs any and all materials in his possession or control which belong to plaintiffs or which bear plaintiffs' name or logos;

(e)     Directing defendant to provide plaintiffs with an accounting of all fees and commissions received by him, directly or indirectly, after his resignation from plaintiffs, from any of plaintiffs' customers whom he served or whose name became known to him while he represented plaintiffs;

(f)     Directing defendant to segregate all receipts from, and to maintain separate accounts for, all services performed for and products sold to any person who is or was plaintiffs' customer whom he served or whose name became known to him while he represented plaintiffs;

(g)     Granting plaintiffs compensatory damages in the amount to be shown at trial;

(h)     Awarding punitive damages as the Court deems appropriate;

(i)     Granting such other relief as the Court deems just and appropriate; and it is further

ORDERED, that until such time as a judicial decision is rendered with respect to plaintiffs' application for the aforesaid relief, (1) defendant is temporarily restrained individually and/or in concert with others from directly or indirectly soliciting any further business from and providing any investment products or services to any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs; (2) defendant is temporarily restrained from making false and misleading descriptions of fact that misrepresent the nature of defendant's relationship



-5-

with plaintiffs or the characteristics, and/or qualities of plaintiffs' goods and services; (3) defendant is temporarily restrained from revealing, disclosing or using in any manner information contained in the records of plaintiffs, including the names, addresses, or any financial information of any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented the plaintiffs; (4) defendant is temporarily restrained from encouraging or inducing any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs to terminate any agreement with plaintiffs or to withdraw any investment or account currently with plaintiffs for one (1) year; and (5) defendant is temporarily restrained from encouraging or inducing any of plaintiffs' financial planners to breach his or her Planner Agreement with plaintiffs; and it is further

ORDERED, that service of a duly conformed copy of this Order together with the annexed affidavit of Michael Keys, sworn to on August 11, 1998, the affidavit of David Jacobus, sworn to on August 7, 1998, and the annexed Summons and Complaint dated August 12, 1998, shall be deemed good and sufficient service if said papers are served upon defendant on or before 5:00 p.m. on <u>AUGUST 26</u>, 1998.

Dated: August 12, 1998

Answering affidavits, if any, shall be served both the Court and upon counsel for the moving party, at least Ten (10) days prior to the return date of this Order to show cause

ENTER

S/THOMAS A STANDER
Thomas A. Stander, J.S.C.

REPLY AFFIDAVITS, IF ANY, SHALL BE SERVED
UPON THE COURT AND OPPOSING COUNSEL AT
LEAST <u>THREE</u> (3) DAYS PRIOR TO THE
RETURN DATE OF THIS ORDER TO SHOW CAUSE.

# EXHIBIT 9

At a Motion Part of the Supreme Court of the
State of New York, County of Monroe, held at
the Hall of Justice in the City of Rochester,
New York, on the 3Y day of July, 1998.

PRESENT: Honorable Thomas A. Stander, Justice Presiding

STATE OF NEW YORK SUPREME COURT
MONROE COUNTY

---

AMERICAN EXPRESS FINANCIAL ADVISORS
INC. and IDS LIFE INSURANCE COMPANY OF
NEW YORK,

                        Plaintiffs,

     v.

JOHN W. LANPHER,

                  Defendant.

Index No.: 7578/98

Assigned Judge:
Thomas A. Stander, J.S.C.

ORDER TO SHOW CAUSE
AND TEMPORARY
RESTRAINING ORDER

---

     PLEASE TAKE NOTICE THAT upon the annexed affirmation of Michael Keys,

sworn to on July 23, 1998, together with the exhibits annexed thereto, and the annexed

Summons and Complaint dated July 23, 1998, and after hearing Underberg & Kessler,

LLP, Russell I. Zuckerman, Esq., of counsel, on behalf of the plaintiffs, and sufficient

cause appearing, it is

     ORDERED, that the defendant show cause before this Court at 9:30 a.m. on

Aug 28                         , 1998, or as soon thereafter as counsel can be heard before

the Honorable Thomas A. Stander, J.S.C., at a Special Term of the Supreme Court, Hall

of Justice, Rochester, New York, why an order should not be made and entered granting

plaintiffs the following relief pursuant to Article 63 of New York Civil Practice Law and Rules:

(a)    enjoining defendant from (1) for a period of one year, directly or indirectly, soliciting any further business from and providing any investment products or services to any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs; (2) making false or misleading descriptions of fact that misrepresent the nature of defendant's relationship with plaintiffs or the characteristics, and/or qualities of plaintiffs' goods and services; (3) revealing, disclosing or using in any manner information contained in the records of plaintiffs, including the names, addresses, or any financial information of any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs; (4) encouraging or inducing any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs to terminate any agreement with plaintiffs or to withdraw any investment or account currently with plaintiffs for one year; (5) encouraging or inducing any of plaintiffs' Financial Planners to breach his or her Planner Agreement with plaintiffs;

(b)    Directing defendant to identify all individuals or entities who received defendant's solicitations;

(c)    Directing defendant to return all copies of plaintiffs' documents, including all of plaintiffs' customer records, financial plans, financial inventories, and plaintiffs' computer software, in his possession or control;

(d)    Ordering defendant to turn over to plaintiffs any and all materials in his possession or control which belong to plaintiffs or which bear plaintiffs' name or logos;

(e)    Directing defendant to provide plaintiffs with an accounting of all fees and commissions received by him, directly or indirectly, after his resignation from plaintiffs, from any of plaintiffs' customers whom he served or whose name became known to him while he represented plaintiffs;

(f)    Directing defendant to segregate all receipts from, and to maintain separate accounts for, all services performed for and products sold to any person who is or was plaintiffs' customer whom he served or whose name became known to him while he represented plaintiffs;

(g)    Granting plaintiffs compensatory damages in the amount to be shown at trial;

(h)    Awarding punitive damages as the Court deems appropriate;

(i)    Granting such other relief as the Court deems just and appropriate; and it is further

ORDERED, that until such time as a judicial decision is rendered with respect to plaintiffs' application for the aforesaid relief, ~~(1) defendant is temporarily restrained individually and/or in concert with others from directly or indirectly soliciting any further business from and providing any investment product or services to any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented plaintiffs;~~ (2) defendant is temporarily restrained from making false and misleading descriptions of fact that misrepresent the nature of defendant's relationship

with plaintiffs or the characteristics, and/or qualities of plaintiffs' goods and services; (3) ~~defendant is temporarily restrained from revealing, disclosing or using in any manner information contained in the records of plaintiffs, including the names, addresses, or any financial information of any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented the plaintiffs; (4) defendant is temporarily restrained from encouraging or inducing any of plaintiffs' customers whom defendant served or whose name became known to defendant while he represented~~ plaintiffs to terminate any agreement with plaintiffs or to withdraw any investment or account currently with plaintiffs for one (1) year; and (5) defendant is temporarily restrained from encouraging or inducing any of plaintiffs' financial planners to breach his or her Planner Agreement with plaintiffs; and it is further

ORDERED, that service of a duly conformed copy of this Order together with the annexed Affidavit of Michael Keys, sworn to on July 23, 1998, and the annexed Summons and Complaint dated July 23, 1998, shall be deemed good ~~and sufficient~~ service ~~if said papers are served upon defendant on or before 5:00 p.m. on~~ _____ 1998.

Dated: July 24 1998

ENTER

Thomas A. Stander, J.S.C.

Answering affidavits, if any, shall be served upon the Court and upon counsel for the moving party, at least ____ ( ) days prior to the return date of this Order to Show Cause.

REPLY AFFIDAVITS, IF ANY, SHALL BE SERVED UPON THE COURT AND OPPOSING COUNSEL AT LEAST _____ ( ) DAYS PRIOR TO THE RETURN DATE OF THIS ORDER TO SHOW CAUSE.

# EXHIBIT 10

IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

AMERICAN EXPRESS FINANCIAL ADVISORS
INC. (formerly named IDS FINANCIAL
SERVICES, INC.) and
IDS LIFE INSURANCE COMPANY,

      Plaintiffs,

  vs.                        Case No. 96-2792-CA-01

ANTHONY W. WELCH,

      Defendant.
_____/

### ORDER DENYING MOTION FOR TEMPORARY INJUNCTION and ORDER COMPELLING ARBITRATION AND STAYING ACTION

This Cause was heard before the court on Plaintiff's Motion for Temporary Injunction and Defendant's Motion to Stay this Action and Compel Arbitration. On the evidence presented, it is

Ordered and Adjudged as follows:

1. The Motion for Temporary Injunction is denied.

2. The parties shall arbitrate this dispute with the National Association of Securities Dealers, Inc.

3. This action is stayed pending arbitration.

Done and Ordered in Chambers, Sarasota County, Florida, on this 18 day of June, 1996.

                        BECKY A. TITUS, Circuit Judge

(Certificate of Service attached)

# EXHIBIT 11

# NASD Manual

**13804. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief**

**The Industry Code will apply to claims filed on or after April 16, 2007. In addition, the list selection provisions of the Industry Code will apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new code.**

### (a) Temporary Injunctive Orders

(1) In industry or clearing disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive order from a court of competent jurisdiction. Parties to a pending arbitration may seek a temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration pursuant to this paragraph, provided that an arbitration hearing on a request for permanent injunctive relief pursuant to paragraph (b) of this rule has not yet begun.

(2) A party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration under the Code must, at the same time, file with the Director a statement of claim requesting permanent injunctive and all other relief with respect to the same dispute in the manner specified under the Code. The party seeking temporary injunctive relief must also serve the statement of claim requesting permanent injunctive and all other relief on all other parties in the same manner and at the same time as the statement of claim is filed with the Director.

(3) Filings and service under this rule must be made by facsimile, overnight delivery service or messenger. Service must be made on all parties at the same time and in the same manner, unless the parties agree otherwise. A party obtaining a court-issued temporary injunctive order must notify the Director and the other parties of the issuance of the order within one business day.

### (b) Hearing on Request for Permanent Injunctive Relief

(1) Scheduling of Hearing

If a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief will begin within 15 days of the date the court issues the temporary injunctive order. If the 15th day falls on a Saturday, Sunday, or NASD holiday, the 15-day period shall expire on the next business day. Unless the parties agree otherwise, a hearing lasting more than one day will be held on consecutive days when reasonably possible. The Director will provide to all parties notice of the date, time and place of the hearing at least three days prior to the beginning of the hearing.

(2) Composition of Arbitration Panel

The hearing on the request for permanent injunctive relief will be heard by a panel of three arbitrators. The composition of the panel will be determined in accordance with Rule 13402.

(3) Selection of Arbitrators and Chairperson

(A)(i) In cases in which all of the members of the panel are non-public, the Director will generate and provide to the parties a list of seven arbitrators from NASD's roster of non-public arbitrators. The Director will send to the parties the employment history for the past 10 years for each listed arbitrator and other background information. At least three of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise one strike to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrator, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Direct shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(B)(i) In cases in which the panel consists of a majority of public arbitrators, the Director will generate and provide to the parties a list of nine arbitrators from NASD's roster of

arbitrators. The Director shall send to the parties employment history for the past 10 years for each listed arbitrator and other background information. At least a majority of the arbitrators listed shall be public arbitrators, and at least four of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise two strikes to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrators, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Director will combine the parties' rankings, and will appoint arbitrators based on the order of rankings on the combined list, subject to the arbitrators' availability and disqualification.

(C)(i) Each party must inform the Director of its preference of chairperson of the panel by the close of business on the next business day after receiving notice of the panel members.

(ii) If the parties do not agree on a chairperson within that time, the Director shall select the chairperson. In cases in which the panel consists of a majority of public arbitrators, the Director will select a public arbitrator as chairperson. Whenever possible, the Director will select as chairperson the lawyer with experience litigating cases involving injunctive relief whom the parties have ranked the highest.

(D) The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this rule and the Code to facilitate the appointment of panels and the selection of chairperson.

(4) Applicable Legal Standard

The legal standard for granting or denying a request for permanent injunctive relief is that of the state where the events upon which the request is based occurred, or as specified in an enforceable choice of law agreement between the parties.

(5) Effect of Pending Temporary Injunctive Order

Upon a full and fair presentation of the evidence from all relevant parties on the request for permanent injunctive relief, the panel may prohibit the parties from seeking an extension of any court-issued temporary injunctive order remaining in effect, or, if appropriate, order the parties jointly to move to modify or dissolve any such order. In the event that a panel's order conflicts with a pending court order, the panel's order will become effective upon expiration of the pending court order.

(6) Fees, Costs and Expenses, and Arbitrator Honorarium

(A) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in the hearing on the request for permanent injunctive relief. The panel may reallocate such costs and expenses among the parties in the award.

(B) Each party seeking a temporary injunctive order in court pursuant to this rule must pay a non-refundable surcharge of $2,500 at the time the party files its statement of claim and request for permanent injunctive relief. In the award, the panel may decide that one or more parties must reimburse a party for part or all of the surcharge. The surcharge is in addition to all other non-refundable filing fees or costs that are required under the Code.

(C) Notwithstanding any other provision in the Code, the chairperson of the panel hearing a request for permanent injunctive relief pursuant to this rule shall receive an honorarium of $375 for each single session, and $700 for each double session, of the hearing. Each other member of the panel shall receive an honorarium of $300 for each single session, and $600 for each double session, of the hearing. The parties shall equally pay the difference between these amounts and the amounts panel members and the chairperson receive under the Code pursuant to Rule 13214. The panel may reallocate such amount among the parties in the award.

**(c) Hearing on Damages or Other Relief**

(1) Upon completion of the hearing on the request for permanent relief, the panel may, if necessary, set a date for any subsequent hearing on damages or other relief, which shall be held before the same panel and which shall include, but not be limited to, the same record.

(2) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in any subsequent hearings on damages or other relief. The panel may reallocate

such costs and expenses among the parties in the award.

Adopted by SR-NASD-2004-011 eff. April 16, 2007.

**Selected Notice:** <u>07-07</u>

*©2008 FINRA. All rights reserved.*

# EXHIBIT 12

# NASD Manual

### 11870. Customer Account Transfer Contracts

#### (a) Responsibility to Expedite Customer's Request

(1) When a customer whose securities account is carried by a member (the "carrying member") wishes to transfer securities account assets, in whole or in specifically designated part, to another member (the "receiving member") and gives authorized instructions to the receiving member, both members must expedite and coordinate activities with respect to the transfer.

(2) If a customer desires to transfer a portion of his or her account outside of ACATS, authorized alternate instructions should be transmitted to the carrying member indicating such intent and specifying the designated assets to be transferred. Although such transfers are not subject to the provisions of this Rule, members must expedite all authorized account asset transfers, whether through ACATS or via other means permissible under this Rule, and coordinate their activities with respect thereto. Unless otherwise indicated, the automated customer account transfer capabilities referred to in paragraph (m)(1) of this Rule shall be utilized for partial transfers.

(3) For purposes of this Rule, customer authorization pursuant to a transfer instruction could be the customer's actual signature, or an electronic signature in a format recognized as valid under federal law to conduct interstate commerce.

#### (b) Transfer Procedures

(1) Upon receipt from the customer of an authorized broker-to-broker transfer instruction form ("TIF") to receive such customer's securities account assets in whole or in specifically designated part, from the carrying member, the receiving member must immediately submit such instruction to the carrying member. The carrying member must, within one business day following receipt of such instruction, or receipt of a TIF received directly from the customer authorizing the transfer of assets in specifically designated part: (A) validate the transfer instruction to the receiving member (with an attachment reflecting all positions and money balances to be transferred as shown on its books); or (B) take exception to the transfer instruction for reasons other than securities positions or money balance discrepancies and advise the receiving member of the exception taken. The time frame(s) set forth in this paragraph will change, as determined from time-to-time in any publication, relating to the ACATS facility, by the National Securities Clearing Corporation (NSCC).

(2) The carrying member and the receiving member must promptly resolve any exceptions taken to the transfer instruction.

#### (c) Transfer Instructions

(1) Securities account asset transfers accomplished pursuant to this Rule are subject to the following conditions, which the customer must be informed of, affirm, or authorize (as the case may be) through their inclusion in the transfer instruction the customer is required to authorize to initiate the account asset transfer:

(A) To the extent any account assets are not readily transferable, with or without penalties, such assets may not be transferred within the time frames required by this Rule.

(B) The customer will be contacted in writing by the carrying member, and/or by the receiving member, with respect to the disposition of nontransferable assets other than proprietary money market fund assets (if any), indicated in an instruction to transfer specifically designated account assets. (See subparagraph (c)(D)(3) below for customer notification requirements pertaining to transfers of securities account assets in whole.)

(C) If securities accounts assets in whole other than retirement plan account assets are being transferred, the customer must affirm that he or she has destroyed or returned to the carrying member any credit/debit cards and/or unused checks issued in connection with the account.

(D) For purposes of this Rule, a "nontransferable asset" shall mean an asset that is incapable

of being transferred from the carrying member to the receiving member because it is:

(i) an asset that is a proprietary product of the carrying member;

(ii) an asset that is a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account;

(iii) an asset that may not be received due to regulatory limitations on the scope of the receiving member's business;

(iv) an asset that is a bankrupt issue for which the carrying member does not possess the proper denominations to effect delivery and no transfer agent is available to re-register the shares;

(v) an asset that is an issue for which the proper denominations cannot be obtained pursuant to governmental regulation or the issuance terms of the product (e.g., foreign securities, baby bonds, etc.);

(vi) limited partnership interests in retail accounts.

(E) The carrying member and the receiving member must promptly resolve and reverse any nontransferable assets that were not properly identified during validation. In all cases, each member shall promptly update its records and bookkeeping systems and notify the customer of the action taken.

(2) A proprietary product of the carrying member shall be deemed nontransferable unless the receiving member has agreed to accept transfer of the product. Upon receipt of the asset validation report, the receiving member shall designate any assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account. The carrying member, upon receipt of such designation, may treat such designated assets as nontransferable and refrain from transferring the designated assets.

(3) If securities account assets to be transferred in whole include any nontransferable assets that are proprietary products of the carrying member, the carrying member must provide the customer with a list of the specific assets and request, in writing and prior to or at the time of validation of the transfer instruction, further instructions from the customer with respect to the disposition of such assets. In particular, such request should provide, where applicable, the customer with the following alternative methods of disposition for nontransferable assets:

(A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer.

(B) Retention by the carrying member for the customer's benefit.

(C) Transfer, physically and directly, in the customer's name to the customer.

(4) If securities account assets to be transferred in whole include any nontransferable assets that the receiving member has designated as assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account, the receiving member must provide the customer with a list of the specific assets and request, in writing and prior to the time it makes such designation, further instructions from the customer with respect to the disposition of such assets. In particular, such request should, where applicable, provide the customer with the following alternative methods of disposition for nontransferable assets:

(A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer. The indication must also refer the customer to the fund prospectus or to their registered representative at the carrying firm for specific details regarding any such fees.

(B) Retention by the carrying member for the customer's benefit.

(C) Shipment, physically and directly, in the customer's name to the customer.

(D) Transfer to the third party that is the original source of the product, for credit to an

account opened by the customer with that third party.

(5) If the customer has authorized liquidation or transfer of assets deemed to be nontransferable, the carrying member must distribute the resulting money balance to the customer or initiate the transfer within five (5) business days following receipt of the customer's disposition instructions.

(6) With respect to transfers of retirement plan securities account assets, the customer authorizes the custodian/trustee for the account:

(A) to deduct any outstanding fees due the custodian/trustee from the credit balance in the account, or

(B) if the account does not contain a credit balance, or if the credit balance in the account is insufficient to satisfy any outstanding fees due the custodian/trustee, to liquidate assets in the account to the extent necessary to satisfy any outstanding fees due the custodian/trustee.

**(d) Validation of Transfer Instructions**

(1) Upon validation of an instruction to transfer securities account assets in whole, a carrying member must "freeze" the account to be transferred, i.e., all open orders, with the exception of option positions that expire within seven (7) business days, must be canceled and no new orders may be taken.

(2) A carrying member may not take exception to a transfer instruction, and therefore deny validation of the transfer instruction, because of a dispute over securities positions or the money balance in the account to be transferred. Such alleged discrepancies notwithstanding, the carrying member must transfer the securities positions and/or money balance reflected on its books for the account.

(3) A carrying member may take exception to a transfer instruction only if:

(A) additional documentation is required (additional legal documents such as death or marriage needed);

(B) the account is "flat" and reflects no transferable assets;

(C) the account number is invalid (account number is not on carrying member's books); however, if the carrying member has changed the account number for purposes of internally reassigning the account to another broker or account executive, it is the responsibility of the carrying firm to track the changed account number, and such reassigned account number shall not be considered invalid for purposes of fulfilling a transfer instruction.;

(D) it is a duplicate request;

(E) violates member's credit policy;

(F) unrecognized residual credit assets (receiving member cannot identify client);

(G) client rescinds instruction (client submitted written request to cancel transfer);

(H) S.S. number/Tax ID mismatch (number does not correspond to carrying member's);

(I) account title mismatch (receiving member's account title does not correspond to carrying member's);

(J) account type mismatches (receiving member's account type does not correspond to carrying member's);

(K) missing or improper authorization (TIF requires an additional client authorization or successor custodian's acceptance authorization or custodial approval); or

(L) Client takes possession (account assets in question are in transfer to deliver direct to customer).

(4) If a carrying member takes exception to a transfer instruction because the account is "flat", as provided in subparagraph (3)(B) above, the receiving member may re-submit the transfer instruction only if the most recent customer statement is attached.

(5)(A) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must return the transfer instruction to the receiving member with an attachment indicating all securities positions, safekeeping positions, and

money balances to be transferred as shown on the books of the carrying member. Except as hereinafter provided, the attachment must include a then-current market value for all assets so indicated. If a then-current market value for an asset cannot be determined (e.g., a limited partnership interest), the asset must be valued at original cost. However, delayed delivery assets, nontransferable assets, and assets in transfer to the customer, i.e., in possession of the transfer agent at the time of receipt of the transfer instruction by the carrying member for shipment, physically and directly to the customer, need not be valued, although the "delayed delivery," "nontransferable," or "in-transfer" status, respectively, of such assets must be indicated on the attachment.

(B) For purposes of this Rule, a "safekeeping position" shall mean any security held by a carrying member in the name of the customer.

(6) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must indicate on the instruction, or by attachment, any Regulation T calls outstanding as of the date of validation with respect to the account assets to be transferred.

(7) A carrying member must provide the following description, at a minimum, as asset data with respect to any municipal securities positions to be transferred that have not been assigned a CUSIP number:

(A) name of the issuer;

(B) interest rate and dated date;

(C) maturity date and put date, if applicable, and if the securities are limited tax, subject to redemption prior to maturity (callable), or revenue bonds; an indication to such effect, including in the case of revenue bonds, the type of revenue, if necessary for a materially complete description of the securities; and

(D) if necessary for a materially complete description of the securities, the name of any company or other person in addition to the issuer obligated, directly or indirectly, with respect to debt service, or if there is more than one such obligor, the statement "multiple obligors" may be shown.

(8) After validation of the transfer instruction by the carrying member, a receiving member may reject a transfer of account assets in whole only if the account is not in compliance with the receiving member's credit policies or minimum asset requirements. (A receiving member may deem an account not in compliance with Regulation T requirements as not in compliance with its credit policies.) A receiving member, however, may only reject the entire account for such reasons; it may not reject only a portion of the account assets (e.g., the particular assets not in compliance with the member's credit policies or minimum asset requirement) while accepting the remainder.

### (e) Completion of the Transfer

Within three business days following the validation of a transfer instruction, the carrying member must complete the transfer of the customer's security account assets to the receiving member. The receiving member and the carrying member must immediately establish fail-to-receive and fail-to-deliver contracts at then-current market values upon their respective books of account against the long/short positions that have not been delivered/received and the receiving/carrying member must debit/credit the related money amount. The customer's security account assets shall thereupon be deemed transferred. The time frame(s) set forth in this paragraph will change, as determined from time-to-time in any publication, relating to the ACATS facility, by the NSCC.

### (f) Fail Contracts Established

(1) Any fail contracts resulting from this securities account asset transfer procedure shall be included in a member's fail file and, not later than 10 business days following the date delivery was due, the member shall take steps to obtain physical possession or control of securities so failed to receive by initiating a buy-in procedure or otherwise; provided, that with respect to the following types of securities or instruments, not later than 30 business days following the date delivery was due, the member shall take steps to obtain physical possession or control of securities so failed to receive by initiating a buy-in procedure or otherwise:

(A) banker's acceptances;

(B) bond anticipation notes;

(C) certificates of deposit;

(D) commercial paper;

(E) FMAC certificates;

(F) FNMA certificates;

(G) foreign securities;

(H) GNMA certificates;

(I) limited partnership interests;

(J) municipal bonds;

(K) mutual fund shares (transferable);

(L) revenue anticipation notes;

(M) SBA certificates; and

(N) tax anticipation notes.

(2) A carrying member may not reject ("DK") a fail contract, including a Receive/Deliver Instruction generated by an automated customer account transfer system, in connection with assets in an account transferred that have not been delivered to the receiving member.

(3) All fail contracts established pursuant to the requirements of this Rule should be clearly marked or captioned as such. This paragraph will not apply if a fail contract participates in a repricing and reconfirmation service offered by a registered clearing agency.

(4) All fail contracts required to be established on safekeeping positions must be so indicated.

(5) Open fail contracts established pursuant to the requirements of this Rule should be marked-to-market regularly.

(6) Nontransferable assets and assets in transfer to the customer are exempt from the requirement in paragraph (e) of this Rule that fail-to-receive and fail-to-deliver contracts must be established for positions in a customer's securities account that have not been delivered.

(7) Members may agree to close out fail contracts established pursuant to the requirements of this Rule through the delivery of securities that are substantially comparable to those owed with prior consent of the customer.

(8) A receiving member should reject a delivery of a security that cannot be deemed a safekeeping position against a fail contract as such.

(9) A receiving member must deem receipt of a duly executed limited partnership change of trustee form with respect to limited partnership interests or a mutual fund re-registration form with respect to mutual fund shares as adequate delivery for purposes of transferring such assets pursuant to the Rule.

## (g) Prompt Resolution of Discrepancies

(1) Any discrepancies relating to positions or money balances that exist or occur after transfer of a customer's securities account assets must be resolved promptly.

(2) The carrying member must promptly distribute to the receiving member any transferrable assets that accrue to the account after the transfer of a customer's securities account.

(3) When a member receives a claim notice relating to a securities account asset transfer, the member must resolve the claim within five (5) business days from receipt of such claim or take exception to the claiming member by setting forth specific reasons for denying the claim.

## (h) Close-Out Procedures

A valued fail contract in a security, for which there are no established close-out procedures, and which has not been completed by the carrying member, may be closed by the receiving member not sooner than the

third business day following the date delivery was due, in accordance with the following procedure:

(1) Written notice shall be delivered to the carrying member at his office not later than 12:00 noon, his time, two business days preceding the execution of the proposed "close-out."

(2)(A) Every notice of "close-out" shall state the settlement date, the quantity and contract price of the securities covered by said contract, and shall state further that unless delivery is effected at or before a certain specified time, which may not be prior to 3:00 p.m. local time in the community where the carrying member maintains his office, the security may be "closed-out" on the date specified for the account of the carrying member.

(B) Original notices may only be issued pursuant to fail contracts marked or captioned as fails established pursuant to paragraph (f)(3) of this Rule.

(C) Notice may be redelivered immediately to another member from whom the securities involved are due in the form of a re-transmitted notice. A re-transmitted notice must be delivered to subsequent members not later than 12:00 noon one business day preceding the original date of execution of the proposed close-out.

(D) Re-transmitted notices may be issued against a fail contract regardless of its origin.

(3)(A) On failure of the carrying member to effect delivery in accordance with the notice, or to obtain a stay as hereinafter provided, the receiving member may close the contract by purchasing the securities necessary to complete the contract. Such execution will also operate to close-out all contracts covered under re-transmitted notices.

(B) The party executing the "close-out" shall immediately upon execution, but not later than the close of business, local time, where the seller maintains his office, notify the member for whose account the securities were bought as to the quantity purchased and the price paid. Such notification should be in written or electronic form having immediate receipt capabilities. If a medium with immediate receipt capabilities is not available, the telephone shall be used for the purpose of same day notification, and written or similar electronic notification having next day receipt capabilities must be sent out simultaneously. In either case formal confirmation of purchase along with a billing or payment (depending upon which is applicable) should be forwarded as promptly as possible after the execution of the "close-out." Notification of the execution of the "close-out" shall be given to succeeding members to whom a re-transmitted notice was issued using the same procedures stated herein.

(C) If prior to the closing of a contract on which a "close-out" notice has been given, the receiving member receives from the carrying member written notice stating that the securities are (i) in transfer; (ii) in transit; (iii) being shipped that day; (iv) due from a depository and include the certificate numbers; then the receiving member must extend the execution date of the "close-out" for a period of seven (7) calendar days from the date delivery was due under the "close-out," except for those securities due from a depository.

(4) In the event that a "close-out" is not completed on the day specified in the notice, said notice shall expire at the close of business on the day specified in the notice, or if extended, at the close of business on the last day of the extension.

**(i) Sell-Out Procedures**

(1) Upon failure of the receiving member to accept delivery in accordance with the terms of the contract, and lacking a (A) properly executed Uniform Reclamation Form; (B) depository generated rejection advice; or (C) valid Reversal Form; the carrying member may, without notice, "sell-out" in the best available market, for the liability of the party in default, all or any part of the securities due or deliverable under the contract.

(2) The party executing a "sell-out" as prescribed above shall notify, no later than the close of business (local time where the receiving member maintains his office) on the day of execution, the member, for whose account and liability such securities were sold, of the quantity sold and the price received. Such notification should be in written or electronic form having immediate receipt capabilities. A formal confirmation of such sale should be forwarded as promptly as possible after the execution of the "sell-out."

**(j) Exemptions**

(1) Pursuant to the Rule 9600 Series, NASD may exempt from the provisions of this Rule, either unconditionally or on specified terms and conditions, (A) any member or (B) any type of account,

security or financial instrument.

(2) The following assets are deemed subject to delayed delivery and are exempt from paragraph (e) of this Rule that valued fail-to-receive and fail-to-deliver contracts must be established for positions in a customer's securities account that have not been delivered:

(A) insurance policies (annuities);

(B) stripped coupons;

(C) when-issued or when-distributed securities.

(3) Zero value fail-to-receive and fail-to-deliver instructions shall be generated for the assets specified in paragraph (j)(2) hereof.

### (k) Retirement Plan Securities Accounts

(1) It is the responsibility of the receiving member to obtain the approval of its custodian/trustee accepting a customer's retirement plan securities account before submitting a transfer instruction for such account assets to the carrying member or its custodian/trustee to facilitate transfer of the account assets.

(2) If, with respect to the transfer of a retirement plan securities account assets, outstanding fees are due the custodian/trustee for the account, such fees must be deducted from the credit balance in the account or, if the account does not contain a credit balance or if the credit balance is insufficient to satisfy such fees, assets in the account must be liquidated to the extent necessary to satisfy such fees. If liquidation of assets in the account is not practicable, such fees must then be transferred to and accepted by the receiving member as a debit item with the account.

### (l) Securities Account

For the purposes of this Rule, the term "securities account" shall be deemed to include any and all of the account's money market fund positions or the redemption value thereof.

### (m) Participant in a Registered Clearing Agency

(1) When both the carrying member and the receiving member are participants in a registered clearing agency having automated customer securities account asset transfer capabilities and are eligible to use such capabilities, the securities account asset transfer procedure, including the establishing and closing out of fail contracts, must be accomplished in accordance with the provisions of this Rule and pursuant to the rules of and through such registered clearing agency with the exception of specifically designated assets transferred pursuant to the submittal of a customer's authorized alternate instructions to the carrying member.

(2) When such registered clearing agency has the capability to transfer mutual fund positions or to employ functionalities including Partial Transfer Receive (PTR), Partial Transfer Delivery (PTD), Fail Reversal, Mutual Fund Fail Cleanup, or Reclaim Processing, such capability must be utilized with the exception of specifically designated assets transferred pursuant to the submittal of a customer's authorized alternate instructions to the carrying member.

(3) When securities account assets are transferred in whole and such registered clearing agency has the capability to transfer residual credit positions (both cash and securities) that have accrued to an account after the account has been transferred (residual credit processing), such capability must be utilized for transferring residual credit positions from the carrying member to the receiving member.

(4) When both the carrying member and the receiving member are participants in a registered clearing agency having automated customer securities account asset transfer capabilities with a facility permitting electronic transmittal of customer account asset transfer instructions, such facilities shall be used in accordance with the following:

(A) members using such facilities shall execute an agreement designated by the Committee specifying the rights, obligations and liabilities of all participants in or users of such facilities;

(B) customer account transfer instructions shall be transmitted in accordance with the procedures prescribed by the registered clearing agency;

(C) the transmittal of a transfer request through such electronic facilities shall constitute a representation by the receiving member that it has received a properly executed TIF or other

actual authority to receive the customer's securities and funds

(D) transfer instructions transmitted through such facilities shall contain the information necessary for the clearing agency and the carrying member to respond to the transfer instruction as may be specified by this Rule and the clearing agency; and

(E) non-standard ACAT processing, such as Partial Transfer Receives (PTR), Partial Transfer Deliver (PTD) Fail Reversal, and reclaim processing shall be transmitted through such facilities, if the facility permits.

(5) For purposes of this Rule, the term "registered clearing agency" shall be deemed to be a clearing agency as defined in the Act and registered in accordance with that Act.

### (n) Transfers Accomplished Ex-Clearing

(1) If one or both of the members processing a customer account transfer pursuant to this Rule is not a member of a registered clearing agency, the fail-to-receive and fail-to-deliver contracts required to be established in paragraph (e) of this Rule must be established outside a clearing corporation on an "ex-clearing house" basis. Similarly, settlement of the fail contracts and any close-out executions must be made "ex-clearing house."

(2) Each member (including members that do not utilize automated customer securities account asset transfer facilities) is required, for a minimum period of six (6) months after the transfer of securities account assets in whole is completed, to transfer credit balances (both cash and securities) that occur is such transferred account assets within (10) ten business days after the credit balances accrue to the account.

(3) A copy of each customer account transfer instruction issued pursuant to paragraph (b) on an "ex-clearing house" basis shall be forwarded to the local District Office of NASD having jurisdiction over the carrying member.

---

Amended by SR-FINRA-2007-005 eff. Oct. 22, 2007.
Amended by SR-NASD-2004-58 eff. Sept. 13, 2004.
Amended by SR-NASD-2001-53 eff. Sept. 12, 2001.
Amended by SR-NASD-2000-68 eff. Nov. 17, 2000.
Amended by SR-NASD-97-28 eff. Aug. 7, 1997.
Amended by SR-NASD-97-05 eff. May 8, 1997.
Amended by SR-NASD-95-59 eff. July 1, 1996.
Amended by SR-NASD-94-56 eff. Mar. 3, 1995.
Amended by SR-NASD-94-56 eff. Dec. 2, 1994.
Amended by SR-NASD-93-41 eff. Feb. 1, 1994.
Amended by SR-NASD-91-61 eff. Mar. 1, 1993.
Adopted by SR-NASD-85-29 eff. Feb. 24, 1986.

**Selected Notices:** 86-12, 93-17, 93-86, 01-53, 01-66, 04-58.

---

©2008 FINRA. All rights reserved.

# EXHIBIT 13

member organization becomes the opposite side to the report; and

(5) the Floor broker assumes any loss occasioned by the erroneous report, and pays any profit to the New York Stock Exchange Foundation.

**Amendment.** January 19, 1956, effective February 13, 1956; June 28, 1957, effective July 1, 1957; May 28, 1982; December 22, 1982; September 13, 2001, effective February 4, 2002 (99-25); June 5, 2007 (NYSE-2006-28)

(b)

**(1)Conduct of Accounts.—** "Bunching" odd/lot orders.—A member or member organization shall not combine the orders given by several different customers to buy or sell odd-lots of the same stock, into a round-lot order without the prior approval of the customers interested.

When a person gives, either for his own account, for various accounts in which he has an actual monetary interest, or for accounts over which such person is exercising investment discretion, buy or sell odd-lot orders which aggregate 100 shares or more, a member or member organization shall not accept such orders for execution unless they are, as far as possible, consolidated into full lots, except that selling orders marked "long" need not be so consolidated with selling orders marked "short." An exception from this consolidation requirement may be relied upon once per trading day by the person exercising investment discretion for the odd-lot orders in a particular stock that would aggregate to less than 300 shares.

**(2)** Recording of transactions in accounts.—Transactions in securities shall be recorded in accounts no later than settlement date.

**Amendment.** June 28, 1978; August 18, 1992.

• • • *Supplementary Material:* ------------------

**.10** Transposed to Rule 411(b-1) without change effective May 28, 1982.

**.20** Transposed to Rule 409(f) with change effective May 28, 1982.

**.30** Rescinded effective May 28, 1982.

**.40** Transposed to Rule 411(b)(2) with change effective May 28, 1982.

**.50** Transposed to Rule 409(g) without change effective May 28, 1982.

**.60** Transposed to Rule 36.30 without change effective May 28, 1982.

**.70** Transposed to Rule 36.20 without change effective May 28, 1982.

------------------

Rule 412. Customer Account Transfer Contracts

(a) When a customer whose securities account is carried by a member organization (the "carrying organization") wants to transfer securities account assets, in whole or in specifically designated part, to another member organization (the "receiving organization") and gives authorized notice of that fact to the receiving organization, both member organizations must expedite and coordinate activities with respect to the transfer. For purposes of this Rule, "authorized notice" pursuant to a transfer instruction could be the customer's actual signature, or an electronic signature in a format recognized as valid under federal law to conduct interstate commerce.

(b)

(1) Upon receipt from the customer of an authorized broker-to-broker transfer instruction form ("TIF") to receive such customer's securities account assets in whole or in specifically designated part, the receiving organization will immediately submit such instruction to the carrying organization. The carrying organization must, within three (3) business days following receipt of such instruction, or receipt of a TIF received directly from the customer authorizing the transfer of assets in specifically designated part: (i) validate the transfer instruction (with an attachment reflecting all positions and money balances to be transferred as shown on its books) to the receiving organization or (ii) take exception to the transfer instruction for reasons other than securities positions or money balance discrepancies and advise the receiving organization of the exception taken.

(2) The carrying organization and the receiving organization must promptly resolve any exceptions taken to the transfer instruction.

(3) Within three (3) business days following the validation of a transfer instruction, the carrying organization must complete the transfer of the customer's securities account assets to the receiving organization. The carrying organization and the receiving organization must establish fail to receive and fail to deliver contracts at then current market values upon their respective books of account against the long/short positions (including options) that have not been delivered/received and the receiving/carrying organization must debit/credit the related money amount. The customer's securities account assets shall thereupon be deemed transferred.

(c) Any fail contracts resulting from this securities account asset transfer procedure must be closed out within ten (10) business days after their establishment.

(d) Any discrepancies relating to positions or money balances that exist or occur after transfer of a customer's securities account assets must be resolved promptly. When a member organization receives a claim notice relating to a securities account asset transfer, the member organization must resolve the claim within five (5) business days from receipt of such notice or take exception to the claiming organization by setting forth specific reasons for denying the claim.

(e)

(1) When both the carrying organization and the receiving organization are participants in a registered clearing agency having automated customer securities account asset transfer capabilities, the securities account asset transfer procedure, including the establishing and closing out of fail contracts, must be accomplished in accordance with the provisions of this rule and pursuant to the rules of and through such registered clearing agency with the exception of specifically designated assets transferred pursuant to the submittal of a customer's authorized alternate instructions to the carrying organization.

(2) When such registered clearing agency has the capability to transfer mutual fund positions or to employ functionalities including Partial Transfer Receive (PTR), Partial Transfer Delivery (PTD), Fail Reversal, Mutual Fund Fail Cleanup, or Reclaim Processing, such capability must be utilized with the exception of specifically designated assets transferred pursuant to the submittal of a customer's authorized alternate instructions to the carrying organization.

(3) When securities account assets are transferred in whole and such registered clearing agency has the capability to transfer residual credit positions (both cash and securities) which have accrued to an account after the account has been transferred (residual credit processing), such capability must be utilized for transferring residual credit positions from the carrying organization to the receiving organization.

(4) Each member organization (including organizations that do not utilize automated customer securities account transfer facilities) is required, for a minimum period of six (6) months after the transfer of securities account assets in whole is completed, to transfer credit balances (both cash and securities) that occur in such transferred account assets within (10) ten business days after the credit balances accrue to the account.

(f) The Exchange may exempt from the provisions of this rule, either unconditionally or on specified terms and conditions, (i) any member organization or class of member organization or (ii) any type of account, security or financial instrument.

* * * *Supplementary Material:* ――― ――――――

.10 For purposes of this rule, the term "securities account" shall be deemed to include any and all of the account's money market fund positions or the redemption value thereof.

.20 For purposes of this rule, the term "registered clearing agency" shall be deemed to be a clearing agency as defined in the Securities Exchange Act of 1934 registered in accordance with that Act.

.30 Transfer instructions and reports required by this rule shall be in such form as may be prescribed by the Exchange.

――――――――――――――

Adopted.October 21, 1971.

Amendment. September 2, 1994; effective December 2, 1994. November 25, 1998. September 2, 1994; effective March 3, 1995. June 28, 1978. November 26, 1985, effective February 24, 1986. September 2, 1994; effective December 2, 1994 and March 3, 1995. March 12, 2004; effective September 13, 2004; February 10, 2005 (NYSE-2004-63).

## Rule 413. Uniform Forms

Every individual member and every member organization shall adopt such uniform forms as the Exchange may prescribe to facilitate the orderly flow of transactions within financial community.

Adopted. February 3, 1973.

## Rule 414. Index and Currency Warrants

(a) Definitions

(i) "Currency index warrant" means a put or call warrant that overlies an "index currency group" (as defined below) and that is listed for trading on the Exchange pursuant to the listing standards of Paragraph 703.15 of the Exchange's Listed Company Manual.

(ii) "Currency warrant" means a put or call warrant that overlies a foreign currency or a "cross currency" and that is listed for trading on the Exchange pursuant to the listing standards of Paragraph 703.15 of the Exchange's Listed Company Manual. "Cross Currency" means two non-United States currencies that are related in a prescribed manner.

(iii) "Index currency group" means a group of currencies whose inclusion and relative representation in the group is determined by the inclusion and relative representation of the current market prices of the currencies in a currency index.

(iv) "Index stock group" and "broad index stock group" have the meanings that paragraphs (b)(31) and (b)(6) of Rule 700 (Applicability, Definitions and References) assign to those terms.

(v) "Industry index stock group" means, in the context of stock index warrants, an index stock group of nine or more stocks whose inclusion and relative representation in the group are determined by the inclusion and relative representation of their current market prices in a widely-disseminated stock index reflecting a particular industry or closely-related industries.

(vi) "Stock index warrant" means a put or call warrant that overlies a broad index stock group or an industry index stock group and that is listed for trading on the Exchange pursuant to the listing standards of Paragraph 703.17 of the Exchange's Listed Company Manual.

(b) Applicability

This Rule 414 shall apply only to Exchange trading in currency warrants, currency index warrants and stock index warrants.

Except as this Rule otherwise provides, or unless the context otherwise requires, the Rules of the Exchange shall apply to trading on the Exchange

# EXHIBIT 14

# NASD Manual

## IM-2110-7. Interfering With the Transfer of Customer Accounts in the Context of Employment Disputes

It shall be inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative, provided that the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account. Nothing in this interpretation shall affect the operation of Rule 11870.

Adopted by SR-NASD-2001-95 eff. Dec. 21, 2001.

**Selected Notice:** 02-07.

©2008 FINRA. All rights reserved.

# EXHIBIT 15

Westlaw.

2003 WL 21183816 (N.A.S.D.)                                                      Page 1

2003 WL 21183816 (N.A.S.D.)

National Association of Securities Dealers, Inc.

IN THE MATTER OF THE ARBITRATION BETWEEN:
NAME OF THE CLAIMANT, AMERICAN EXPRESS FINANCIAL ADVISORS, INC. v.
NAME OF THE RESPONDENT, SUZANNE M. OSBORNE

Docket Number
01
-
06713

Date of Service (For NASD Dispute Resolution office use only): May 8, 2003
Signature Date: May 2, 2003

Signature Date: April 28, 2003

Signature Date: April 26, 2003


**Award**

Hearing Site: Richmond, Virginia

**REPRESENTATION OF PARTIES**: Claimant American Express Financial Advisors, Inc.,
hereinafter referred to as "Claimant", was represented by Gilbert W. Boyce, Kutak
Rock, LLP, Washington, DC.

Respondent Suzanne M. Osborne, hereinafter referred to as "Respondent", was
represented by Anthony Paduano, Esq. and Willard Knox, Esq., Paduano & Weintraub,
LLP, New York, New York.

**CASE INFORMATION**: Statement of Claim filed on or about December 12, 2001.

Claimant's Reply to Respondent's Counterclaim filed on April 3, 2002.

Claimant's Amended Reply to Respondent's Counterclaim filed on November 21, 2002.

A representative of Claimant executed the Uniform Submission Agreement on December
6, 2001.

Statement of Answer, Affirmative Defenses and Counterclaim filed by Respondent on

February 6, 2002.

Amended Statement of Answer, Affirmative Defenses and Counterclaim filed by
Respondent on October 15, 2002.

Respondent signed the Uniform Submission Agreement on February 4, 2002.

Respondent's Motion for Summary Award filed on March 6, 2003.

Claimant's Response to Respondent's Motion for Summary Award and Cross Motion for
Summary Award filed on March 14, 2003.

Respondent's Response to Claimant's Cross Motion for Summary Award filed on March
19, 2003.

**CASE SUMMARY**: Claimant asserted the following causes of action, among others: breach
of contract; misappropriation of trade secrets; breach of fiduciary duties; unfair
competition; unjust enrichment; and, intentional interference with business
relationships. The causes of action arise from Respondent's employment with
Claimant.

Unless specifically admitted in her Answer, Respondent denied the allegations made
in the Statement of Claim and asserted the following defenses, among others: failure
to state a claim upon which relief can be granted; any losses were the result of
Claimant's actions; failure to mitigate; unclean hands; agreement at issue is void
and unenforceable; and, Claimant's claims are speculative.

Respondent in her Counterclaim asserted the following causes of action, among
others: wrongful termination; defamation; tortuous interference; and, unfair
competition. The causes of action arise from Respondent's employment with Claimant.

Unless specifically admitted in its Answer, Claimant denied the allegations made in
the Counterclaim and asserted the following defenses, among others: all alleged
injury to Respondent arose from privileged statements; lack of causation; *in pari
delicto* ; failure to state a claim upon which relief may be granted; unclean hands;
laches; waiver; and, contributory and/or comparative negligence.

**RELIEF REQUESTED**: Claimant in its Statement of Claim requested:

| | |
|---|---|
| Compensatory Damages | amount unspecified |
| Punitive Damages | amount unspecified |
| Attorneys' Fees | amount unspecified |
| Other Costs | amount unspecified |
| Other Non-Monetary Relief | |

Respondent in her Counterclaim requested:

| | |
|---|---|
| Compensatory Damages | amount unspecified |

| Punitive Damages | amount unspecified |
|---|---|
| Attorneys' Fees | amount unspecified |
| Other Costs | amount unspecified |

Other Non-Monetary Relief

**OTHER ISSUES CONSIDERED AND DECIDED**: Neither Claimant's nor Respondent's Motions for Summary Award were granted by the Panel.

**PANEL'S FINDINGS**: Claimant did not meet its burden of proof to establish that Respondent's specific conduct violated the post termination provision of the applicable franchise agreement. Therefore, its claims are denied. From the evidence, however, it is more likely than not that Respondent did engage in a pattern of step transactions that were violations of Claimant's compliance and compensation policies, including notarization of documents to initiate a series of fund transfers that she was aware and intended would benefit Claimant financially. She was evasive in responding to Claimant's questions concerning such transactions. Respondent's termination was, therefore, within the discretion granted to Claimant under the terms of its franchise agreement. The conduct may or may not have been in the best interest of clients, but that question is not within the mandate of the Panel to determine. The Panel believes, however, that it is likely that most clients were aware of the costs involved in their transactions and were satisfied with the personal financial advisory services received from Claimant. The Panel notes, in addition, that some of the conduct cited as the grounds for termination may have been encouraged by the Claimant's compensation structure and business culture and tolerated by supervisory personnel of Respondent and other financial advisors of Claimant in the past. The prosecution of the complaints against Respondent may have been motivated by the financial interests of the other financial advisors of Claimant and by situational "company politics".

From the evidence it appeared that Claimant's internal company investigation of Respondent's conduct was poorly planned and conducted, and seemed to involve some company wide misinterpretations of its own rules and policies. Claimant's procedure for disciplinary review was incomplete and not all of its findings were well supported. Claimant's compliance, commission, and compensation rules are vague and its guidance to its financial advisors and their supervisors may be inadequate. Specifically, there was too much delegation of authority to relatively junior level disciplinary "case handlers" without adequate supervisory review to assure appropriate investigative techniques and fair treatment of the target of an investigation. There was also too much reliance on the Registered Principal's investigations in a context where the Registered Principal was also a business and personal associate of Respondent. Not enough consideration was given to the financial and/or personal interest and bias of the other financial advisors in Claimant's franchise office.

This said, the Panel is not prepared to read an expansive "due process" requirement into Claimant's franchise agreement that Respondent signed, and which by its nature, is a private contract. The Panel holds that the bare minimum right to appeal contained within the document was provided. This does not represent an endorsement of Claimant's franchise agreement, but only a strict reading thereof.

The Panel finds that Claimant's post termination claims against Respondent, including its action for injunctive relief in federal district court and its arbitration claims, were not substantially justified. The Panel believes that Claimant aggressive pursuit of such claims may have had a larger purpose to vindicate its termination decision and to make an example of Respondent's case for some reason unrelated to its legitimate contract rights. The Panel holds that this conduct falls within Respondent's Third Claim for Relief in her Amended Statement of Answer, Affirmative Defenses, and Counterclaim, for Tortious Interference with her client relationships. The Panel therefore issues the Award set out below.

**AWARD**: After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. All claims against Respondent are denied in their entirety;

2. Claimant is liable to and shall pay to Respondent compensatory damages in the amount of $100,000.00. No pre-judgment interest is awarded on this amount;

3. Claimant is liable to and shall pay to Respondent reimbursement of filing fees in the amount of $250.00;

4. The parties shall bear their respective costs, including attorney's fees, except as Fees are specifically addressed below; and,

5. Any and all relief not specifically addressed herein, including punitive damages, is denied in its entirety.

**FEES**: Pursuant to the Code, the following fees are assessed:

**Filing Fees**: NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee = | $ 500.00 |
| Counterclaim filing fee = | $ 250.00 |

**Member Fees**: Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person(s) at the time of the events giving rise to the dispute. Accordingly, Claimant is a party.

| | |
|---|---|
| Member surcharge = | $ 1,500.00 |
| Pre-hearing process fee = | $ 750.00 |
| Hearing process fee = | $ 2,200.00 |
| Total Member Fees = | $ 4,450.00 |

**Forum Fees and Assessments**: The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) Pre-hearing session with the Panel @ $1,000.00 | | | = $ 1,000.00 |
| Pre-hearing conference: | July 30, 2002 | 1 session | |
| Twenty-one (21) hearing sessions @ $1,000.00 | | | = $21,000.00 |
| Hearing Dates: | December 16, 2002 | 2 sessions | |
| | December 17, 2002 | 2 sessions | |
| | December 18, 2002 | 2 sessions | |
| | January 28, 2003 | 1 session | |
| | January 29, 2003 | 2 sessions | |
| | January 30, 2003 | 2 sessions | |
| | March 24, 2003 | 2 sessions | |
| | March 25, 2003 | 2 sessions | |
| | March 26, 2003 | 2 sessions | |
| | March 27, 2003 | 2 sessions | |
| | March 28, 2003 | 2 sessions | |

5/13/2008 3:01 PM

Total Forum Fees                                                    = $22,000.00

1. The Panel has assessed $22,000.00 of the forum fees to Claimant.

**Administrative Coasts**: Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

| | |
|---|---|
| 1. Claimant requested copies of tapes = | $ 120.00 |
| 2. Claimant requested the use of a speaker phone = | $ 156.69 |
| 3. Respondent requested copies of tapes = | $ 480.00 |

**FEE SUMMARY**: 1. Claimant is assessed the following fees:

| | |
|---|---|
| Initial Filing Fee = | $ 500.00 |
| Member Fees = | $ 4,450.00 |
| Forum Fees = | $22,000.00 |
| Administrative Costs = | $ 276.69 |
| Total Fees = | $27,226.69 |
| Less payments = | $ 5,950.00 |
| Balance Due NASD Dispute Resolution = | $21,276.69 |

2. Respondent is assessed the following fees:

| | |
|---|---|
| Filing Fee = | $ 250.00 |
| Administrative Costs = | $ 480.00 |
| Total Fees = | $ 730.00 |
| Less payments = | $ 1,490.00 |
| Refund Owed Respondent = | $ 760.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

**ARBITRATION PANEL**: James F. Tucker - Public Arbitrator, Presiding Chairperson

Robin S. Gnatowsky, J.D. - Public Arbitrator, Panelist

Wayne J. Thaemert - Non-Public Arbitrator, Panelist

Concurring Arbitrators' Signatures

Robin S. Gnatowsky, J.D.
Public Arbitrator, Panelist

James F. Tucker
Public Arbitrator, Presiding Chairperson

Wayne J. Thaemert
Non-Public Arbitrator, Panelist

2003 WL 21183816 (N.A.S.D.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

NASD INTERIM INJUNCTIVE ORDER

NASD REGULATION Office of Dispute Resolution

In the Matter of the Arbitration Between

Name of Claimant

American Express Financial Advisors, Inc

98-01732

Name of Respondents

Edward C. VonLange
Rehan A. Dawer

This cause coming on for an immediate injunctive relief hearing pursuant to Rule 10335(d) of the NASD Regulation Code of Arbitration Procedure ("Code") and administered through NASD Regulation, Inc. Office of Dispute Resolution ("NASD Regulation") in Washington, D.C. on May 15, 1998 upon Claimant's Statement of Claim filed with NASD Regulation pursuant to Rule 10335(b) of the Code. NASD Regulation designated the undersigned interim arbitrator pursuant to Rule 10335(a) of the Code and duly notified the parties of the appointment. The arbitrator, having read and considered all pleadings submitted by the parties and hearing the arguments and evidence presented by counsel in a telephonic hearing, rules as follows:

IT IS HEREBY ORDERED:

A.    The request to enjoin VonLange and Dawer (collectively "Respondents"), their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms and corporations acting in connection or participation with them or on their behalf, from:

    1.    for a period of one year, directly or indirectly, soliciting or otherwise seeking any further business from any of Claimant's customers whom Respondents served or whose name became known to Respondents while they represented Claimant;

    2.    for a period of one year, directly or indirectly, selling financial products or services to any of Claimant's customers whom Respondents served or whose name became known to them while they represented Claimant who has not already opened a new account through Respondents;

    3.    for a period of one year, selling any financial product or service to any of Claimant's customers who Respondents served or whose name became known to Respondents while they represented Claimant who had opened a new account through Respondents prior to the filing of this arbitration, without fully, fairly and accurately disclosing all adverse consequences of redeeming, canceling, lapsing or otherwise withdrawing products or assets from Claimant;

    4.    revealing or disclosing in any manner information contained in the records of Claimant, including the names, addresses or any financial information of any customer of Claimant whom Respondents served or whose name became known to Respondents while they represented Claimant;

is denied, and

American Express Financial Advisors. Inc. vs. E. VonLinge & R. Dawer
Arbitration No. 98-01732
Page 3

B.    The request to order Respondents to return to Claimant any and all materials in their possession
      or control which belong to Claimant or which bear Claimant's name or logos is denied; and

C.    The request to order Respondent to provide Claimant with an accounting of all fees and
      commissions received by them, directly or indirectly, after their termination from Claimant, from
      any of Claimant's customers whom they served or whose name became known to them while they
      represented Claimant is denied; and

D.    The request to order Respondents to segregate all receipts from and to maintain separate accounts
      for, all services performed for and products sold to any person who is or was a customer of
      Claimant whom Respondents served or whose name became known to them while they
      represented Respondent is denied; and

E.    The request to order Respondents to return all copies of Claimant's documents, including all
      customer records, financial plans, financial inventories, and Claimant's computer software, in
      their possession or control is denied; and

F.    The request to order Respondents to remove all of the material referred to in letter E above from
      the hard drives of their computers is denied; and

G.    The request to permit Claimant or its designee to perform an inspection of Respondents'
      computer system(s) and diskettes to ensure that proprietary and/or confidential information
      remains on Respondents' computer system is denied; and

H.    The request for compensatory damages is denied; and

I.    The request for exemplary damages is denied; and

J     The request for attorneys' fees and costs is denied; and

K.    The Request for an order requiring Respondents to pay all Forum Fees in this arbitration is
      denied.


This Interim Order shall remain in effect until such time as an expedited hearing on the merits. Pursuant
to Rule 10335(f) of the Code, is conducted. NASD Regulation will appoint a panel based upon the
pleadings and as specified in the Code to hear the matter on the merits pursuant to a schedule and
procedures specified by the arbitrators.

      Dated this 15th Day of May, 1998.


_Bruce Sanders_ by _Kynor M Frasier_

Bruce Sanders, Esq., Interim Arbitrator Presiding